UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------X
ALLIED IRISH BANKS, p.l.c.                          :

                Plaintiff,          :          03 Civ. 3748 (DAB) (GWG)

    -v.-                                 :          <u>OPINION AND ORDER</u>

BANK OF AMERICA, N.A. and
CITIBANK, N.A.,                                    :

            Defendants              :
-------------------------------------------------------------X
**GABRIEL W. GORENSTEIN, UNITED STATES MAGISTRATE JUDGE**

APPEARANCES OF COUNSEL:

For Plaintiff Allied Irish Banks, p.l.c.:

        Celia Goldwag Barenholtz
        Alan Levine
        Jeffrey Gross
        Jeffrey W. Lang
        Kronish, Lieb, Weiner & Hellman, LLP
        New York, New York

For Defendant Bank of America, N.A.:

        Richard Spehr
        Steven Wolowitz
        Henninger S. Bullock
        Therese Craparo
        Mayer, Brown, Rowe & Maw, LLP
        New York,  New York

For Defendant Citibank, N.A.,

        Thomas J. Moloney
        Howard S. Zelbo
        Tanisha L. Massie
        Abigail S. Hendel
        Cleary Gottlieb Steen & Hamilton
        New York, New York

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------------------------------------X
ALLIED IRISH BANKS, p.l.c.                     :

               Plaintiff,          :          03 Civ. 3748 (DAB) (GWG)

   -v.-                                      :          <u>OPINION AND ORDER</u>

BANK OF AMERICA, N.A. and
CITIBANK, N.A.,                                 :

            Defendants         :
----------------------------------------------------------------X

**GABRIEL W. GORENSTEIN, UNITED STATES MAGISTRATE JUDGE**

     Allied Irish Banks, p.l.c. ("AIB") has sued Citibank, N.A. and Bank of America, N.A. for

claims arising out of a rogue trading scheme perpetrated by one of AIB's traders.  The scheme is

alleged to have resulted in $691 million in losses to AIB.  When the scheme came to light, AIB

hired an independent banking expert and a law firm to investigate the scheme and make

recommendations for changes.  Their report was released to the public.  Citibank and Bank of

America have now moved to compel production of documents generated during the preparation

of the report.  For the reasons stated below, AIB has not shown that these documents are

protected by the attorney-client privilege or constitute attorney work product.  Accordingly,

defendants' motion to compel is granted.

I. <u>BACKGROUND</u>

    A. <u>Facts</u>

     John Rusnak was employed as a foreign currency trader for AIB's United States

subsidiary Allfirst Bank[1] for nine years.  <u>See</u> Report to the Boards of Directors of Allied Irish

---

[1] AIB later sold Allfirst Financial, Inc. to an unrelated party.  Complaint, filed May 23,
2003 (Docket #1), ¶ 7 ("Compl.").

Banks, P.L.C., Allfirst Financial Inc., and Allfirst Bank Concerning Trading Losses (capitalization omitted) ("Report" or "Ludwig Report") (reproduced as Ex. A to Declaration of Tanisha L. Massie In Support Of Citibank, N.A. and Bank Of America's  Motion To Compel Production Of Documents, filed Sept. 15, 2006) ("Massie Decl.") (attached to Notice of Motion to Compel Production of Documents by Citibank, N.A. and Bank of America, N.A.) (Docket #41), at 7 (Rusnak hired in 1993).  During his employment, Rusnak perpetrated a scheme in which he created bogus transactions to disguise losses he had incurred while engaging in foreign exchange trading.  See Declaration of Gregory K. Thoreson, dated Oct. 12, 2006 ("Thoreson Decl.") (attached to Declarations in Support of Plaintiff's Memorandum of Law in Opposition to Defendants' Motion to Compel Production of Documents) (Docket #45) ("Declarations"), ¶ 2; Allied Irish Banks, P.L.C. v. Bank of America, N.A., 2006 WL 278138, at *1-4 (S.D.N.Y. Feb. 2, 2006).  This scheme is alleged to have resulted in $691 million in losses for Allfirst.  Compl. ¶ 1.  That Rusnak had committed a significant fraud became clear to AIB on February 4, 2002. See Thoreson Decl. ¶ 2.  In the days immediately following, both the Central Bank of Ireland and the United States Federal Reserve Board announced that they were launching investigations. See Declaration of Michael Buckley, dated Oct. 6, 2006 ("Buckley Decl.") (attached to Declarations), ¶ 4.

The Federal Bureau of Investigation began a criminal investigation, which included a search for Rusnak.[2]  Buckley Decl. ¶ 3.  Meanwhile, AIB had already begun its own internal

---

[2] Rusnak was eventually indicted for defrauding AIB.  He pled guilty and was sentenced to seven and a half years' imprisonment.  Compl. ¶ 1.

2

investigation, which was conducted by Allfirst and AIB employees, with the help of PriceWaterhouseCoopers.  Thoreson Decl. ¶¶ 3-5.

On February 6, 2002, AIB announced to the public that it was undertaking a "full investigation" of the fraud, that it had reported the fraud to the FBI, and that it had suspended certain high-level managers at Allfirst.  See Press Release, dated Feb. 6, 2002 (reproduced as Ex. E of Massie Decl.) ("Feb. 6 Press Release").  It also indicated that AIB would take a "once off reduction of 596 million [Euros] after tax," but that Allfirst's "capital ratios remain strong by international financial standards."  Id.

The next day, February 7, 2002, AIB issued another press release announcing that the Board of Directors had met that evening and had decided that it would approve "comprehensive terms of reference for the investigation currently underway."  See Press Release, dated Feb. 7, 2002 (reproduced as Ex. F of Massie Decl.) ("Feb. 7 Press Release").  The investigation was to ascertain the facts regarding the foreign trading activities, to describe the policies and controls in place and how they operated, and to make recommendations on "any improvements which may appear necessary or desirable to the policies and controls."  Id.  The Board stated that it would appoint "an eminent person with standing and expertise in the financial services industry" to conduct this investigation and that this person "will be appointed by and report directly to the board on the adequacy and scope of the review and its findings."  Id.  The report was to be presented within 30 days.  Id.

On February 8, 2002, the Group Chief Executive of AIB contacted Eugene A. Ludwig, former Comptroller of the United States Currency, to discuss his potential engagement by AIB for this project.  Buckley Decl. ¶ 10.  During their conversation, it was decided that Ludwig's

consulting firm, Promontory Financial Group ("Promontory") would "jointly investigate" with the law firm of Wachtell, Lipton, Rosen & Katz ("Wachtell").  Id. ¶ 10.

On February 10, 2002, AIB announced to the public that it had appointed an "independent expert" to "direct and report" to the Board on the investigation into the Allfirst losses.  See Press Release, dated Feb. 10, 2002 (reproduced as Ex. G of Massie Decl.) ("Feb. 10 Press Release").  The person identified was Ludwig.  Ludwig was characterized as "an eminent US banking figure," who had been "credited with restoring the financial health of the American national banking system."  Id.  At the time of his appointment, Ludwig was the managing partner of Promontory, a Washington based consulting firm for financial services companies.  See Ex. R. of Reply Declaration Of Tanisha L. Massie In Further Support Of Citibank, N.A. and Bank of America N.A.'s Motion To Compel Production Of Documents, filed Nov. 3, 2006 (Docket #51) ("Massie Reply Decl.").

The terms of Ludwig's engagement required that he "report[] directly to the Board . . ." and conclude the investigation by March 9, 2002.  See Engagement Letter, dated Feb. 8, 2002 (reproduced as Ex. P in Massie Reply Decl.) ("Engagement Letter") (stamped page 645374).  Specifically, the AIB Board explained that the investigation was charged with the following responsibilities:

> (1) Ascertaining the facts concerning the foreign exchange activities in the Treasury Operations of Allfirst Bank which led to the loss referred to in the AIB Stock Exchange Announcement of 6 February 2002; (2) Describing the policies and controls, which applied to those operations during the period in which these activities took place; (3) Reporting on the manner in which such policies and controls operated (or may have failed to operate) in relation to these activities; and (4) Making recommendations on any improvements which appear necessary or desirable to the policies and controls.

Feb. 10 Press Release; see also Engagement Letter (stamped page 645374).

4

The Engagement Letter states that Ludwig would be entitled to retain the assistance of any "legal, accountancy, or other advisory services" as Ludwig deemed necessary.  Engagement Letter (stamped page 645375).  The Engagement Letter also reflects that, at the suggestion of Ludwig, AIB would retain Wachtell to "report to the Board" and to "provide privileged, legal advice on the basis of the joint investigation."  Id.  The hiring of Wachtell was "[o]ne of "[Ludwig's] first recommendations."  See Transcript of AIB Press Conference, dated Mar. 14, 2002 (reproduced as Ex. U of Massie Reply Decl.) ("Press Conf.") (stamped page 623239).  In a sur-reply affidavit, a member of the Wachtell firm asserts that the firm was "retained to provide legal advice to the AIB and Allfirst boards, and to assist the Promontory investigation."  Affidavit of Robert B. Mazur, filed Dec. 5, 2006 (Docket #53) ("Mazur Aff."), ¶ 3.  He further asserts that "[d]uring the course of this engagement, we also provided legal advice to AIB and Allfirst managers . . . ." Id.; see also Buckley Decl. ¶ 10 (purpose of including Wachtell was "so that AIB could receive confidential legal advice, particularly with respect to the likelihood of criminal and regulatory proceedings and potential civil litigation both by and against AIB and/or Allfirst.").  It appears, however, that there was no letter of engagement between the Wachtell firm and AIB.  See Massie Reply Decl. ¶ 3.  Also, neither AIB nor Wachtell has provided any evidence regarding the manner in which Wachtell's purported legal advice was provided to AIB – for example, orally or in writing – or on what dates.

In a February 20, 2002 press release, AIB stated that Ludwig was the "head[]" of the investigation.  Press Release, dated Feb. 20, 2002 (reproduced as Ex. N of Massie Decl.).  In its motion papers, AIB characterizes Wachtell's role as "assist[ing]  in leading the investigation and jointly author[ing] the investigation report with Mr. Ludwig."  Thoreson Decl. ¶ 12.

During the course of the investigation, Ludwig and his company, along with Wachtell, interviewed "approximately 55 present and former employees of AIB and Allfirst" and "reviewed a substantial volume of electronic records and thousands of pages of printed documents."  Report at 1.  This included "thousands of pages of documents, . . . e-mails[,] . . . telephone logs and computerised trading records."  Press Conf. (stamped page 623239). Wachtell lawyers "worked closely with Promontory" and "communicated on a daily basis with Mr. Ludwig" and other Promontory personnel.  Mazur Decl. ¶ 4.  AIB states that Wachtell personnel  "attended" the witness interviews, Thoreson Decl. ¶ 13, though it does not state that Wachtell personnel conducted any of the questioning.

On March 12, 2002, the final draft of the Report was presented to the AIB Board. Thoreson Decl. ¶ 16.  The Report indicates that it was submitted by "Promontory Financial Group and [Wachtell]."  See Ludwig Report at i, 1.  A day later, AIB publicly released the Report, see Thoreson Decl. ¶ 16, and on March 15, 2002, filed it with the Securities and Exchange Commission as part of Allfirst's Form 8-K.  See Form 8-K (reproduced Ex. H of Massie Decl.).  The Report contained, inter alia, the following finding: although Rusnak was "the principal culprit behind the[] losses, . . . there was a major breakdown in controls, and in particular by Rusnak's immediate superiors in the Treasury Section."  Press Conf. (stamped page 623237).  It ended with a series of recommendations, including reconsideration of AIB's business strategy in the trading areas, a review of its risk management architecture, and improvements in the control environment.  See Ludwig Report at 46-56.  AIB's board "fully accept[ed]," the Report's conclusions and "adopt[ed] those recommendations."  See Press Release, dated Mar. 14, 2002 (reproduced as Ex. I of Massie Decl.) ("Mar. 14 Press Release"), at

6

2; Press Conf. (stamped page 623241). AIB fired six individuals and accepted the resignation of two others. Mar. 14 Press Release at 3. Thereafter, the board implemented changes to its strategy, structure and corporate governance. Id. at 4-6.

At a press conference held on March 14, 2002 to announce the Report's findings, AIB executives were joined by Ludwig and a Promontory executive – though not Wachtell. See Press. Conf. The AIB Chairman announced that it was the "priority of our board" to build value for AIB shareholders "[a]nd [of] course after this event in Baltimore, to restore the confidence of customers and employees." Press Conf. (stamped page 623236). Ludwig discussed the circumstances under which he had been commissioned to do the report. He indicated that the AIB Chairman had told him that the report had to be completed within 30 days because "it was in the best interests of the board, AIB shareholders, customers and the communities that AIB serves, to know as much as possible about this loss and the circumstances surrounding it in as short a period as possible." Id. (stamped page 623239).

B. The Documents at Issue in this Motion

The defendants have filed a joint motion to compel production of the documents underlying the creation of Ludwig's report.[3] Essentially, the defendants seek the documents that

_____

[3] The following papers relate to the briefing on this motion: Notice of Motion to Compel Production by Citibank, N.A. and Bank of America, N.A., filed Sept. 15, 2006 (Docket #41) ("Def. Notice of Motion"); Memorandum of Law in Support of Citibank, N.A. and Bank of America, N.A.'s Motion to Compel Production of Documents, filed Sept. 15, 2006 (Docket #42) ("Def. Mem."); Massie Decl. (attached to Def. Notice of Motion); Declaration of Henniger S. Bullock, filed Sept. 15, 2006 (attached to Def. Notice of Motion.) ("Bullock Decl."); Plaintiff's Memorandum of Law in Opposition To Defendants' Motion to Compel Production of Documents, filed Oct. 13, 2006 (Docket #44) ("Pl. Mem."); Buckley Decl.; Thoreson Decl.; Declaration of Jeffrey E. Gross, filed on Oct. 13, 2006 (Docket #45) ("Gross Decl.") (attached to Declarations); Citibank, N.A.'s Reply Memorandum of Law in Further Support of Citibank, N.A. and Bank of America, N.A.'s Motion to Compel Production, filed Nov. 3 , 2006 (Docket

were created in the course of preparing the Ludwig Report or reviewed in the course of preparing

the Report, including, for example, notes of witness interviews and drafts of the Report.[4]  See

Def. Mem. at 6.  Bank of America has limited its request to the "factual documents generated

during the investigation," and thus excludes "any legal analysis undertaken by Promontory or

Wachtell."  Bank of America Reply Mem. at 5.  AIB opposes production on the grounds that the

documents are protected by both the attorney-client privilege and the work product doctrine.

## II.  DISCUSSION

### A.  Attorney-Client Privilege

#### 1.  Choice of Law

Because this Court's subject matter jurisdiction is based upon diversity, see Compl. ¶ 10 ,

state law provides the rule of decision concerning the claim of attorney-client privilege.  See

Fed. R. Evid. 501; Dixon v. 80 Pine St. Corp., 516 F.2d 1278, 1280 (2d Cir. 1975).  AIB asserts

that there is "no need to decide whether New York or Maryland law controls this issue because

there is no substantive difference in the two States' laws." Pl. Mem. at 11 n.11.  The defendants

do not address the choice-of-law issue, but cite to New York cases.  See Def. Mem. at 5-8.  In

these circumstances, the parties have implicitly consented to having New York privilege law

apply and this "'implied consent . . . is sufficient to establish choice of law'" on the privilege

---

#50) (Citibank Reply Mem.).; Bank of America's Reply Memorandum of Law in Further
Support of Defendants' Motion to Compel Production of the Ludwig Documents, filed Nov. 3,
2006 (Docket #48) ("Bank of America Reply Mem."); Sur-Reply Declaration of Jeffrey E.
Gross, filed Dec. 5, 2006 (Docket #54); Mazur Aff.; Letter from AIB, dated Dec. 4, 2006 ("Sur-
Reply Letter").

[4] The motion also requested documents relating to AIB's "internal controls."  Def. Mem.
at 15-17.  The Court disposed of this request at a December 11, 2006 conference.

question.  Krumme v. WestPoint Stevens Inc., 238 F.3d 133, 138 (2d Cir. 2000) (quoting

Tehran-Berkeley Civil & Envtl. Eng'rs v. Tippetts-Abbett-McCarthy-Stratton, 888 F.2d 239, 242

(2d Cir. 1989)).

       2.  The Attorney-Client Privilege Under New York Law

"The attorney-client privilege is the oldest of the privileges for confidential

communications known to the common law."  Upjohn Co. v. United States, 449 U.S. 383, 389

(1981) (citation omitted).  In New York, the statutory codification of the privilege is as follows:

> [A]n attorney or his or her employee, or any person who obtains without the knowledge
> of the client evidence of a confidential communication made between the attorney or his
> or her employee and the client in the course of professional employment, shall not
> disclose, or be allowed to disclose such communication, nor shall the client be
> compelled to disclose such communication . . . .

N.Y.C.P.L.R. 4503(a)(1).  For the privilege to apply, the communication from attorney to client

must be made "for the purpose of facilitating the rendition of legal advice or services, in the

course of a professional relationship."  Rossi v. Blue Cross & Blue Shield, 73 N.Y.2d 588

(1989).  The communication itself must be "primarily or predominantly of a legal character."  Id.

at 594; accord Spectrum Sys. Int'l Corp. v. Chem. Bank, 78 N.Y.2d 371, 378-380 (1991).  "The

critical inquiry is whether, viewing the lawyer's communication in its full content and context, it

was made in order to render legal advice or services to the client."  Spectrum Sys. Int'l. Corp.,

78 N.Y.2d at 379.

The proponent of the privilege has the burden of establishing that the information was a

communication between client and counsel, that it was intended to be and was kept confidential,

and it was made in order to assist in obtaining or providing legal advice or services to the client.

See, e.g., Charter One Bank, F.S.B. v. Midtown Rochester, L.L.C., 191 Misc.2d 154 (Sup. Ct.

2002); accord People v. Mitchell, 58 N.Y.2d 368, 373 (1983) (citing cases). A communication between an attorney and the agent or employee of a corporation may be privileged where the agent "possessed the information needed by the corporation's attorneys in order to render informed legal advice." In re Copper Mkt. Antitrust Litig., 200 F.R.D. 213, 218 (S.D.N.Y. 2001) (citing Upjohn, 449 U.S. at 391).

Additionally, the party claiming the privilege bears the burden of establishing that it has not been waived. See, e.g, John Blair Commc'ns, Inc. v. Reliance Capital Group, 182 A.D.2d 578, 579 (1st Dep't 1992). "Generally, communications made between a defendant and counsel in the known presence of a third party are not privileged." People v. Osorio, 75 N.Y.2d 80, 84 (1989) (citing cases). Rather, "[d]isclosure of attorney-client communication to a third party, who is not an agent or employee of counsel, or communications with an attorney in the presence of a third party vitiates the confidentiality required for asserting the privilege." Delta Fin. Corp. v. Morrison, 13 Misc.3d 441 (Sup. Ct. 2006). An exception exists where, "communications [are] made to counsel through a hired interpreter, or one serving as an agent of either attorney or client to facilitate communication." Osorio, 75 N.Y.2d at 84.

"The scope of the privilege is not defined by the third parties' employment or function, however; it depends on whether the client had a reasonable expectation of confidentiality under the circumstances." Id. In addition, for such third party disclosures to receive continued protection, "disclosure to [the] third party. . . [must be] necessary for the client to obtain informed legal advice." Nat'l Educ. Training Group, Inc. v. Skillsoft Corp., 1999 WL 378337, at *4 (S.D.N.Y. June 10, 1999) (citing cases). "The available case law indicates that the 'necessity' element means more than just useful and convenient, but rather requires that the involvement of

10

the third party be nearly indispensable or serve some specialized purpose in facilitating the attorney-client communications." Id. Thus, where the third party's presence is merely "useful" but not "necessary," the privilege is lost. Id. at *5.

       3.  Analysis

AIB identifies three categories of documents that it contends are protected by the attorney-client privilege: "[d]rafts of the Ludwig Report shared with Allfirst and AIB employees, memos of Wachtell's investigation interviews, [and] reports of attorney communications with the banks' Board of Directors." Pl. Mem. at 11-12.[5] It argues that these documents "reflect confidential communications with counsel for the purpose of obtaining legal advice about regulatory and other legal matters, including potential ligation." Pl. Mem. at 12. It adds that it was "necessary for Wachtell to communicate with Mr. Ludwig to enable Wachtell to provide legal advice to AIB." Sur-Reply Letter.

AIB's showing is inadequate to invoke the attorney-client privilege for two independent reasons. First, AIB has not met its burden of showing that the materials at issue were "primarily or predominantly of a legal character." Rossi, 73 N.Y.2d at 588. The only evidence as to whether legal representation was actually provided to AIB consists of the single statement of the Wachtell lawyer that "[d]uring the course of [Wachtell's] engagement, we also provided legal advice to AIB and Allfirst managers . . . ." Mazur Aff. ¶ 3. With only this statement, the Court is left to speculate as to when, where, how, to whom, and in what manner the purported legal advice was provided to AIB. The only document attributable in any form to Wachtell personnel

---

    [5] It also asserts that "other applicable documents" are covered by the privilege, id. at 11, but because it fails to identify these documents, it cannot meet its burden of showing the privilege's applicability.

that was also presented to AIB is the Ludwig Report itself, which does not reflect the provision of legal advice.  Indeed, AIB does not even argue that it does.  Thus, there is ample evidence to show that at least two categories of documents – the drafts of the Ludwig Report and the memoranda of Wachtell's investigation interviews – were not prepared "primarily" or "predominantly" for the purpose of providing legal advice.  Rather, they were prepared for the purpose of generating the Report, which indisputably did not provide legal advice.

Even if there existed some uncited communication between Wachtell and AIB containing legal advice, AIB provides no information as to what the relationship was between the documents sought by defendants and that purported legal advice.  Inasmuch as AIB has the burden of demonstrating the applicability of the privilege, it has not met that burden here.

The assertion of privilege must be denied for an independent reason: AIB has not met its burden of showing that any privilege was not waived.  AIB makes no claim that any of the documents at issue were not shared with Ludwig or other Promontory personnel.  Indeed, AIB asserted at the time of the engagement of Ludwig that he would "direct" the investigation.  See Feb. 10 Press Release; accord Thoreson Decl. ¶ 12 (Ludwig was to "lead" the investigation).  Accordingly, there is no factual record to support any claim that Ludwig was acting merely as an agent or employee of Wachtell in Wachtell's purported provision of legal advice to AIB.  Nor is there any basis on which to conclude that Ludwig's presence was "necessary" for the provision of legal advice, as an interpreter's presence might be.  Courts routinely find waiver where otherwise attorney-client privileged materials are shared with outsiders to whom privileged materials were shown unnecessarily.  See, e.g., Delta Fin Corp., 13 Misc.3d at 445-50 (accountant); Stenovich v. Wachtell, Lipton, Rosen & Katz, 195 Misc.2d 99 (Sup. Ct. 2003)

(investment banks); see also Haugh v. Schroeder Inv. Mgmt. N. Am. Inc., 2003 WL 21998674
(S.D.N.Y. Aug. 25, 2003) (public relations consultant) (construing federal law).

AIB cites to United States v. Kovel, 296 F.2d 918 (2d Cir. 1961), in support of its
position that there has been no waiver of any privilege. See Sur-Reply Letter. Kovel held that
the attorney-client privilege would not be waived in circumstances where a "lawyer ha[d]
directed the client . . . to tell his story in the first instance to an accountant engaged by the
lawyer, who [was] then to interpret it so that the lawyer may better give legal advice." 296 F.3d
at 922. Kovel has no applicability here. Wachtell did not retain Ludwig at all, let alone retain
him for the purpose of assisting Wachtell in providing legal advice. Rather, AIB retained
Ludwig to "head[]" an investigation, see Feb. 20 Press Release, and then retained the attorneys
to "assist" him. See Thoreson Decl. ¶ 12 (AIB retained Wachtell to "assist in leading the
investigation and jointly author the investigation report with Mr. Ludwig"). Because Ludwig
"was not [acting] as a translator or interpreter of client communications, the principle of Kovel
does not shield his discussions" with Wachtell. United States v. Ackert, 169 F.3d 136, 140 (2d
Cir. 1999). As the court in Ackert noted, "a communication between an attorney and a third
party does not become shielded by the attorney-client privilege solely because the
communication proves important to the attorney's ability to represent the client." Id. at 140.

In sum, AIB has not met its burden of showing the applicability of the attorney-client
privilege to any of the materials at issue. Nor has it met its burden of showing that any privilege
has not been waived.

_____   B.  Work Product Doctrine

1.  Law Governing the Work Product Doctrine

While state law governs the question of attorney-client privilege in a diversity action, federal law governs the applicability of the work product doctrine.  See, e.g., Weber v. Paduano, 2003 WL 161340, at *3 (S.D.N.Y. Jan. 22, 2003) (citing cases).  The work product doctrine is codified in Fed. R. Civ. P. 26(b)(3), which provides that a party is not entitled to obtain discovery of "documents and tangible things . . . prepared in anticipation of litigation or for trial by or for another party or by or for that other party's representative" unless a showing of substantial need and lack of undue hardship is made.  The doctrine "is intended to preserve a zone of privacy in which a lawyer can prepare and develop legal theories and strategy 'with an eye towards litigation,' free from unnecessary intrusion by his adversaries."  United States v. Adlman, 134 F.3d 1194, 1196 (2d Cir. 1998) (quoting Hickman v. Taylor, 329 U.S. 495, 510-11 (1947)); accord In re Grand Jury Subpoenas Dated March 19, 2002 and August 2, 2002, 318 F.3d 379, 383-84 (2d Cir. 2003).  Though the work product doctrine protects both factual and opinion work product, the latter – defined as "the attorney's mental process," Adlman, 134 F.3d at 1197 – is considered to be "[a]t [the] core" of the doctrine, United States v. Nobles, 422 U.S. 225, 238 (1975), and "receive[s] special protection not accorded to factual material."  Adlman, 134 F.3d at 1197.

The party asserting work product protection "bears the burden of establishing its applicability to the case at hand."  In re Grand Jury Subpoenas, 318 F.3d at 384 (citing cases).  This includes demonstrating that the doctrine applies and that it has not been waived.  See, e.g., RLS Assocs., LLC v. United Bank of Kuwait, PLC, 2003 WL 1563330, at *3 (S.D.N.Y. Mar. 26,

14

2003); Bank of America, N.A. v. Terra Nova Ins. Co., 212 F.R.D. 166, 169 (S.D.N.Y. 2002);

Resolution Trust Corp. v. Mass. Mut. Life Ins. Co., 200 F.R.D. 183, 188 (W.D.N.Y. 2001).  The

burden is a "heavy one," In re Grand Jury Subpoenas, 318 F.3d at 384.

"'[T]hree conditions must be met to earn work product protection.  The material must (1)

be a document or a tangible thing, (2) that was prepared in anticipation of litigation, and (3) was

prepared by or for a party, or by his representative.'"  A.I.A. Holdings, S.A. v. Lehman Bros.,

Inc., 2002 WL 31556382, at *4 (S.D.N.Y. Nov. 15, 2002) (quoting In re Grand Jury Subpoenas

Dated December 18, 1981 & January 4, 1982, 561 F. Supp. 1247, 1257 (E.D.N.Y. 1982))

(citations omitted); accord SR Int'l Bus. Ins. Co., Ltd. v. World Trade Ctr. Props., LLC, 2002

WL 1455346, at *2 (S.D.N.Y. July 3, 2002) (citation omitted).  The dispute in this case focuses

on the second element: whether the documents at issue were prepared "in anticipation of

litigation."

### 2.  In Anticipation of Litigation

A document is prepared in anticipation of litigation if "'in light of the nature of the

document and the factual situation in the particular case, [it] can fairly be said to have been

prepared or obtained because of the prospect of litigation.'"  Adlman, 134 F.3d at 1202

(emphasis in original) (quoting 8 Charles Alan Wright, Arthur R. Miller, and Richard L. Marcus,

Federal Practice and Procedure § 2024, at 343 (1994)).  Adlman established that documents

prepared both for litigation and business purposes may be protected under Rule 26(b)(3).

Adlman, 134 F.3d at 1195.  Whether there is work product protection turns on whether the

material "would have been prepared irrespective of the expected litigation . . . ."  Id. at 1204.

Indeed, even where "[t]here is little doubt under the evidence that [a party] had the prospect of

litigation in mind when it directed the preparation of the [document] . . .," id. at 1204, or that "such documents might [also] help in preparation for litigation," id. at 1202, work product protection is not available for documents "that are prepared in the ordinary course of business or that would have been created in essentially similar form irrespective of litigation." Id.; accord Int'l Design Concepts v. Saks Inc., 2006 WL 1564684, at *1 (S.D.N.Y. June 6, 2006); Gulf Islands Leasing, Inc. v. Bombardier Capital, Inc., 215 F.R.D. 466, 474-75 (S.D.N.Y. 2003); Stephenson Equity Co.. v. Credit Bancorp, Ltd., 2002 WL 59418, at *2 (S.D.N.Y. Jan. 16, 2002).

   3.  Analysis

  There is no doubt that as soon as AIB learned of Rusnak's illegal activities, it believed that litigation would result.  AIB's in-house counsel expected that "there would be litigation in connection with employees who were suspended in connection with the fraud" and that "shareholder litigation was likely."  Thoreson Decl. ¶ 9; see also Buckley Decl. ¶¶ 4-6, 12. Given the extensive losses to AIB in the wake of a huge trading fraud, AIB's belief that litigation would ensue was certainly reasonable.

  The question under Adlman, however, is not merely whether AIB contemplated litigation when it generated the materials at issue, but rather whether these materials "would have been prepared in essentially similar form irrespective of litigation." 134 F.3d at 1204.

  To answer this question, we first consider whether there existed any reasons other than the anticipation of litigation for generating the materials.  That issue is easily resolved here inasmuch as AIB concedes the point and the contemporaneous evidence is overwhelming. AIB's Group Chief Executive states that AIB commissioned the Report "for several reasons" including "the fundamental need to understand how, why and when the losses occurred and who

was responsible for helping cause or cover up the losses." Buckley Decl. ¶ 12.  The Group Chief

Executive states further that, in addition to its interest in obtaining legal advice concerning

litigation, AIB "wanted to address the concerns of AIB's customers, shareholders, creditors, and

the media . . . ." Id.  More succinctly, he states that AIB had "business-related purposes" in

generating the materials.  Id.; accord Pl. Mem. at 3 ("business reasons" compelled the

commissioning of the Report).

      Having concluded that there existed a non-litigation purpose for the generation of the

Ludwig Report and the underlying documents, the next question to be answered is whether these

documents "would have been created in substantially similar form" based on this non-litigation

purpose.  Adlman, 134 F.3d at 1203.  This question requires us to consider what "would have"

happened had there been no litigation threat – that is, whether AIB "would have" generated these

documents if it were acting solely for its "business-related purposes."

      As a general rule, it is not easy for a factfinder to determine what "would have" happened

in some hypothetical situation – and it is particularly difficult here inasmuch as it is impossible

even to imagine a scenario involving a multi-million dollar fraud that does not include the

potential for litigation.  Nonetheless, this is the question that the Adlman test requires us to

answer and it is an exercise that courts have regularly performed.  See, e.g., DeBeers LV

Trademark Ltd. v. DeBeers Diamond Syndicate Inc., 2006 WL 357825, at * 1 (S.D.N.Y. Feb. 15,

2006) (documents created by management consultant not work product where consultant "would

have created" them in similar form "even if the potential for litigation had been remote"); MSF

Holding Ltd. v. Fiduciary Trust Co. Int'l, 2005 WL 3046287, at *2 (S.D.N.Y. Dec. 10, 2005) (e-

mail not work product where no showing was made that it "would not have been prepared

without the threat of litigation"); In re Otal Invs. Ltd. v. Capital Bank Pub. Ltd. Co., 2005 WL 1473925, at *1 (S.D.N.Y. June 22, 2005) (factual statement prepared following collision of boats not work product where "business reasons for obtaining a statement from their captain" would have compelled the report regardless of litigation); Verizon Directories Corp. v. Yellow Book USA, Inc., 2004 WL 4054842, at * 2 (E.D.N.Y. July 22, 2004) (e-mail released where no showing was made that it would not have been created in essentially similar form irrespective of the litigation); see also In re Leslie Fay Cos. Inc. Sec. Litig., 161 F.R.D. 274, 281 (S.D.N.Y. 1995) (pre-Adlman case finding no work product protection because "had there been no ongoing or anticipated litigation, [the company] would have conducted an investigation anyway").

Notably, AIB does not attempt to provide a witness to attest to the question of what AIB "would have" done had there been no threat of litigation, although it is a point on which AIB potentially could offer testimony.  Nor has anyone from AIB affirmatively asserted that the Report and its underlying materials would not have been commissioned had there been no potential for litigation.  These lacunae certainly militate against recognizing work product protection.  See, e.g., United States Fid. & Guar. Co. v. Braspetro Oil Servs. Co., 2000 WL 744369, at *9 (S.D.N.Y. June 4, 2000) (rejecting claim of work product protection where plaintiff "failed to offer any evidence . . . indicating that it hired [the investigating attorney] solely because of anticipated litigation").  But there are good reasons why AIB apparently found itself unable to make these attestations.  All of the circumstances surrounding the creation of the Report point to the ineluctable conclusion that AIB would have prepared the Report, along with the materials used to generate it, simply because of its "business-related purposes" – that is, regardless of the potential for litigation.

First, the fact that the investigation was announced to the press demonstrates that there were critical public accountability concerns that motivated the commissioning of the Report and, as a result, the creation of the underlying investigatory documents.  Within a week of discovering the fraud, AIB issued three press releases announcing the investigation.  <u>See</u> Press Releases, dated Feb. 6, 7, and 10, 2002.  AIB touted Ludwig as an "independent" voice, Feb. 7, 2002 Press Release, and hoped his appointment would give people both inside and "outside the bank real confidence in the report."  E-mail from Taylor Foss, dated Feb. 12, 2002 (reproduced as Ex. Q of Massie Reply Decl. at 879).  Having just discovered a major fraud resulting in a loss of millions of  dollars, AIB needed to reassure the public that "[t]he Group's underlying business and profitability momentum is not impaired by this once-off blow," Feb. 6, Press Release, and that "[its] capital adequacy continues to be strong."  <u>See</u> Feb. 7 Press Release.  This public relations effort was particularly important given that Allfirst "wished to minimize [the] adverse effects" of the ongoing governmental investigations.  Thoreson Decl. ¶ 7.  When Ludwig discussed the circumstances under which he had been commissioned to do the report, he stated that the AIB Chairman had told him that the report had to be completed within 30 days because "it was in the best interests of the board, AIB shareholders, customers and the communities that AIB serves, to know as much as possible about this loss and the circumstances surrounding it in as short a period as possible."  Press Conf. (stamped page 6233239).  The Chairman also voiced his concern that the company had to act to build value for AIB "shareholders" and to "to restore the confidence of customers and employees."  <u>Id.</u> (stamped page 623236).

Second, the business reasons for the preparation of the Report figure prominently in the initial commissioning of the investigation.  AIB's Engagement Letter with Ludwig says nothing

about litigation.  Rather, in addition to seeking an investigation of factual matters, including how AIB's internal policies and controls operated or failed to operate, the Engagement Leter asks that Ludwig "make recommendations on any improvements which appear necessary or desirable to the [internal] policies and controls."  Engagement Letter (stamped page 645374).  Such recommendations have nothing to do with any need to prepare for litigation and AIB's desire for them alone would have required the same painstaking investigation as the one conducted by Ludwig and Wachtell.

This conclusion is supported by the fact that the Report itself contains no suggestion that it was engendered by any concern about litigation.  Rather, the Report explains that its purpose was "to advise the Boards of Directors of [AIB] and Allfirst . . . with respect to losses sustained by Allfirst Financial Inc. and Allfirst Bank . . . in foreign exchange trading."  Report at 1.  The Report defines its scope with reference to the "questions that [the Board] . . . referred to us for our review," id., none of which reveal its litigation concerns.  Indeed, nowhere in the Report are AIB's litigation concerns adverted to explicitly or implicitly.

Third, the use to which the Report was ultimately put provides further evidence of why it would have been generated in the same manner irrespective of the potential for litigation. According to AIB's Group Chief Executive, the AIB board intended the Report to be used to "address[] culpability, accountability, control systems and organizational issues."  Buckley Decl. ¶ 6.  As noted, the Board publicly fired six individuals identified in the Report as "directly responsible for oversight of Mr. Rusnak . . . ."  Mar. 14 Press Release at 3.  "[C]onsistent with the findings and recommendations of the report," id. at 4, the Board also adopted a series of "organisational changes," id., to its "strategy and group structure" as well as to its corporate

governance.  Id. at 6.  These actions evidence the importance of the role of Ludwig investigation as a corporate management tool, not as a mechanism to assist in expected litigation.

In sum, AIB needed Ludwig's Report to provide an appropriate public response to the fraud and apparent mismanagement that had been committed.  As one court noted in remarkably similar circumstances, AIB's concern about its perception as a viable company "could not be addressed merely by hiring a team of attorneys to litigate the complex factual and legal issues, in the hope that [the company] would eventually be vindicated."  In re Kidder Peabody Sec. Litig., 168 F.R.D. 459, 465 (S.D.N.Y. 1996).

Not only do AIB's witnesses fail to address the issue of whether the Report's underlying materials would have been created in the absence of litigation, its memorandum of law virtually ignores the critical Adlman test.  Its only mention comes in a single footnote in which AIB characterizes the argument that the interview notes would have taken "similar form absent litigation" as "without merit."  Pl. Mem. at 11 n.10.  No further explanation is provided.  The one case AIB cites to support this statement, United States v. Stewart, 287 F. Supp. 2d 461, 468 (S.D.N.Y. 2003), is irrelevant as the court in Stewart merely concluded that the Adlman test had not been met where an individual under criminal investigation prepared a factual summary of her alleged crime for her attorney.   It did not hold, as AIB seems to suggest, that a party can never show that factual material would have been prepared irrespective of expected litigation.[6]

---

[6] To the extent AIB means to suggest that the Adlman test applies only to "opinion" work product rather than "factual" work product, such an argument is of no help to AIB inasmuch as the only alternative to the Adlman test – an inquiry into whether the documents were prepared "primarily or exclusively to assist in litigation," 134 F.3d at 1198 – would also require disclosure of the documents.

Other cases cited by AIB in its brief are also consistent with the result reached here.  In In re Woolworth Corp Sec. Class Action Litig., 1996 WL 306576 (S.D.N.Y. June 7, 1996), a law firm was engaged to conduct an investigation and negotiate with regulatory authorities.  Id. at *1.  A class action lawsuit was filed the day after firm was retained.  Id.  There was no suggestion of any business purpose behind the engagement of the law firm.  Thus, the court made no determination as to whether the documents at issue would have been prepared in the absence of litigation.  In Granite Partners v. Bear, Stearns & Co. Inc., 184 F.R.D. 49 (S.D.N.Y. 1999), the court did not even reach the question of whether the materials would have been created in the absence of a litigation purpose, but decided the case based on waiver grounds.  See id. at 54.

The Kidder case, by contrast, is particularly instructive here.  168 F.R.D. 459.  Kidder Peabody, a large financial institution, discovered that a rogue trader had caused it to suffer hundreds of millions of dollars in losses.  Kidder engaged a law firm to represent it in expected litigation and also asked the firm to investigate the fraud and prepare a report.  Kidder made public pronouncements that it had done so, focusing on the fact that it had hired "independent" counsel to investigate, "to determine who was responsible and to make recommendations to Kidder for corrective action."  Id. at 466.  Kidder, like AIB, ultimately released the report to the public.  Id. at 464.  In ordering release of investigative materials used to generate the report, Kidder accepted that the law firm had been retained to represent Kidder in litigation and that the investigative materials were necessary for such representation.  But because Kidder was threatened not only with litigation but also with a "major business crisis," the court concluded that Kidder "would have hired outside counsel to perform such an inquiry even if no litigation had been threatened at the time."  Kidder, 168 F.R.D. at 465.  Kidder applied a test later rejected

by the Second Circuit in <u>Adlman</u>: that is, whether the requested documents were "principally or exclusively" created for use in litigation.  <u>Id.</u> at 462; <u>Adlman</u>, 134 F.3d at 1198.  <u>Kidder</u> is relevant, however, not for its application of this test but rather for the factual inference it drew based on circumstances remarkably similar to the instant case.  If anything, Kidder had a stronger claim to work product protection than AIB does here since the law firm in <u>Kidder</u>, unlike Wachtell, had been retained for the purpose of defending Kidder in litigation.

That AIB hired a law firm to "assist" in the investigation is of no moment.  As was aptly stated in <u>United States Fid. & Guar. Co.</u>, "[s]imply because an attorney participated in and supervised [an investigation] does not transform investigative documents into work product." 2000 WL 744369, at *12; <u>accord</u> <u>OneBeacon Ins. Co. v. Forman Int'l, Ltd.</u>, 2006 WL 3771010, at *5 (S.D.N.Y. Dec. 15, 2006) ("Investigatory reports and materials are not protected by the attorney-client privilege or the work-product doctrine merely because they are provided to, or prepared by, counsel.").  A party may not "insulate itself from discovery by hiring an attorney to conduct" an investigation that would otherwise not be accorded work product protection.  <u>United States Fidelity & Guaranty Co.</u>, 2000 WL 744369, at *9.  Of course, if AIB could point to any particular documents authored by Wachtell that were "specifically directed to litigation strategy or possible litigation defenses; under <u>Adlman</u>, these [documents] would fall within work product protection, because they would not have been produced in the same form irrespective of the threat of litigation."  <u>Id.</u> at *12.  No such showing has been made, however.

In sum, AIB has not met its burden of showing that the materials sought by defendants are protected by the work product doctrine.

<u>Conclusion</u>

Defendants' motion to compel is granted.

Dated: January 23, 2007
       New York, New York

_____
GABRIEL W. GORENSTEIN
United States Magistrate Judge

<u>Conclusion</u>

Defendants' motion to compel is granted.

Dated: January 22, 2007
     New York, New York

                                      GABRIEL W. GORENSTEIN
                                      United States Magistrate Judge