UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------------ X
                                                                    :
ALLIED IRISH BANKS, p.l.c.,                                         :     No. 03 Civ. 3748 (DAB) (GWG)
                                                                    :
                        Plaintiff,                                  :
                                                                    :
                v.                                                  :
                                                                    :
BANK OF AMERICA, N.A. and                                           :
CITIBANK, N.A.,                                                     :
                                                                    :
                        Defendants.                                 :
------------------------------------------------------------------ X
                                                                    :
BANK OF AMERICA, N.A. and CITIBANK, N.A.,                           :
                                                                    :
                Counterclaim and Third-Party Plaintiffs,            :
                                                                    :
                v.                                                  :
                                                                    :
ALLIED IRISH BANKS, p.l.c.,                                         :
                                                                    :
                Counterclaim-Defendant,                             :
                                                                    :
                and                                                 :
                                                                    :
M&T BANK CORPORATION and MANUFACTURERS :
AND TRADERS TRUST COMPANY,                                          :
                                                                    :
                Third-Party Defendants.                             :
                                                                    :
------------------------------------------------------------------ X

## MEMORANDUM OF LAW IN SUPPORT OF CITIBANK N.A.'S MOTION TO STRIKE ALLIED IRISH BANKS, P.L.C.'S DEMAND FOR TRIAL BY JURY

## <u>TABLE OF CONTENTS</u>

| | Page |
|---|---|
| **PRELIMINARY STATEMENT** | 1 |
| **BACKGROUND** | 5 |
| A. The Claim In This Action | 5 |
| B. AIB's Jury Demand | 8 |
| C. The Contractual Agreements Between Citibank and Allfirst | 8 |
| 1. The IFEMA | 8 |
| 2. The Prime Brokerage Agreement | 11 |
| **ARGUMENT** | 12 |
| **AIB HAS NO RIGHT TO A JURY TRIAL IN THIS CASE** | 12 |
| A. Allfirst's Jury Trial Waivers Cover All Of the Claims Between Citibank And AIB | 12 |
| 1. The IFEMA | 13 |
| 2. The Prime Brokerage Agreement | 20 |
| 3. AIB Has No Right To A Jury With Respect To Its Equitable Claims.. | 25 |
| B. Allfirst Knowingly And Voluntarily Waived Its Right To A Jury Trial | 26 |
| 1. Allfirst Was An Active Participant In the Negotiation Of Both Agreements | 27 |
| 2. The Waivers Were Conspicuous | 30 |
| 3. Allfirst And Citibank Had Comparable Bargaining Power | 32 |
| 4. Allfirst Was An Experienced And Sophisticated Institution | 33 |
| **CONCLUSION** | 34 |

## TABLE OF AUTHORITIES

**Page(s)**

<u>**Cases**</u>

<u>Allied Irish Banks v. Bank of America, N.A.</u>,
No. 03 Civ. 3748 (DAB), 2006 WL 278138 (S.D.N.Y. Feb. 2, 2006) ............................... 5

<u>Am. Equities Grp., Inc. v. Ahava Dairy Prods. Corp.</u>,
No. 01 Civ. 5207 (RWS), 2007 WL 4563487 (S.D.N.Y. Dec. 18, 2007) ......................... <u>passim</u>

<u>Bank of China v. NBM L.L.C.</u>,
No. 01 Civ. 0815 (DC), 2002 WL 1072235 (S.D.N.Y. May 28, 2002).............................. 30,31

<u>Bear, Stearns Funding, Inc., v. Interface Group-Nevada, Inc.</u>,
No. 03 Civ. 8259 (CSH), 2007 WL 3286645 (S.D.N.Y. Nov. 7, 2007)............................. 26, 27, 32

<u>Borden, Inc. v. Manhattan Magazine, Inc.</u>,
No. 91 Civ. 1103 (DC), 1995 WL 640588 (S.D.N.Y. Oct. 31, 1995) ................................ 24

<u>Brown v. Cushman & Wakefield, Inc.</u>,
235 F. Supp. 2d 291 (S.D.N.Y. 2002)................................................................................. 13, 24

<u>C.D. of NYC Inc. v. U.S. Postal Serv.</u>,
No. 03 Civ. 5055 (JFK), 2004 WL 2072032 (S.D.N.Y. Sept. 16, 2004)............................ 25

<u>Curtis Ctr. Ltd. P'ship v. Sumitomo Trust & Banking Co., Ltd.</u>,
No. Civ. A. 95-1465 (JPF), 1995 WL 365411 (E.D. Penn. June 15, 1995) ....................... 13, 24-25

<u>F.D.I.C. v. Sextant Dev. Corp.</u>,
142 F.R.D. 55 (D. Conn. 1992)........................................................................................... 26

<u>Granfinanciera, S.A. v. Nordberg</u>,
492 U.S. 33 (1989).............................................................................................................. 25

<u>Hatco Corp. v. W.R. Grace & Co.-Conn.</u>,
59 F.3d 400 (3rd Cir. 1995) ............................................................................................... 26

<u>In re Actrade Fin. Tech. Ltd.</u>,
No. 05-03657 (ALG), 2007 WL 1791687 (Bankr. S.D.N.Y. June 20, 2007)...................... 12-13, 24-25

<u>In re Daimlerchrysler AG Sec. Litig. Trancinda Corp.</u>,
No. Civ. A. 00-993 (JJF), 2003 WL 22769051 (D. Del. Nov. 19, 2003) ........................... 13

<u>In re Kolinsky</u>,
110 B.R. 128 (Bankr. S.D.N.Y. 1990) ................................................................................ 25

i

Morgan Guar. Trust Co. of N.Y. v. Crane,
36 F. Supp. 2d 602 (S.D.N.Y. 1999)...................................................................26, 27, 32, 33

N. Feldman & Son, Ltd. v. Checker Motors Corp.,
572 F. Supp. 310 (S.D.N.Y. 1983) ........................................................................    29

Nat'l Equip. Rental, Ltd. v. Hendrix,
565 F.2d 255 (2d Cir. 1977)..............................................................................30, 31, 32

Nat'l Westminster Bank, U.S.A. v. Ross,
130 B.R. 656 (S.D.N.Y. 1991)........................................................................13, 24, 31-32, 33

Neuro-Rehab Assocs., Inc. v. Amresco Commercial. Fin., L.L.C.,
No. Civ. A. 05-12338 (GAO), 2006 WL 1704258 (D. Mass. June 19, 2006)...................    24-25

Okura & Co. (Am.), Inc. v. Careau Grp.,
783 F. Supp. 482 (C.D. Cal. 1991) ......................................................................    26-27

Orix Credit Alliance, Inc. v. Better Built Corp.,
No. 89 Civ. 7333 (JFK), 1990 WL 96992 (S.D.N.Y. July 2, 1990) ....................................    31

Schappert v. Bedford, Freeman & Worth Publ'g Grp., LLC,
No. 03 Civ. 0058 (RMB) (DFE),
2004 U.S. Dist. LEXIS 14153 (S.D.N.Y. July 23, 2004) ...................................................    31

Simler v. Conner,
372 U.S. 221 (1963)...........................................................................................    26

Solutia Inc. v. FMC Corp.,
456 F. Supp. 2d 429 (S.D.N.Y. 2006)..................................................................    26

Union Pac. R.R. Co. v. Reilly Indus., Inc.,
215 F.3d 830 (8th Cir. 2000) ..............................................................................    25

Wechsler v. Hunt Health Sys., Ltd.,
No. 94 Civ. 8294 (PKL), 2003 WL 21878815 (S.D.N.Y. Aug. 8, 2003) ...........................    passim

Defendant Citibank, N.A. ("Citibank") respectfully submits this memorandum of law in support of its motion, pursuant to Rule 39(a) of the Federal Rules of Civil Procedure, to strike the jury demand made by plaintiff Allied Irish Banks, p.l.c. ("AIB").

## PRELIMINARY STATEMENT[1]

AIB's claim to a purported right to a jury trial in this action is inconsistent with and expressly barred by Allfirst's two master trading agreements with Citibank – the International Foreign Exchange Master Agreement ("IFEMA") and the Customer Agreement for Foreign Exchange Prime Brokerage Services (the "Prime Brokerage Agreement") – which govern every aspect of the parties' foreign exchange trading relationship and expressly waive AIB's right to a jury trial with respect to each and every one of AIB's claims against Citibank.[2]

At bottom this is a case about alleged abuses that occurred in the trading relationships that developed between Allfirst and the two financial institutions that acted as its prime brokers – Citibank and Bank of America ("BofA").[3]  From the commencement of

---

[1]  Unless otherwise indicated, all exhibits are attached to the accompanying Declaration of Alida Y. Lasker, dated January 27, 2012.

[2]  AIB relied on these agreements in connection with its briefing on defendants' motions to dismiss at the onset of the case in arguing that its claims were governed by New York law because of the New York choice of law clauses in these contracts.  AIB's Memorandum of Law in Opposition to Defendants Bank of America, N.A. and Citibank, N.A.'s Motions to Dismiss the Complaint, dated Sept. 26, 2003 ("AIB's Opp'n to Mot. to Dismiss"), Ex. A at 36 n.10.  For AIB now to argue that the IFEMA and Prime Brokerage Agreement do not cover its claims against Citibank would be necessarily inconsistent with the position it took at the outset of the case.

[3]  In his deposition testimony, Gregory Thoreson, Allfirst's General Counsel and Senior Vice President from 1995 through the discovery of the Allfirst fraud, acknowledged that AIB sued only Allfirst's two prime brokers, Citibank and BofA.  Dep. of Gregory K. Thoreson, dated May 27, 2009, Ex. B at 269:13-270:13.

this action and throughout discovery, AIB has framed its case as one against its "prime brokers." See, e.g., AIB's Complaint, dated May 23, 2003 ("Original Complaint"), Ex. C at 1 (defining defendants Citibank and BofA as the "prime brokers"). Accordingly, AIB's Original Complaint – in the second paragraph – alleges that "[i]n September 2000, BofA and Citibank joined [John] Rusnak's scheme by opening 'prime brokerage' accounts for him" and that all of Rusnak's "trades [were] settled and documented exclusively through his prime brokers, BofA and Citibank." Original Complaint, Ex. C ¶ 2. AIB's Amended Complaint, filed in October 2009 ("Amended Complaint"), furthers this theme, reiterating AIB's central claims that Citibank and BofA "operated the Prime Brokerage Accounts in a manner that assisted Rusnak in perpetuating his fraud." AIB's Amended Complaint, dated Oct. 22, 2009, Ex. D ¶ 71; see also, e.g., id. at 13, § V (section entitled: "BofA and Citibank Aid and Abet Rusnak's Fraud through the Prime Brokerage Accounts"). Both the Amended and the Original Complaints detail the alleged participation by Citibank and BofA in Allfirst's fraud as Allfirst's foreign exchange prime brokers and conclude that Citibank and BofA should be held liable for all of Allfirst's losses during their tenure as Allfirst's prime brokers. See Amended Complaint, Ex. D ¶¶ 241-242; § V, ¶¶ 62-71; Original Complaint, Ex. C ¶¶ 122-124.

   The Prime Brokerage Agreement provides an unequivocal waiver of Allfirst's right to a jury trial, stating: "EACH PARTY . . . WAIVES ANY RIGHT TO JURY TRIAL WITH RESPECT TO ANY ACTION ARISING OUT OF THIS AGREEMENT OR ANY TRANSACTION HEREUNDER." Prime Brokerage Agreement, dated as of Sept. 1, 2000 ("PBA"), Ex. E at CITI-AIB000107 (capitalization in original).

At an even earlier point in the parties' trading relationship, in order to ensure that they would be able to net their payment obligations under all outstanding foreign exchange transactions between each other, which at the time included spot, forward and option trades, the parties entered into the IFEMA agreement. The IFEMA, along with the Prime Brokerage Agreement, governed the parties' trading relationship at the times relevant to AIB's claims and likewise contains a clear jury trial waiver as follows: "Waiver of Jury Trial. Each Party irrevocably waives any and all right to trial by jury in any Proceedings." IFEMA, dated as of Mar. 28, 2000; schedule signed Apr. 25, 2000, Ex. F at CITI-AIB 000131, ¶ 9.3 (underline in original). "Proceedings" in turn, are defined as "any suit, action or other proceedings relating to the Agreement or any FX Transaction." IFEMA, Ex. F at CITI-AIB 000121.

There is no question that these jury trial waivers in the parties' agreements that governed their foreign exchange trading relationship and all claims raised here by AIB are enforceable. The jury trial waivers were twice included in negotiated agreements between the parties, they are conspicuous in both agreements, the parties were of equal bargaining power, and Allfirst, the U.S. trading arm of AIB – then the largest financial institution in Ireland – clearly had sufficient business acumen to enter into (and did enter into) a knowing and voluntary waiver of its right to a jury trial in the event of a dispute between the parties. Indeed, as a matter of course, Allfirst routinely waived its right to a jury trial in all of its foreign exchange trading contracts and it is therefore not surprising that it agreed to such a waiver under both agreements that governed its trading relationship with Citibank. See Dep. of Ralph Partlow, dated June 2, 2009, Ex. G at 306:10-13 (Partlow,

3

Allfirst in-house counsel, testified: "[I]n FEOMAs, IFEMAs and ISDA master agreements, parties, including Allfirst, to those agreements typically waive jury trial.").[4]

Despite this background and history, AIB has indicated it will argue that both the IFEMA and the Prime Brokerage Agreement exclude option trading and because many of its claims in this case arise out of such trading, they are outside the jury waivers.  Letter from L.G. Birger to Hon. G.W. Gorenstein, dated June 3, 2009, Ex. H at 1-2.  As set forth herein, this argument mischaracterizes the terms of the IFEMA and the Prime Brokerage Agreement, the nature of AIB's claims and of the parties' trading relationship in a failed attempt to escape the jury trial waivers in the IFEMA and Prime Brokerage Agreement.  It is also inconsistent with the clear terms of the IFEMA, which defines "FX Transactions" to include options as well as by the parties' course of dealing thereunder to net option premia in accordance with the IFEMA netting agreement.  Finally, it is also well established that even were there (unlike here) no effective contractual jury waivers, AIB would not be entitled to a jury trial with respect to the equitable claims AIB asserts in the fourth through sixth claims for relief of its Amended Complaint.  Amended Complaint, Ex. D ¶¶ 267-278. Accordingly, for the reasons set forth herein, the Court should grant Citibank's motion and strike AIB's demand for a jury trial.

---

[4]   See also infra note 21.

4

## BACKGROUND

A.    The Claims In This Action

On May 23, 2003, AIB filed its Original Complaint against Citibank and BofA.[5] The Original Complaint listed numerous steps allegedly taken by Citibank as Allfirst's prime broker that allegedly assisted Rusnak in his fraud.[6] After the Court denied in part defendants' motions to dismiss,[7] Citibank filed its Answer, Counterclaims and Third-Party Complaint on March 27, 2006 ("Original Answer"). Original Answer, dated Mar. 27, 2006, Ex. I. On October 13, 2009, AIB filed its Amended Complaint, in which it again alleges that Citibank enabled Rusnak's scheme by advancing and concealing his fraud through Allfirst's relationship with Citibank in its capacity as Allfirst's prime broker. See, e.g., Amended Complaint, Ex. D ¶ 71. AIB argues that Citibank's conduct – taken as a

---

[5]    Before filing the Original Complaint, Allfirst purportedly "assigned all of its rights and interests arising out of [Rusnak's fraud] to its parent, AIB." Original Complaint, Ex. C ¶ 7; see also Amended Complaint, Ex. D ¶ 17.

[6]    See, e.g., Original Complaint, Ex. C ¶ 42 (Citibank "did not send a single monthly prime brokerage account statement to Allfirst"); id. ¶ 50 ("never mentioned the existence of the [Citibank prime brokerage] websites to anyone at Allfirst other than Rusnak"); id. ¶ 61 ("agreed to operate the prime brokerage account[] without any provisions for margin"); id. ¶ 72 (provided Rusnak with funding to hide his losses in the prime brokerage account); id. ¶ 89 (omitted the details of the disguised funding from its daily prime brokerage reports); id. ¶¶ 104-105 (conducted same-day options to settle profit (or loss) in the prime brokerage account); id. ¶¶ 112-113 (conducted off-market trades in the prime brokerage account).

[7]    AIB's Original Complaint asserted six claims against Citibank and BofA: (i) fraudulent concealment; (ii) aiding and abetting Rusnak's fraud; (iii) aiding and abetting Rusnak's breach of fiduciary duty and duty of loyalty; (iv) rescission and restitution for lack of authority and lack of consideration; (v) money had and received; (vi) unjust enrichment. Original Complaint, Ex. C ¶¶ 126-160. After Citibank and BofA moved to dismiss all counts, the Court granted only defendants' motions to dismiss the claims for aiding and abetting breach of fiduciary duty and duty of loyalty. Allied Irish Banks v. Bank of America, N.A., No. 03 Civ. 3748 (DAB), 2006 WL 278138, at *15 (S.D.N.Y. Feb. 2, 2006).

5

whole – demonstrates that it was aware of, and substantially assisted in, Rusnak's concealment of his foreign exchange trading losses from Allfirst.[8]

   The Amended Complaint avers, inter alia, that Citibank "operated the Prime Brokerage Accounts in a manner that assisted Rusnak in perpetuating his fraud," Amended Complaint, Ex. D ¶ 71, and that "Enablers at . . . Citibank[9] assisted Rusnak to perpetuate and expand his fraud," id. ¶ 31.  In particular, AIB alleges that Citibank improperly: "did not reveal the existence of [the Citibank prime brokerage] website[] to anyone in Allfirst's back office," id. ¶ 78; failed to disclose "mark-to-market and profit-and-loss information for Rusnak's trading" in its prime brokerage account, id. ¶ 79; "agreed to open and operate the Prime Brokerage Account[] without any provisions for margin," id. ¶ 82; corrupted the prime brokerage confirmation process and failed to disclose that alleged corruption to Allfirst management, which allegedly "facilitate[ed Rusnak's] efforts to enter fake prime brokerage trades," id. ¶ 101; provided Rusnak with funding to hide his losses in its prime brokerage account, id. ¶¶ 153, 160; conducted same-day options to settle profit (or loss) in its prime brokerage account, id. ¶¶ 115-117; failed to disclose the so-called "Synthetic

---

[8] Notably, the Amended Complaint was filed after Citibank sent to this Court a letter previewing the arguments it proposed to assert in a motion to strike AIB's jury claims. Letter from H. Zelbo to Hon. G.W. Gorenstein, dated May 28, 2009, Ex. J. At AIB's urging, the Court instructed Citibank to wait until the conclusion of discovery before presenting the motion. Letter from L.G. Birger to Hon. G.W. Gorenstein, dated June 3, 2009, Ex. H at 1; Endorsed Memorandum of Hon. G. W. Gorenstein, so ordered June 5, 2009, Ex. K at 2.  Although the Amended Complaint cosmetically attempts to deemphasize the importance of the prime brokerage relationship to AIB's claims in an effort to improve its purported entitlement to a jury trial, this effort is unavailing because in substance the allegations remain the same.

[9] AIB identifies the Citibank Enablers as Richard Marra, Salesperson in the Foreign Exchange Sales Desk, Eric Price, Head of the Foreign Exchange Sales Desk, and Leonard Campbell, Head of Foreign Exchange Prime Brokerage.  Amended Complaint, Ex. D ¶ 34.

Loan" to anyone in Allfirst management, id. ¶¶ 191-194; and helped Rusnak conceal his fraud in April and May 2001 through "fake trades," id. ¶ 199, and "off-market" trades, id. ¶ 211, in the prime brokerage account, id. ¶¶ 199-222.

Based on these allegations, AIB's Amended Complaint asserts the following claims against Citibank (and BofA): (i) fraud and fraudulent concealment[10]; (ii) aiding and abetting fraud; (iii) rescission and restitution for lack of authority and lack of consideration; (iv) money had and received; and (v) unjust enrichment. Amended Complaint, Ex. D ¶¶ 244-278. AIB claims that Citibank should be "liable for the trading losses Allfirst suffered from and after the point [Citibank's] misconduct began," id. ¶ 241, should "disgorge the profits they made from Rusnak's trading, including . . . the spreads and fees they made on trades in the Prime Brokerage Accounts," id. ¶ 242, and should be liable for punitive damages, id. ¶ 243. On January 22, 2010, Citibank filed its Answer and Counterclaims to Amended Complaint and Amended Third-Party Complaint ("Amended Answer"), asserting counterclaims for: (i) indemnity and contribution; (ii) negligent supervision and retention; (iii) contractual indemnification; (iv) breach of the IFEMA; and (v) breach of the Prime Brokerage Agreement. Amended Answer, Ex. L ¶¶ 381-407.[11]

---

[10]  AIB's Original Complaint alleged "fraudulent concealment" as its first claim for relief, Original Complaint, Ex. C ¶¶ 126-135; AIB's Amended Complaint adds a claim of fraud to that count, Amended Complaint, Ex. D ¶¶ 244-255.

[11]  Because AIB and M&T Bank Corporation  merged Allfirst into Manufacturers and Traders Trust Company, a subsidiary of M&T Bank Corporation, in April 2003, Amended Answer, Ex. L ¶¶ 379-380, Citibank also asserted claims against M&T Bank Corporation and Manufacturers and Traders Trust Company that are identical to the counterclaims against AIB, id. ¶¶ 381-407.

B.   AIB's Jury Demand

Ten days after Citibank filed its Original Answer and Counterclaims on

March 27, 2006, AIB demanded "a trial by jury of any claims and counterclaims so triable"

with respect to Citibank and BofA.  AIB's Demand for Jury Trial, served on Citibank on

April 10, 2006 ("Jury Demand"), Ex. M.  AIB subsequently withdrew its jury demand as to

BofA (with which it has now settled), but has not done so with respect to Citibank.  See

Stipulation between AIB and BofA withdrawing AIB's Jury Demand, so ordered December

18, 2009, Ex. N.  As noted, on June 5, 2009, this Court waived the requirement of a pre-

motion conference concerning AIB's jury demand as to Citibank and ordered that Citibank's

motion to strike AIB's jury demand "be filed after the close of discovery (and prior to the

deadline for dispositive motions)," and "will be returnable before the undersigned."

Endorsed Memorandum of Hon. G. W. Gorenstein, so ordered June 5, 2009, Ex. K at 2.

C.   The Contractual Master Trading Agreements Between Citibank And Allfirst

1.   The IFEMA

In March 2000, in order to permit netting of all of the payments relating to

their outstanding trades going forward, Citibank and Allfirst entered into a standard master

trading agreement known as an IFEMA.  See, e.g., Email chain among E. Price, L. Diamond

and J. Navotkoski, dated April 28, 2000, Ex. O at CITI-AIB 055777 (Price stating, "[I]t's a

signed ifema agreement (not isda) that has now been signed and allows us to net [with

Allfirst[12].").  An IFEMA is a standard master agreement for foreign exchange transactions

designed to embody best market practices.  Robert Ray, then a Senior Vice President at

---

[12]   This email references Allfirst by its previous name, First National Bank of Maryland.
See Susan Todd, Bank Has New Name, The Morning Call, Apr. 15, 1999, Ex. P (noting
that, as of June 28, 1999, "First National Bank of Maryland . . . will operate under the
name Allfirst").

Allfirst and a 22-year veteran of the banking industry, signed the IFEMA on behalf of Allfirst.  IFEMA, Ex. F at CITI-AIB 000132.

Paragraph 9.3 of the IFEMA, entitled "Waiver of Jury Trial," provides: "Each Party irrevocably waives any and all right to trial by jury in any Proceedings." IFEMA, Ex. F at CITI-AIB 0000131 (underline in original).  "Proceedings," in turn, are defined as "any suit, action or other proceedings relating to the [IFEMA] Agreement or any FX Transaction," id. at CITI-AIB 000121, and "FX Transaction," by the IFEMA's definition, includes every foreign exchange transaction entered into between Allfirst and Citibank, id. at CITI-AIB 000120.  In particular, the term "FX Transaction" is broadly defined in the IFEMA as "any transaction between the Parties for the purchase by one Party of an agreed amount in one Currency against the sale by it to the other of an agreed amount in another Currency, both such amounts either being deliverable on the same Value Date or, if the Parties have so agreed in Part VI of the Schedule, being cash-settled in a single currency, which is or shall become subject to the Agreement and in respect of which transaction the Parties have agreed (whether orally, electronically or in writing): the Currencies involved, the amounts of such Currencies to be purchased and sold, which Party will purchase which Currency and the Value Date."  IFEMA, Ex. F at CITI-AIB 000120.

The IFEMA allows the parties the opportunity to clarify further the types of transactions they intend to be picked up under the definition of "FX Transaction" in Part I to the Schedule to the agreement, entitled "Scope of Agreement."  IFEMA, Ex. F at CITI-AIB 000133.  Here, the parties specifically chose in Part I of the Schedule, which is referred to in the "Scope of Agreement" section of the IFEMA, id. at CITI-AIB 000122, to insert the words: "Agreement shall apply to all foreign exchange transactions outstanding between

9

any two Designated Offices of the Parties on the Effective Date." IFEMA, Ex. F at CITI-AIB 000133. The Effective Date of the IFEMA was March 28, 2000. IFEMA, Ex. F at CITI-AIB 000116, CITI-AIB 000118. As of that date Allfirst and Citibank were already engaged in a robust foreign exchange trading relationship that included trading in spots, options and forwards and the foreign exchange trades that Allfirst and Citibank had outstanding as of that date included spots, forwards and a one-year option. See Declaration of Christopher L. Culp, Ph.D., dated Jan. 27, 2012, ("Culp Decl.") at ¶ 5. Notably, an issue had arisen in connection with the large exposures that were resulting from foreign exchange trading between Citibank and Allfirst that led to a direct communication in Ireland from Citibank to the Treasurer of Allfirst's parent AIB when its exposure exceeded $2 billion in spring 2000. See Email from G. Garth to B. King, dated May 3, 2000, Ex. Q; B. King Notes, dated April 26, [2000], Ex. R. This call, inter alia, led the parties to formalize their expanded trading relationship with a master trading agreement, the IFEMA, which among other things required the parties to reduce counterparty exposure through netting. See, e.g., Email chain among E. Price, L. Diamond and J. Navotkoski, dated April 28, 2000, Ex. O at CITI-AIB 055777 (Navatkoski noting that trading between Citibank and Allfirst has caused Citibank to "blow[] the [credit] lines" and asking whether an ISDA with netting provisions was in place; Price responding that "its [sic] a signed ifema agreement (not isda) that has now been signed and allows us to net"); IFEMA, Ex. F §§ 3.2 and 3.3 (netting provisions).

The bottom line is that the IFEMA does not "exclude options" as AIB erroneously claims but expressly includes them within its coverage. Thus, by signing the IFEMA, Allfirst waived its right to trial by jury in any proceeding "relating to" either the IFEMA or any foreign exchange transaction – including options – at issue in this litigation.

10

2.    The Prime Brokerage Agreement

In the fall of 2000, Citibank expanded its foreign exchange trading relationship with Allfirst by agreeing to become one of Allfirst's two foreign exchange prime brokers.[13] The prime brokerage relationship between Citibank and Allfirst was commenced when the parties entered into the Prime Brokerage Agreement, dated September 1, 2000. PBA, Ex. E. The Prime Brokerage Agreement both sets forth the terms under which Citibank provided prime brokerage services and supplements the IFEMA. PBA, Ex. E at CITI-AIB 000103-12. Rusnak, then an Allfirst Vice President and subsequently promoted to Managing Director, signed the Prime Brokerage Agreement on behalf of Allfirst. PBA, Ex. E at CITI-AIB 000108; Email from R. Ray announcing J. Rusnak's promotion to Managing Director, dated June 1, 2001, Ex. T at AIB 04505879. Like the IFEMA, the Prime Brokerage Agreement contains a broad jury trial waiver in which Allfirst – then for a second time – waived its right to a jury trial in this action. Specifically, in the paragraph directly preceding the parties' signatures, the Prime Brokerage Agreement provides – in all capital letters – that each party "WAIVES ANY RIGHT TO JURY TRIAL WITH RESPECT TO ANY ACTION ARISING OUT OF THIS AGREEMENT OR ANY TRANSACTION HEREUNDER." PBA, Ex. E at CITI-AIB 000107.

---

[13]    Allfirst already had a prime brokerage relationship with BofA that began in August 2000. Advisor Authorization Agreement between BofA and Allfirst, dated August 30, 2000, Ex. S.

11

## ARGUMENT

## AIB HAS NO RIGHT TO A JURY TRIAL IN THIS CASE

A.   Allfirst's Jury Trial Waivers Cover All Of The Claims Between
       Citibank and AIB

Without exception, the broad jury trial waivers in the IFEMA and the Prime Brokerage Agreement cover all the claims and counterclaims for which AIB would be otherwise entitled to a jury trial.[14] As set forth above, in the IFEMA, Allfirst waived the right to a jury trial in "any Proceedings," IFEMA, Ex. F at CITI-AIB 000121 (capitalization in original), and the IFEMA in turn defines "Proceedings" as "any suit, action or other proceedings relating to the Agreement or any FX Transaction," id. at CITI-AIB 000121 (emphasis added).  As noted above, in further defining FX Transactions, the parties explicitly chose to include "all foreign exchange transactions outstanding between any two Designated Offices of the Parties on the Effective Date," IFEMA, Ex. F at CITI-AIB 000133, which at the time included, inter alia, a one-year option between Citibank and Allfirst.  See Culp Decl. at ¶ 5.a.  Similarly, in the Prime Brokerage Agreement, Allfirst waived "ANY RIGHT TO JURY TRIAL WITH RESPECT TO ANY ACTION ARISING OUT OF THIS AGREEMENT OR ANY TRANSACTION HEREUNDER."  PBA, Ex. E at CITI-AIB 000107 (capitalization in original; emphasis added).

Contractual jury trial waivers "must be construed literally."  Wechsler v. Hunt Health Sys., Ltd., No. 94 Civ. 8294 (PKL), 2003 WL 21878815, at *6 (S.D.N.Y. Aug. 8, 2003).  Waivers, such as those at issue here, expressed in "arising out of" or "relating to" language are commonly described by courts as "broad" and "sweeping."  See, e.g., In re

---

[14]   As discussed below, infra Pt. A.3, even in an absence of these binding jury trial waivers, AIB would not be entitled to a jury trial on its equitable claims.

_Actrade Fin. Tech. Ltd.,_ No. 05-03657 (ALG), 2007 WL 1791687, at * 1 (Bankr. S.D.N.Y.

June 20, 2007) (describing "arising from" waiver as "extremely broad"); _Wechsler,_ 2003

WL 21878815, at *6 (describing "arising from" waiver as "broad language"); _Brown v._

_Cushman & Wakefield, Inc.,_ 235 F. Supp. 2d 291, 293-94 (S.D.N.Y. 2002) (describing

"arising out of" waiver as "extremely broad"); _In re Daimlerchrysler AG Sec. Litig._

_Trancinda Corp.,_ No. Civ. A. 00-993 (JJF), 2003 WL 22769051, at * 2 (D. Del. Nov. 19,

2003) ("The waiver is broadly worded and applies to any claim or any action 'arising out of

or in connection with this Agreement or the transactions contemplated hereby.'") (citation

omitted); _Curtis Ctr. Ltd. P'ship v. Sumitomo Trust & Banking Co., Ltd.,_ No. Civ. A. 95-

1465 (JPF), 1995 WL 365411, at *2 (E.D. Penn. June 15, 1995) (recognizing waiver of all

claims "arising out of or relating to this Agreement or the transactions contemplated hereby"

was "sweeping"); _see also_ _Nat'l Westminster Bank, U.S.A. v. Ross,_ 130 B.R. 656, 667

(S.D.N.Y. 1991) ("The plain language of the clause establishes that [plaintiff] 'waives the

right in any litigation with the Bank . . . to trial by jury.' The phrase 'any litigation' means

precisely that . . . .") (citation omitted). To the extent that AIB would have been entitled to a

jury on any of these claims, the plain and unambiguous language of these broad and

sweeping provisions waived any such right.

### 1. The IFEMA

The jury trial waiver in the IFEMA applies where, as here, "Proceedings

relat[e] to the [IFEMA] Agreement or any FX Transaction." IFEMA, Ex. F at CITI-AIB

000121. Both standards are easily satisfied here. First, this case undisputedly relates to the

IFEMA. For example, AIB's claim for damages is for the losses incurred through "FX

13

Transactions" conducted under the IFEMA. See Amended Complaint, Ex. D ¶¶ 241-243.

Likewise, as discussed below, this action unquestionably relates to "FX Transactions."

   The definition of "FX Transaction" in the IFEMA clearly covers all the

complained-of transactions, including spot, forward and European style options – the type of

options entered into between Allfirst and Citibank. A European style option, which can be

exercised only on the date of expiration,[15] easily fits squarely within the IFEMA's definition

of "FX Transaction," as it is a "transaction . . . for the purchase by one Party of an agreed

amount in one Currency against the sale by it to the other of an agreed amount in another

Currency," which are deliverable on the same value date. IFEMA, Ex. F at CITI-AIB

000120.

   Moreover, the parties explicitly chose for the IFEMA to cover all

transactions outstanding at the time the IFEMA was signed, which included a one-year

European style option between Allfirst and Citibank London,[16] transacted on May 19, 1999

with a value date of May 18, 2000. Culp Decl. ¶ 5.a. Specifically, under the "Scope of the

Agreement" section of the IFEMA, "[e]ach FX Transaction . . . outstanding on the Effective

Date which is identified in Part I of the Schedule shall also be governed by the Agreement."

IFEMA, Ex. F at CITI-AIB 000122. As noted above, Part I of the Schedule states that the

IFEMA "shall apply to all foreign exchange transactions outstanding between any two

Designated Offices of the Parties on the Effective Date." IFEMA, Ex. F at CITI-AIB

---

[15] American style options can be exercised any time between the purchase date and the
expiration date. Unless otherwise indicated, the term "option" will be used
interchangeably with the term "European style option" herein.

[16] London is one of the "Designated Offices" enumerated in the IFEMA schedule.
IFEMA, Ex. F at CITI-AIB 000020.

000133. Therefore, Part I of the Schedule makes clear that the parties intended options to be picked up by the definition of "FX Transaction."

Further, under the "Settlement and Netting" section of the IFEMA, "[i]f, on any date, more than one delivery of a particular Currency under Currency Obligations is to be made between a pair of Settlement Netting Offices," then each party shall "aggregate the amounts of such Currency deliverable by it and only the difference between these aggregate amounts shall be delivered by the Party owing the larger aggregate amount." IFEMA, Ex. F at CITI-AIB 000123. It is indisputable that, in accordance with this provision, Citibank and Allfirst netted the option premium payments that they were required to make to each other. See Culp Decl. ¶¶ 6-7 (stating that Citibank and Allfirst netted payments of option premia in the course of their trading relationship and noting examples of such netted payments). Significantly, the parties netted payment for the option premia associated with the February 20, 2001 options that are central to AIB's allegations against Citibank. Amended Complaint, Ex. D ¶¶ 153-179. Specifically, on February 20, 2001 Allfirst and Citibank sold options to one another, with Allfirst owing $59,016 in premium to Citibank and Citibank owing Allfirst $125,054,904. Culp Decl. ¶ 7.a. Two days later, when the premium payments came due, a single Fedwire transmittal confirmation shows that Citibank paid Allfirst $124,996,000, almost the exact sum of the difference between the two premia, demonstrating that Citibank and Allfirst netted the premia payments with respect to the February 20, 2001 options. Id. Similarly, on August 20, 2001 and September 6, 2001, Citibank and Allfirst also netted premia associated with options transacted between them. Id. ¶¶ 7.b and 7.c. In each of those instances Allfirst and Citibank sold options to one another on the same day, and the Fedwire transmittal confirmation in each instance shows

that the payment Citibank sent to Allfirst was almost exactly the difference between the two

option premia (and in the case of the August 20, 2001, the payment was exactly the

difference).  Id. ¶¶ 7.b and 7.c.  Thus, subsequent to the execution of the IFEMA and

throughout the course of the parties' foreign exchange trading relationship, Citibank and

Allfirst netted payments of option premia in accordance with the IFEMA's netting

provisions.  Additionally, when options turned out to be "in the money" they were exercised

by spot trades (which are clearly covered by the IFEMA), the majority of which were settled

in the prime brokerage account (and thus clearly covered by the Prime Brokerage

Agreement, and the jury waiver contained therein, as well).  See Culp Decl. ¶¶ 8.

As the type of options that were traded became more complex, another

standard industry agreement was developed known as a Foreign Exchange and Options

Master Agreement ("FEOMA"), which more explicitly dealt with some of the complexities

that can arise in option netting but continued also to cover spot and forward trades.  The

standard FEOMA also contains a jury trial waiver provision and AIB entered into precisely

such an agreement with BofA, which AIB has conceded covers trades substantially identical

to those entered into with Citibank and that are the subject of its Amended Complaint.  To

be sure, the IFEMA does not deal with options as explicitly or completely as the FEOMA,

but this in no way means that the IFEMA does not cover or excludes options.  Dep. of Dr.

Christopher L. Culp, dated Jan. 5, 2012 ("Culp Dep."), Ex. U at 196:23-198:9 ("It is

certainly true that the ICOM and the FEOMA include specific references to options and

things like premium netting that are absent from the IFEMA.  But that does not mean that

the IFEMA cannot be used to document an option.").  Specifically, the FEOMA provides

for the automatic discharge and termination of offsetting options having identical terms,

16

including identical expiration dates and trade dates, see FEOMA Standard Form, dated Nov. 19, 1995, Ex. V § 4.1(ii), and for the potential to settle options at their "In-the-money Amount," see id. § 5.3.  Except for these special features, the FEOMA follows virtually the same netting formula as the IFEMA.  Compare, e.g., §§ 3.2 (settlement netting) and 3.3 (novation netting) of the IFEMA, Ex. F, with §§ 6.2 (payment netting) and 6.3 (novation netting) of the FEOMA, Ex. V (language is identical).  It is therefore simply inaccurate to claim that options are excluded from the IFEMA, particularly given the broad definition of FX Transactions in the IFEMA.  See Dep. of Dr. David F. DeRosa, dated Jan. 11, 2012, Ex. W at 367:3-369:15 (testifying that the IFEMA covers foreign exchange options in addition to forward and spot trades); Expert Report of Dr. David DeRosa, dated August 15, 2011 ("DeRosa Report"), Ex. X ¶ 288 (stating that Rusnak was authorized to enter into option transactions "under the terms of Allfirst's IFEMA with Citi"); Culp Dep., Ex. U at 193:8-194:23 (opining that "the IFEMA can cover options").  While parties may choose to enter into a FEOMA to have the benefit of the additional netting provisions addressing certain complexities in option trading, they, as Allfirst and Citibank did here, can instead enter into an IFEMA which by its terms covers all of their foreign exchange trading, including options.  Culp Dep., Ex. U at 197:16-198:7 ("[O]ne difference [between the FEOMA and the IFEMA] is an explicit language in the FEOMA for dealing with certain aspects of options that are unique to options – things like premium netting.  But the bilateral netting provisions of the IFEMA can lead you to the exact same result for premium netting.").

        Additionally, as set forth in greater detail in the discussion below of the parties' Prime Brokerage Agreement, the gravamen of AIB's Amended Complaint is not any disagreement concerning performance under an isolated option trade.  AIB's complaint

17

is that the alleged abuses that occurred within the parties' overall trading relationship, including the alleged structuring of foreign exchange trades by combining options, spots and/or forwards to create synthetic forwards that acted as loans. For this reason as well, these claims clearly fall within the scope of the IFEMA and its jury waiver, even if the Court were to conclude that the agreement does not cover stand-alone options. It is beyond peradventure that every one of AIB's claims "relates" to a foreign exchange transaction that is covered by the IFEMA.

Indeed, because each of AIB's allegations against Citibank "relates to" spot and/or forward transactions, and it is undisputed by AIB that the definition of "FX Transaction" (and thus the IFEMA) covers spot and forward transactions, the jury trial waiver would still apply to this action even, assuming arguendo, were the IFEMA not to cover option transactions. Apart from AIB's overarching allegations concerning Citibank's purported misconduct as Allfirst's prime broker (discussed further below in connection with the Prime Brokerage Agreement's jury trial provision), the Amended Complaint identifies three main categories of specific complained-of transactions: (1) the purported "Disguised Cash Advances," see Amended Complaint, Ex. D ¶¶ 109-152; (2) the purported February 20, 2001 "Synthetic Loan," id. ¶¶ 153-198; and (3) the May 9, 2001 purported "Phony Trades," id. ¶¶ 199-222. In each case, AIB's allegations undeniably, even on their face, "relate to" spot and/or forward transactions.

First, as regards the purported "Disguised Cash Advances," AIB alleges that Citibank created them by means of a "**spot trade** with a built-in loss to Rusnak, which was **rolled forward [through a forward trade]** to the next Settlement Date in the Prime Brokerage Account," and through "a second **spot trade** with Rusnak to 'lock in' the value."

18

Id. ¶¶ 119-124 (emphases added).  Second, as regards the February 20, 2001 purported "Synthetic Loan," AIB has alleged that it was effected through a "structured transaction" comprised of three component parts: two "options and **[an] associated spot trade.**"  Expert Report of Richard A. Rua, Ex. Y, Statement of Facts (attached as Exhibit B to Mr. Rua's report, and written by AIB's counsel), ¶ 52 (emphasis added).  Moreover, AIB has acknowledged that when an option is exercised, "[t]he trade exercising the option is a spot trade," see Amended Complaint, Ex. D ¶ 26, and thus when AIB incurred its supposed damages from this purported "Synthetic Loan" by being "forced to pay when Rusnak's fraud came to light," id. ¶ 198, it did so through a spot trade resulting from the exercise of the large in-the-money option component of the purported structured transaction.  In fact, AIB's purported experts have alleged the supposed impropriety of that option by emphasizing that it was "exercised into a **spot contract** with a far off-market rate of 73.77." Expert Report of Richard A. Rua, Ex. Y, ¶ 59 (emphasis added).  AIB's purported experts have gone further, alleging regarding the two options components of the purported structured transaction that "[t]aken together, these options created a synthetic **forward**," id. ¶ 56 (emphasis added), and that the larger option of the two "was, [even] taken in isolation, essentially an off-market **forward**," id. ¶ 57 (emphasis added).  Finally, regarding the May 9, 2001 purported "Phony Trades," Allfirst alleges that Citibank acted inappropriately insofar as, "[a]t Rusnak's direction, [Citibank] split its **spot trade** into two **spot trades**, with volumes and rates that were dictated by Rusnak," see Amended Complaint, Ex. D ¶ 205 (emphases added), and that, further, at Rusnak's direction, Citibank supposedly "split his netted trades for that day into two **spot trades** at rates and volumes he dictated," id. ¶ 216

19

(emphasis added). Thus, each of AIB's allegations undeniably "relate to" spot and/or

forward transactions.

      For all the reasons stated above, IFEMA's jury waiver provision therefore

applies to all claims between Allfirst and Citibank.

      2.     The Prime Brokerage Agreement

      To fall under the ambit of the Prime Brokerage Agreement's waiver, this

action must simply "arise[] out of the[] agreement" "or any transaction thereunder" (i.e. the

prime brokerage relationship). PBA, Ex. E at CITI-AIB 000107. Both standards are easily

satisfied. Not only has AIB framed this as a case against the "prime brokers," but,

according to AIB, "[a]s Rusnak's prime brokers, the defendants BofA and Citibank engaged

in a wide variety of misconduct designed to help Rusnak hide his trading losses." AIB's

Opp'n to Mot. to Dismiss, Ex. A at 6 (emphasis added). In particular, as discussed above,

AIB's Amended Complaint alleges that:

- "Defendants operated the Prime Brokerage Accounts in a manner that assisted Rusnak in perpetuating his fraud," Amended Complaint, Ex. D ¶ 71;

- Citibank's failure to disclose "mark-to-market and profit-and-loss information for Rusnak's trading" allowed Rusnak to maintain inaccurate information in the prime brokerage account, id. ¶ 79;

- Citibank concealed the existence of Citibank's prime brokerage website from Allfirst, id. ¶ 78;

- Citibank agreed to operate the prime brokerage account without margin, id. ¶ 82;

- "Citibank's corruption of the confirmation process . . . facilitate[d] Rusnak's efforts to enter fake prime brokerage trades on Allfirst's books, and to conceal real trades," id. at ¶ 101;

- Citibank conducted same-day options to "manufacture" profit (or loss) in the prime brokerage account, id. ¶ 117; see also id. ¶¶ 115-124; 132-136;

20

- Citibank provided Rusnak with funding to hide his losses in the prime brokerage account, id. ¶¶ 153, 160; and

- Citibank helped Rusnak conceal his fraudulent scheme through "fake trades," id. ¶ 199, and "off-market" trades, id. ¶ 211, in the prime brokerage account in April and May 2001, id. ¶¶ 199-222.

Moreover, discovery in this case has shown that all of the transactions about which AIB complains were transacted (or purportedly transacted) in the prime brokerage accounts, exercised, hedged and settled in the prime brokerage account, were conducted to monetize profits or losses in the prime brokerage account and/or were transacted to allegedly hide Rusnak's actual losses in Allfirst's prime brokerage account. As such, the jury trial waiver in the Prime Brokerage Agreement covers all of AIB's claims.

First, with respect to the April and May 2001 fake prime brokerage trades AIB alleges that Citibank facilitated, Amended Complaint, Ex. D ¶¶ 101, 199-222, AIB has conceded that Rusnak booked fake prime brokerage trades on Allfirst's books listing Citibank and BofA as the purported counterparties, AIB's Response to Defendants' Interrogatory Concerning "Fake Trades," dated April 22, 2010, Ex. Z at 3-4; see also Report of Christopher L. Culp, Ph.D, dated August 15, 2011 ("Culp Report"), Ex. AA ¶¶ 254-258. The Prime Brokerage Agreement clearly covers any and all claims related to Rusnak's fake prime brokerage trades.

Second, the jury waiver in the Prime Brokerage Agreement likewise precludes a trial by jury on any claims related to options transacted between Allfirst and Citibank, as the options that form the basis of AIB's claims against Citibank were exercised, hedged and settled in the prime brokerage account, were conducted to monetize profits or losses in the prime brokerage account and/or were allegedly transacted to hide Rusnak's actual losses in Allfirst's prime brokerage account. Indeed, AIB's own Amended Complaint

21

– which consistently alleges the interconnectedness of the relevant foreign exchange transactions as part of the fraudulent scheme that Citibank allegedly assisted – proves this point.

Specifically, with respect to the four same-day options (or, as AIB refers to them, "Disguised Cash Advances") that AIB claims Citibank facilitated, AIB alleges – and discovery has shown – that each same-day option transaction was exercised and settled in the prime brokerage account through a prime brokerage transaction. Amended Complaint, Ex. D ¶¶ 109-152; id. at ¶ 121 ("The exercise [of the same-day option] created a spot trade with a built-in loss to Rusnak, which was rolled forward to the next Settlement Date in the Prime Brokerage Account."); see also, e.g., Facsimile from Citibank to Allfirst, April 25, 2001, Ex. BB, at 2, 4 (prime brokerage list of trades for monthly settlement between Citibank and Allfirst on May 11, 2001, listing the spot trade exercising the April 23, 2001 same-day option and the spot trade used to roll the April 23, 2001 same-day option to the next settlement date in the prime brokerage account); DeRosa Report, Ex. X ¶¶ 378-381. Moreover, as AIB observes in its Amended Complaint, each same-day option was hedged with a spot trade in the prime brokerage account. Amended Complaint, Ex. D ¶ 122. The hedge trades associated with the same-day options were also rolled forward to the next monthly settlement date in the prime brokerage account. DeRosa Report, Ex. X ¶ 345, 386 n.283.

In addition, AIB itself alleges that the prime brokers entered into same-day options for the sole purpose of "manufactur[ing]" Allfirst's losses or gains in the prime brokerage accounts. Amended Complaint, Ex. D ¶ 17; see also id. ¶¶ 115-124; 132-136. Riccardo Gomes, one of AIB's purported expert witnesses in this case, similarly opines that

22

Rusnak used the same-day options to reduce his credit exposure to Citibank in its prime

brokerage account and to reduce his balance sheet usage with respect to his prime brokerage

trading.  Expert Report of Riccardo Gomes, dated August 15, 2011 ("Gomes Report"), Ex.

CC ¶¶ 117-118; see also Citibank, N.A.'s Responses to Plaintiff's Third Set of Requests for

Admission, dated Dec. 3, 2010, Ex. DD at 50 (AIB's Request No. 191 requests that Citibank

admit that Campbell knew that the purpose of the [same-day] options was to enable Rusnak

to monetize his unsettled gain, and Citibank "admits that Campbell knew that Allfirst did

same-day options to monetize his unsettled gains and losses."); Rebuttal Report of

Christopher L. Culp, Ph.D., dated Oct. 28, 2011,  Ex. EE ¶ 102 ("The purported Disguised

Cash Advances resulted in immediate cash payments when Allfirst bought the same-day

options and immediate cash receipts when Allfirst sold same-day options. The transactions

thus [legitimately] monetized the intra-month profits and losses of Allfirst's Prime

Brokerage Accounts.").

       With respect to the two February 20, 2001 options between Allfirst and

Citibank, which AIB refers to as a "Synthetic Loan" or "deep-in-the-money option," AIB

alleges that Rusnak used the options to disguise his losses in the prime brokerage account

from Allfirst by allegedly "outsourcing" his balance sheet.  Amended Complaint, Ex. D

¶¶ 153-160; see also Gomes Report, Ex. CC ¶¶ 125-128 (opining that Rusnak used the

February 20, 2001 option transactions to reduce his balance sheet usage).  Moreover, AIB

has also admitted that "the Fake April 9 Prime Trades were intended to supplement the

removal of the . . . [Citibank] February [20,] 2001 Options in producing false profits and

foreign exchange positions which Rusnak needed in or around April 9, 2001 to remain

within his risk limits."  Plaintiff's Objections and Responses to Defendants' Amended

Interrogatories to Plaintiff Allied Irish Banks, p.l.c. Regarding Fake Trades and Phony Confirmations, dated Dec. 23, 2010, Ex. FF at 60. Furthermore, it is telling that, despite having conducted so-called "deep-in-the-money" options with five banks, AIB chose to sue only the two banks that also served as Allfirst's foreign exchange prime brokers. Dep. of Gregory K. Thoreson, dated May 27, 2009, Ex. B at 269:13-270:13.[17]

   In light of AIB's own emphasis on Citibank's alleged conduct as Allfirst's prime broker and the fact that each of the complained-of trades were conducted (or purportedly conducted) in the prime brokerage account or, in the case of options, were exercised, hedged and settled in the prime brokerage account, were conducted to monetize profits or losses in the prime brokerage account and/or were allegedly transacted to hide Rusnak's actual losses in Allfirst's prime brokerage account, there can be no dispute that all claims and counterclaims between Citibank and AIB arise out of both the Prime Brokerage Agreement and the prime brokerage transactions between Citibank and Allfirst. See Brown v. Cushman & Wakefield, Inc., 235 F. Supp. 2d 291, 294 (S.D.N.Y. 2002) (finding that claims under state and federal discrimination statutes had their "origin or genesis" in the employment contract and thus fell under an "arising out of" jury trial waiver); Borden, Inc. v. Manhattan Magazine, Inc., No. 91 Civ. 1103 (DC), 1995 WL 640588, at *1 (S.D.N.Y. Oct. 31, 1995) ("Regardless of what theories of liability plaintiff may assert in attempting to hold defendants liable for unpaid rent, it is undisputed that each cause of action arises out of the sublease agreements.").[18]

---

[17] In addition, the Prime Brokerage Agreement specifies that "[a]ny transaction entered pursuant to this Agreement will be subject to the IFEMA," PBA, Ex. E at CITI-AIB 000103, which, as discussed above, also covers foreign currency options.

[18] The fact that AIB has asserted fraud claims, rather than breach of contract claims, is of no moment. See In re Actrade, 2007 WL 1791687, at *1 (finding that "arising from"

3.    AIB Has No Right To A Jury With Respect To Its Equitable Claims

Apart from the contractual jury waivers, AIB's jury demand necessarily fails with respect to its equitable claims, as there is no right to a jury trial on equitable claims. See Granfinanciera, S.A. v. Nordberg, 492 U.S. 33, 40-41 (1989) (the Seventh Amendment preserves – but does not expand – the right to a jury trial "in Suits at common law;" there is no right to a jury trial on claims that are solely equitable in nature). For this reason alone, AIB is not entitled to a jury trial on its equitable claims of rescission and restitution, money had and received, and unjust enrichment. Amended Complaint, Ex. D ¶¶ 267-278; see, e.g., In re Kolinsky, 110 B.R. 128, 135 (Bankr. S.D.N.Y. 1990) (describing "[r]escissional relief" as "equitable"); C.D. of NYC Inc. v. U.S. Postal Serv., No. 03 Civ. 5055 (JFK), 2004 WL 2072032, at *6 (S.D.N.Y. Sept. 16, 2004) (describing unjust enrichment as an "equitable claim" and money had and received as "an equitable cause of action").

Indeed, AIB has effectively conceded that it has no right to a jury trial on these claims by arguing to this Court that such claims are equitable in nature. See AIB's Opp'n to Mot. to Dismiss, Ex. A at 12 ("The complaint also alleges equitable claims for rescission and restitution, money had and received, and unjust enrichment."). For the same reasons, AIB does not have a right to a jury trial on Citibank's equitable counterclaim of indemnification and contribution. See Union Pac. R.R. Co. v. Reilly Indus., Inc., 215 F.3d 830, 834, 841 (8th Cir. 2000) (affirming the trial court's dismissal of contribution and

---

jury trial waiver was broad enough to cover tort claims, including conspiracy to defraud); Neuro-Rehab Assocs., Inc. v. Amresco Commercial. Fin., L.L.C., No. Civ. A. 05-12338 (GAO), 2006 WL 1704258, at * 7 (D. Mass. June 19, 2006) (holding that fraud in the inducement claim was covered by contractual jury waiver); Curtis Ctr. Ltd. P'ship v. Sumitomo Trust & Banking Co., Ltd., No. Civ. A. 95-1465 (JPF), 1995 WL 365411, at *1-2 (E.D. Penn. June 15, 1995) (holding that all of plaintiff's claims, including fraud claim, were properly characterized as "arising out of" the agreement and thus covered by contractual jury waiver).

25

indemnification claims and noting that these claims were not tried to a jury as they were "equitable in nature"); Hatco Corp. v. W.R. Grace & Co.-Conn., 59 F.3d 400, 413 (3rd Cir. 1995) ("[W]e are of the belief that a claim for contribution of the nature presented in the case before us would have been entertained by a chancellor in equity in 1791 [at the time of the adoption of the Seventh Amendment], but not by a court at law."); F.D.I.C. v. Sextant Dev. Corp., 142 F.R.D. 55, 58 (D. Conn. 1992) ("Claims for contribution are equitable claims which are not triable before a jury.").[19]

B.    Allfirst Knowingly And Voluntarily Waived Its Right To A Jury Trial

As this Court has recognized, under federal law, it is "plainly well-settled" that parties may contractually waive the right to a jury trial as long as the waiver is knowing and voluntary.[20] Am. Equities Grp., Inc. v. Ahava Dairy Prods. Corp., No. 01 Civ. 5207 (RWS), 2007 WL 4563487, at * 2 (S.D.N.Y. Dec. 18, 2007); see also Morgan Guar. Trust Co. of N.Y. v. Crane, 36 F. Supp. 2d 602, 603 (S.D.N.Y. 1999) (noting that jury trial waivers are "regularly enforced"); Solutia Inc. v. FMC Corp., 456 F. Supp. 2d 429, 454 (S.D.N.Y. 2006) (noting that jury trial waivers are "commonly upheld"). Accordingly, under Federal Rule of Civil Procedure 39(a)(2), federal courts routinely strike a party's jury demand where "the right to a jury trial, having been contractually waived, no longer exist[s]." Bear, Stearns Funding, Inc., v. Interface Group-Nevada, Inc., No. 03 Civ. 8259 (CSH), 2007 WL 3286645, at *3 n.3 (S.D.N.Y. Nov. 7, 2007); see also Okura & Co. (Am.),

---

[19]    Assuming, arguendo, that this Court finds that any of these claims are legal in nature, the broad waivers in the Prime Brokerage Agreement and IFEMA would also cover these claims as shown above.

[20]    Where, as here, a federal court sits in diversity, federal law governs whether a party is entitled to a jury trial because the issue is a question of procedural – as opposed to substantive – law.  See Simler v. Conner, 372 U.S. 221, 222 (1963) ("[T]he right to a jury trial in the federal courts is to be determined as a matter of federal [law] in diversity [actions].").

26

Inc. v. Careau Grp., 783 F. Supp. 482, 488 (C.D. Cal. 1991) ("While the right to civil jury is a fundamental constitutional right, it may be waived by a contract knowingly and voluntarily executed.").

      Courts consider the following four factors "in determining whether a contractual waiver of a right to a jury trial was entered into knowingly and voluntarily . . . : 1) the negotiability of contract terms and negotiations between the parties concerning the waiver provision; 2) the conspicuousness of the waiver provision in the contract; 3) the relative bargaining power of the parties; and 4) the business acumen of the party opposing the waiver." Morgan Guar., 36 F. Supp. 2d at 603-04. "Applying these principles to the case at bar, it requires no lengthy analysis to demonstrate that [Citibank], seeking to enforce [Allfirst]'s contractual waiver of its right to a jury trial, has satisfied all four elements articulated in Morgan Guaranty." Bear, Stearns Funding, 2007 WL 3286645, at *3.

      1.     Allfirst Was An Active Participant In The Negotiation Of Both
             Agreements

      In determining the enforceability of a jury trial waiver, a district court begins its analysis by determining whether the party against whom waiver would be enforced had an opportunity to review and revise the agreement at issue prior to execution. Wechsler v. Hunt Health Sys., Ltd., No. 94 Civ. 8294 (PKL), 2003 WL 21878815, at *3 (S.D.N.Y. Aug. 8, 2003). "[E]ven if the term itself was never specifically negotiated . . . [p]roof of the negotiability of a contract term may include the fact that other provisions of the contract were successfully negotiated and changed." Id. Similarly, review by legal counsel prior to execution suggests that provisions in the agreement, including the jury trial waiver, were negotiable. Id.

Here, Allfirst indisputably had an opportunity to review and negotiate the Prime Brokerage Agreement and the IFEMA. For example, with respect to the Prime Brokerage Agreement, Allfirst sent Citibank a proposed draft of the agreement that is patently different from the final agreement, thus demonstrating that the signed agreement was a product of negotiation. See email from J. Rusnak attaching proposed prime brokerage agreement, dated Sept. 6, 2000, Ex. GG at CITI-AIB 043014-7. Similarly, the IFEMA includes a Schedule reflecting agreed-upon modifications to the standard IFEMA agreement, indicating that the parties engaged in negotiation. Indeed, the Schedule modifies the numbered paragraphs directly preceding the jury trial waiver. IFEMA, Ex. F at CITI-AIB 000137. Most critically, the parties explicitly negotiated what types of foreign exchange transactions would be covered by the IFEMA and decided that the "Agreement shall apply to all foreign exchange transactions outstanding between any two Designated Offices of the Parties on the Effective Date." IFEMA, Ex. F at CITI-AIB 000133.

Moreover, to the extent that Allfirst chose not to negotiate certain provisions of the Prime Brokerage Agreement and IFEMA, this simply reflects Allfirst's acceptance of these provisions. Allfirst generally was comfortable not changing agreements that contained contractual provisions that had become relatively standard in the market. Crucially, Allfirst's Funds Management Policy – approved annually by Allfirst's Board of Directors – encourages the use of standard master agreements, which reflect best market practice. See First Maryland Bancorp's Funds Management Policy, dated January 20, 1998, AIB 266999-7101, Ex. HH at AIB 267051; Allfirst Financial Inc.'s Funds Management Policy, dated December 14, 1999, AIB 027369-484, Ex. II at AIB 027409; Allfirst Financial Inc.'s Funds Management Policy, dated January 23, 2001, AIB 539869-983, Ex. JJ at AIB 539885; see

28

also N. Feldman & Son, Ltd. v. Checker Motors Corp., 572 F. Supp. 310, 313 (S.D.N.Y.

1983) (rejecting argument that boilerplate jury trial provision was not enforceable).  Allfirst

specifically embraced this approach with respect to foreign exchange trading in order to

save money on negotiation fees.  See Ludwig Report investigation document entitled "Prime

Accounts," AIB 05072598-609, Ex. KK at AIB 05072604 ("GG [Glorianne Garth of

Allfirst's Risk Assessment] said BR's [Bob Ray, the Senior Vice President of Allfirst's front

office] view was that he was happy to accept a counterparty's document because it saved on

negotiation fees.").  And, most importantly for purposes of this motion, as noted above

Allfirst routinely entered into contracts waiving jury rights under all of its foreign exchange

master trading agreements.[21]

        Finally, Allfirst's in-house counsel reviewed the trading agreements.  For

example, on April 4, 2000 Rusnak sent Allfirst in-house counsel Ralph Partlow an email

entitled, "FW: Complete IFEMA for Allfirst," forwarding a copy of the IFEMA between

Citibank and Allfirst that included the Schedule modifying the terms of the IFEMA, and

asked Partlow, "Would you please have a look at this FEOMA [sic][22] and give me your

---

[21]  See, e.g., Foreign Exchange and Options Master Agreement ("FEOMA") between
Merrill Lynch International Bank and First National Bank of Maryland, dated Mar. 14,
1997, Ex. LL at AIB 05055801; FEOMA between Bank of America National Trust and
Savings Association and First National Bank of Maryland, dated May 5, 1998, Ex. MM
at AIB 05055635; International Swap Dealers Association, Inc. ("ISDA") Master
Agreement between Chemical Bank and First National Bank of Maryland, dated Oct.
15, 1992, Ex. NN at JPM 000058; FEOMA between the Bank of New York and First
National Bank of Maryland, dated Apr. 30, 1998, Ex. OO at BNY-AIB 00224; ISDA
Master Agreement between the Bank of New York and Allfirst Bank, dated Feb. 1,
2001, Ex. PP at BNY-AIB 00488; ISDA Master Agreement between First National
Bank of Maryland and Franklin P. Perdue, dated May 10, 1996, Ex. QQ at AIB
00256810.

[22]  Rusnak's use of the term "FEOMA" here is a typographical error; the email attaches the
IFEMA between Citibank, see Email from J. Rusnak to R. Partlow, attaching IFEMA,

29

thoughts." Email from J. Rusnak to R. Partlow, attaching IFEMA, dated Apr. 4, 2000, Ex. RR at AIB 05126958;[23] see also G. Garth notes on May 22, 2001 meeting with J. Rusnak and B. Ray, Ex. TT at AIB 268216 (stating Bob Ray (Rusnak's superior) "implied [that] Ralph Partlow had reviewed all our prime account agreements"). Allfirst's access to – and use of – in-house counsel adds further support to the conclusion that the waivers were negotiable and that they were knowing and voluntary. See Wechsler, 2003 WL 21878815, at *3 (noting the involvement of counsel in support of its finding that the waiver was negotiable); Am. Equities, 2007 WL 4563487, at *3 (same).

       2.      The Waivers Were Conspicuous

"With regard to the 'conspicuousness' of a waiver, courts have looked at the placement of the waiver within the contract, as well as the font size and style of the waiver." Am. Equities, 2007 WL 4563487, at *3. Waivers that are "easily found and [] equal in appearance to all other contract provisions" are "entirely conspicuous." Bank of China v. NBM L.L.C., No. 01 Civ. 0815 (DC), 2002 WL 1072235, at *3 (S.D.N.Y. May 28, 2002). Conversely, jury trial waivers that are "literally buried" in a lengthy agreement may be found to be inconspicuous. See Nat'l Equip. Rental, Ltd. v. Hendrix, 565 F.2d 255, 258 (2d Cir. 1977).

Here, the waivers were clearly conspicuous, as they are prominently set forth in both the IFEMA and the Prime Brokerage Agreement. In the IFEMA, the jury trial waiver is set off in its own numbered paragraph entitled "Waiver of Jury Trial." IFEMA,

---

dated Apr. 4, 2000 Ex. RR at AIB 05126959-993, and the rest of the email chain refers to the IFEMA not a FEOMA, id. at AIB 05126958.

23  Although AIB originally redacted this email for privilege and logged it as entry 489 on its privilege log, it produced the same without redactions on June 28, 2010. See Letter from J. Lang to M. Vogele, dated June 28, 2010, Ex. SS.

Ex. F at CITI-AIB 000131 (underline in original).  Similarly, in the Prime Brokerage

Agreement, the jury trial waiver is included in a paragraph entitled "JURISDICTION AND

VENUE."  PBA, Ex. E at CITI-AIB 000107.  Moreover, both waivers are close in proximity

to the signature lines.  See Schappert v. Bedford, Freeman & Worth Publ'g Grp., LLC, No.

03 Civ. 0058 (RMB) (DFE), 2004 U.S. Dist. LEXIS 14153, at *35 (S.D.N.Y. July 23, 2004)

(noting, in support of the Court's finding that the waiver was conspicuous, that the jury trial

provision waiver "immediately preceded the parties' signatures"); Bank of China, 2002 WL

1072235, at *3 (same).  Additionally, the Prime Brokerage Agreement, excluding four pages

of exhibits, is only six pages long – hardly lengthy enough to allow a provision to be

"literally buried."  Nat'l Equip. Rental, Ltd. V. Hendrix, 565 F.2d at 258; see also Orix

Credit Alliance, Inc. v. Better Built Corp., No. 89 Civ. 7333 (JFK), 1990 WL 96992, at *2

(S.D.N.Y. July 2, 1990) (noting the brevity of the agreement in support of its finding that

the jury trial waiver was conspicuous).

       The font size and style of the waiver provisions in the IFEMA and the Prime

Brokerage Agreement further support the conclusion that the waivers were conspicuous.  In

the IFEMA, the jury trial waiver, in addition to being underlined, is also set forth in the

same font and size as the remainder of the agreement.  In the Prime Brokerage Agreement,

the jury trial waiver is written in all capital letters.  The jury trial waivers in both agreements

are in no way hidden.  See Am. Equities, 2007 WL 4563487, at * 3 (noting, in support of its

finding that the waiver was conspicuous, that the waiver is "in the same font and size as all

other provisions"); Bank of China, 2002 WL 1072235, at *3 (noting, in support of its

finding that the waivers were conspicuous, that the provisions "are equal in appearance to

all other contract provisions"); Nat'l Westminster Bank, 130 B.R. at 667 (noting, in support

of its finding that the waiver was conspicuous, that the waiver, "like the balance of the [Agreement], is printed in small but entirely legible text"). Thus, the placement, font and style of the waivers all demonstrate that Allfirst's jury waivers were conspicuous, a factor weighing in favor of this Court determining that the waivers were knowing and voluntary.

### 3.   Allfirst And Citibank Had Comparable Bargaining Power

The next factor relevant to determining whether a waiver of a jury trial is knowing and voluntary is the relative bargaining power of the parties. While "gross inequality in bargaining power" can suggest that a waiver was not voluntary or knowing, Nat'l Equip. Rental, 565 F.2d at 258, a finding that one party had greater bargaining power does not end the inquiry, see Morgan Guar., 36 F. Supp. 2d at 604 (noting, in support of its finding that the jury waiver was enforceable, that "although there was clearly a difference in bargaining power between the sides – as there would be between a major bank and virtually any two individuals – [the parties against whom the waiver was enforced] were not financial neophytes"). Rather, the Court must examine whether one party's bargaining power was so great as to render the waiver not knowing and voluntary.

Here, there was "no inequality of bargaining power between these two major and well-funded players in the business world." Bear, Stearns Funding, 2007 WL 3286645, at *3. Allfirst was a sophisticated financial institution conducting domestic and international banking services. It was also a highly regulated financial institution. Indeed, Allfirst was a wholly owned subsidiary of AIB which, as of 2001, was "the largest banking corporation organized under the laws of Ireland," with total assets of $78.3 billion. See Excerpt from Allfirst Financial Inc.'s Form 10-K, filed with the Securities & Exchange Commission on April 1, 2002, Ex. UU.

32

4.    Allfirst Was An Experienced And Sophisticated Institution

With respect to the final factor, "[e]xtensive past business experience on behalf of the party contesting a jury waiver is an indication that this party knowingly and intentionally consented to the waiver." Wechsler, 2003 WL 21878815, at *4. Put simply, this factor seeks to determine whether the party resisting enforcement is a "stranger to contract negotiations." See Am. Equities, 2007 WL 4563487, at * 3 (quoting Ortix, 1990 WL 96992, at *2). In making this determination, courts examine the sophistication of the party seeking to avoid enforcement, including the signatories' education and previous business experience. See Nat'l Westminster, 130 B.R. at 667.

Under no stretch of the imagination can Allfirst – a wholly owned subsidiary of the largest bank in Ireland – claim it lacked sufficient business acumen to understand the jury trial waivers in the IFEMA and Prime Brokerage Agreement. As an initial matter, as discussed above, Allfirst routinely entered into similar agreements – and routinely waived its right to a jury trial. See supra note 21; see also Am. Equities, 2007 WL 4563487, at * 3 (noting that defendant had entered into similar agreements before). Additionally, experienced officers at Allfirst executed both the IFEMA and the Prime Brokerage Agreement. See Nat'l Westminster, 130 B.R. at 667 (listing defendant's education credentials, occupation and past negotiating experience as evidence in support of finding that the defendant had sufficient business acumen). The IFEMA was executed by Allfirst Senior Vice President Bob Ray, and the Prime Brokerage Agreement was signed by Rusnak, then a Vice President. See Morgan Guar., 36 F. Supp. 2d at 604 (noting, in favor of finding that the parties were experienced business people, that a Vice President signed the agreement).

33

**CONCLUSION**

For the foregoing reasons, Citibank's motion to strike AIB's demand for a

jury trial should be granted and the Court should grant such other and further relief to

Citibank as it deems just and proper.

Dated: January 27, 2012
      New York, New York

            CLEARY GOTTLIEB STEEN & HAMILTON LLP

            By: /s/ Howard S. Zelbo
               Thomas J. Moloney tmoloney@cgsh.com
               Howard S. Zelbo hzelbo@cgsh.com

            One Liberty Plaza
            New York, New York 10006
            Telephone:  (212) 225-2000
            Facsimile:  (212) 225-3999

            Attorneys for Defendant and Counterclaim and Third-
               Party Plaintiff Citibank, N.A.

34