UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

ALLIED IRISH BANKS, p.l.c.,

Plaintiff,

v.

BANK OF AMERICA, N.A. and CITIBANK, N.A.,

Defendants.

No. 03 Civ. 3748 (DAB) (GWG)

BANK OF AMERICA, N.A. and CITIBANK, N.A.,

Counterclaim and Third-Party Plaintiffs,

v.

ALLIED IRISH BANKS, p.l.c.,

Counterclaim-Defendant,

and

M&T BANK CORPORATION and MANUFACTURERS AND TRADERS TRUST COMPANY,

Third-Party Defendants.

**Filed Under Seal-**
**REDACTED VERSION**

**Oral Argument Requested**

**REPLY MEMORANDUM OF LAW OF DEFENDANT CITIBANK, N.A. IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT**

**TABLE OF CONTENTS**

| | Page |
|---|---|
| TABLE OF AUTHORITIES | ii |
| PRELIMINARY STATEMENT | 1 |
| ARGUMENT | 2 |
| I. AIB'S CLAIMS ARE BARRED BY THE DOCTRINE OF IN PARI DELICTO | 2 |
| II. NO CLEAR AND CONVINCING EVIDENCE OF THE FRAUD CLAIMS | 5 |
| A. No Material Misrepresentation or Omission | 5 |
| B. No Reliance | 6 |
| C. Citibank Did Not Cause Allfirst's Losses | 8 |
| III. THE EQUITABLE CLAIMS ARE ALL BARRED | 12 |
| CONCLUSION | 12 |

# TABLE OF AUTHORITIES

Page(s)

**Cases**

720 Lex Acquisition LLC v. Guess? Retail, Inc.,
No. 09 Civ. 7199, 2011 WL 5039780 (DAB) (S.D.N.Y. Oct. 21, 2011) .......... 10

A.I.G., Inc., v. Greenberg,
965 A.2d 763 (Del. Ch. 2009), aff'd Kirschner v. KPMG,15 N.Y.3d 446 (2010) .......... 5

Bickerstaff v. Vassar Coll.,
196 F.3d 435 (2d Cir. 1999) .......... 9

Bullmore v. Ernst & Young,
861 N.Y.S.2d 578 (N.Y. Sup. Ct. 2008) .......... 4

Century Pacific, Inc. v. Hilton Hotels Corp.,
528 F. Supp. 2d 206 (S.D.N.Y. 2007) .......... 6

Compania Sud-Americana De Vapores v. Schroder Bank & Trust Co.,
785 F. Supp. 411 (S.D.N.Y. 1992) .......... 6

Derdiarian v. Felix Contracting Corp.,
51 N.Y.2d 308 (1980) .......... 11

Edwards & Hanly v. Wells Fargo Sec. Clearance Corp.,
602 F.2d 478 (2d Cir. 1979) .......... 10-11, 12

Food Holdings v. Bank of America Corp.,
423 F. App'x 73 (2d Cir. 2011) .......... 11

Gaidon v. Guardian Life Ins. Co. of Am.,
94 N.Y.2d 330 (1999) .......... 6

Goldberg v. Kidder Peabody & Co.,
991 F. Supp. 215 (S.D.N.Y. 1997) .......... 12

Granite Partners, L.P. v. Bear Stearns & Co., Inc.,
17 F. Supp. 2d 275 (S.D.N.Y. 1998) (Sweet, J.) .......... 6

In re Eugenia VI Venture Holdings, Ltd. Litig.,
649 F. Supp. 2d 105 (S.D.N.Y. 2008) (Batts, J.) .......... 7

In re Parmalat,
659 F. Supp. 2d 504 (S.D.N.Y. 2009), aff'd 412 F. App'x 325 (2d Cir. 2011) .......... 5

In re Refco Sec. Litig. (Krys v. Sugrue),
779 F. Supp. 2d 372 (S.D.N.Y. 2011) .......... 4

Kirschner v. KPMG,
15 N.Y.3d 446 (2010) .......... 2-3, 4, 5

Laugh Factory, Inc. v. Basciano,
608 F. Supp. 2d 549 (S.D.N.Y. 2009).......... 5

LNC Invs., Inc. v. First Fidelity Bank,
No. 92 Civ. 7584, 1997 WL 528283 (MBM) (S.D.N.Y. Aug. 27, 1997).......... 11

Naughright v. Weiss,
826 F. Supp. 2d 676 (S.D.N.Y. 2011).......... 6

NML Capital, Ltd. v. Republic of Argentina,
No. 05 Civ. 2434 (TPG), 2009 WL 1528535 (S.D.N.Y. May 29, 2009).......... 5, 12

Perma Research & Dev. Co. v. Singer Co.,
410 F.2d 572 (2d Cir. 1969).......... 9

Phillips v. Am. Int'l Grp., Inc.,
498 F. Supp. 2d 690 (S.D.N.Y. 2007).......... 6

Sheehan v. City of New York,
40 N.Y.2d 496 (1976) .......... 11

Trs. of Am. Fed'n of Musicians & Emp'rs Pension Fund v. Steven Scott Enters.,
40 F. Supp. 2d 503 (S.D.N.Y. 1999).......... 12

U.S. Bank Nat'l Ass'n v. Ables & Hall Builders,
696 F. Supp. 2d 428 (S.D.N.Y. 2010).......... 12

## PRELIMINARY STATEMENT

Notwithstanding its attempt to obscure the issues with an improper and largely irrelevant Rule 56.1 response,[1] AIB's opposition confirms that the material facts compelling summary judgment are not in dispute. As to Citibank's *in pari delicto* defense, AIB admits [REDACTED] and that he used Allfirst's balance sheet [REDACTED] which, when successful, resulted in funds going directly to the bank. Resp. ¶ 51. Because Rusnak indisputably was attempting, even if largely unsuccessfully, to make money for Allfirst, it was not Rusnak's "intended victim," and Rusnak did not "totally abandon" Allfirst's interests.

AIB also admits its "control weaknesses were largely sufficient for Rusnak to conceal his losses for the first four years of his" five-year fraud. Opp. at 1. It also admits those sufficient control failures continued until the fraud was discovered, including the continued [REDACTED]" Resp. ¶ 24. AIB also admits that [REDACTED] ¶¶ 89-90, such that AIB's purported expert [REDACTED] ¶¶ 132-33. AIB also admits a material [REDACTED] that allowed Rusnak to falsely self-report his [REDACTED] which was [REDACTED] Resp. ¶¶ 100, 104. Additionally, AIB only attempts to minimize, but does not deny,

[1] For the reasons set forth in Citibank's Reply to AIB's 56.1 response and statement of additional material facts, these responses for the most part are not in compliance with Rule 56.1 and should be ignored or stricken. Any paragraph references herein (i.e., "¶") are to the corresponding paragraphs in both Citibank's 56.1 Statement and Citibank's Reply 56.1 Statement. Any references to "Resp. ¶" are to AIB's Response to Citibank's Statement of Material Facts. References to "Opp." are to AIB's Memorandum in Opposition to Citibank's Motion for Summary Judgment. References to "Br." are to Citibank's Memorandum in Support of Its Motion for Summary Judgment.

myriad additional Allfirst supervisory and control failures, including allowing Rusnak to continue fabricating intra-month pricing of his positions even after recognizing that there was a risk this was occurring, Resp. ¶¶ 105-21, as well as permitting a hostile and dysfunctional control environment that allowed numerous missed opportunities to uncover and stop the fraud, ¶¶ 79-90, 122-51.

AIB says these failures were [REDACTED] Resp. ¶ 3, but, collectively and individually, they represent a complete abdication of the acknowledged responsibility to maintain an effective system of internal controls imposed on Allfirst and AIB under federal law. It is undisputed that Allfirst had the ability to stop this fraud at any time had it only done what it was supposed to do as a regulated financial institution.

AIB's claims also fail because there is: (a) no material misrepresentation or omission, or with respect to the aiding and abetting fraud claim, substantial assistance, as AIB does not dispute that all of the material economic terms of the transactions entered into with Citibank were accurately disclosed; (b) no reasonable reliance and no substantial assistance, including because the information relied on by AIB's putative experts to claim the options were not "genuine" is the same information that Citibank fully disclosed to Allfirst and that Allfirst had an obligation to review and analyze and from which it could have reached its own conclusions; and (c) neither "but for" nor "proximate causation." Finally, AIB only even attempts to defend its purported rescission claim with respect to one trade. That effort fails because this trade was authorized or in any event ratified by Allfirst and AIB.

## ARGUMENT

## I. AIB'S CLAIMS ARE BARRED BY THE DOCTRINE OF IN PARI DELICTO

The "total abandonment" standard "avoids ambiguity . . . and reserves this most narrow of exceptions for those cases – outright theft or looting or embezzlement – where the insider's

misconduct benefits only himself or a third party." Kirschner v. KPMG, 15 N.Y.3d 446, 466-67 (2010) (emphasis added). This case does not involve theft, looting or embezzlement, the three enumerated instances in which the "total abandonment" exception applies. Resp. ¶¶ 48-51. Allfirst was also not Rusnak's "intended victim" because he was attempting to profit from trading for the benefit of Allfirst, including when he was trying to win back concealed losses; when he did have gains, they inured to Allfirst's benefit.[2]  Resp. ¶¶ 43-44.

AIB does not even attempt to respond to the argument that allowing the defense is required by Kirschner's expressed policy rationales that (1) corporations need to take responsibility for their failure to prevent malfeasance of their own employees and (2) it is unfair when dealing with public corporations to apply a "double standard" by imputing to the defendant responsibility for the alleged conduct of its employees but not imputing the primary fraudster's conduct to the plaintiff. Kirschner, 15 N.Y.3d at 464-65, 468, 475.[3]  To achieve these two policy goals, Kirschner held that courts should not engage in the weighing exercise urged by AIB and, thus, AIB's claims are barred even if, as AIB wrongly alleges, Citibank's employees were somehow complicit in Rusnak's conduct. Id. Rusnak lost money while engaged in proprietary trading for Allfirst – the activity he was hired to perform. Resp. ¶ 4. This is precisely the situation where Kirschner says the employer has an obligation to supervise its employees, and there is no question that egregious supervisory and control failures occurred at Allfirst. Under Kirschner, then, Rusnak's conduct must be imputed to Allfirst, which acts to bar AIB's claims.

AIB's attempt to limit the defense to cases where "the losses were incurred as a result of ordinary business activity and the fraudulent scheme was deployed to conceal the losses" is both

---

[2] AIB misconstrues Kirschner when it argues that the total abandonment exception applies whenever the corporation is harmed by the fraud, or is the agent's victim. Opp. at 22-23. Kirschner stated that the exception applies "[w]here the corporation is actually the agent's intended victim." 15 N.Y.3d at 466 (emphasis added). Rusnak indisputably was not intending to – and did not – steal, loot or embezzle from Allfirst; he was trying to make money for Allfirst.
[3] The Court held that when agents for both companies acted improperly, the equities favor the defendant. Id. at 475.

legally unsupported and unhelpful to AIB.[4] Opp. at 24. In fact, Allfirst [redacted] ¶ 50.

The fundamental flaws in AIB's analysis are shown by [redacted][5]

AIB also argues that application of the *in pari delicto* defense turns on the timing of when the corporation is injured. Opp. at 22-23. Contrary to AIB's "timing theory," which no Court has ever embraced, in many cases the corporation is injured in an actual accrual sense long before the disclosure of the fraud causes the corporation to realize the injury. Thus, for example, in both cases that the Kirschner court reviewed, the wrongful activity was hidden and resulted in fraudulent embellishments of economic performance, which caused in an accrual sense increased liabilities to third parties long before the true facts came to light. In the case of Refco, the CEO,

---

[4] See, e.g., Bullmore v. Ernst & Young, 861 N.Y.S.2d 578, 580 (N.Y. Sup. Ct. 2008) (rejecting adverse interest exception where losses were caused by "fraudulent valuation methods").

[5] This case is therefore unlike In re Refco Sec. Litig. (Krys v. Sugrue), 779 F. Supp. 2d 372 (S.D.N.Y. 2011), a case brought by a fund against its own directors where the court denied a motion to dismiss because the complaint alleged the "functional equivalent" of "theft or looting."

just like Rusnak, hid losses in the hopes he could buy time to act on solving his problem, but only ended up digging himself into a deeper hole.[6] Kirschner refused to adopt a rule that focused on the fraudster's selfish motives or the injury to the corporation because it would cause the adverse interest rule, which the Court considered to be an important policy-based rule, to become a "dead letter." 15 N.Y. 3d at 471. Thus, both in accordance with the "total abandonment" test set forth in Kirschner and on a policy level, the *in pari delicto* defense should be applied and all of AIB's claims dismissed.

## II. NO CLEAR AND CONVINCING EVIDENCE OF THE FRAUD CLAIMS[7]

### A. No Material Misrepresentation or Omission

There can be no misrepresentation or omission when a party to a financial transaction discloses the underlying trade details to its counterparty; a party has no duty to further characterize the transaction for its sophisticated counterparty. Br. at 15, 16 n.16 (citing cases). AIB does not contest that Citibank accurately confirmed to Allfirst the underlying financial terms of the six complained-of trades. See Br. at 15; Opp. at 17.[8]

Nor does AIB attempt to rebut the principle that a plaintiff cannot sustain a fraud claim when the counterparty defendant provides it with "concededly accurate" disclosures of financial facts by asserting that those accurate facts nonetheless could be "interpret[ed]" in a way that

---

[6] See Kirschner, 15 N.Y. 3d at 457-58 (Refco CEO took on debt, an accrued, ongoing liability). Similarly, AIG had to pay $10 million to Gen Re – an actual, accrued loss – for fake insurance contracts that AIG used to cover its inadequate loss reserves. A.I.G., Inc., v. Greenberg, 965 A.2d 763, 783 (Del. Ch. 2009), aff'd Kirschner, 15 N.Y. 3d at 464. See also In re Parmalat, 659 F. Supp. 2d 504, 509 (S.D.N.Y. 2009) (fraudsters created misleading transactions to secure loans, which were used to obtain yet more loans, increasing the real time, "ongoing" accrual of liabilities and debt), aff'd 412 F. App'x 325 (2d Cir. 2011).

[7] Contrary to AIB's view, Opp. at 12 & n.7, it must show both a misstatement/omission and Allfirst's reliance thereon not only to survive summary judgment on its fraud and fraudulent concealment claim, but also to sustain its aiding and abetting claim, since Citibank's alleged substantial assistance to Rusnak – a required element of aiding and abetting – is based on the same purported deception of Allfirst upon which it bases its fraud and fraudulent concealment claim. Compare Amd. Cplt. ¶¶ 259-60 with ¶¶ 247-55; see Br. at 14-20.

[8] Citibank argued that it made no misrepresentations or omissions concerning the prime brokerage account confirmation process or prime brokerage website. Br. at 17. AIB's brief fails to respond to these points, waiving those arguments. See NML Capital, Ltd. v. Republic of Argentina, No. 05 Civ. 2434 (TPG), 2009 WL 1528535, at *1 (S.D.N.Y. May 29, 2009); Laugh Factory, Inc. v. Basciano, 608 F. Supp. 2d 549, 560 (S.D.N.Y. 2009).

misrepresents the "fundamental characteristics" of the financial deal, Granite Partners, L.P. v. Bear Stearns & Co., Inc., 17 F. Supp. 2d 275, 287 (S.D.N.Y. 1998), or the "practical implications" of the financial deal, Gaidon v. Guardian Life Ins. Co. of Am., 94 N.Y.2d 330, 350 (1999); Phillips v. Am. Int'l Grp., Inc., 498 F. Supp. 2d 690, 697 (S.D.N.Y. 2007).

Additionally, once Citibank accurately disclosed the underlying details of the transactions, it had no duty to opine on the meaning of those financial details, such as disclosing that the transactions were allegedly not "genuine foreign exchange transactions." Opp. at 16-17. There is no duty to make further disclosures, including to characterize a trade a certain way (be it as "not genuine" or as something else) where, as here, the counterparty provided the plaintiff with "access to all [of the] material information" it needs – here, the accurately confirmed financial details – to arrive at the supposedly omitted characterization itself. Compania Sud-Americana De Vapores v. Schroder Bank & Trust Co., 785 F. Supp. 411, 422-23 (S.D.N.Y. 1992);[9] see also Naughright v. Weiss, 826 F. Supp. 2d 676, 690-91 (S.D.N.Y. 2011) (no duty to disclose where plaintiff made no attempt to show that the supposedly undisclosed information "was not available to [it] upon reasonable inquiry").[10]

**B. No Reliance**

AIB argues that Allfirst somehow satisfied the standard of applying "ordinary intelligence" in assessing its activities with Citibank by default, because nobody at Allfirst was assigned responsibility to review and understand the six transactions at issue in this case. Opp. at 19 (claiming it can show reliance because nobody was reviewing Rusnak's activities "on a trade-

[9] Indeed, a duty to disclose such as the one AIB alleges, see Opp. at 17 n.18, only exists in situations where a "party has superior knowledge that is not available to the other party and the party with superior knowledge knows that the other party is acting on the basis of mistaken knowledge." Century Pacific, Inc. v. Hilton Hotels Corp., 528 F. Supp. 2d 206, 232 (S.D.N.Y. 2007) (emphasis added).

[10] Notably, although AIB relies entirely on the incompetent views of its purported experts, [redacted] Resp. ¶ 165.

by-trade basis"). But reasonable reliance through "ordinary intelligence" requires more than just inaction; rather, it requires "inquiry and investigation if [plaintiff] has the ability." In re Eugenia VI Venture Holdings, Ltd. Litig., 649 F. Supp. 2d 105, 118 (S.D.N.Y. 2008) (Batts, J.) (internal citations and quotations omitted); see also Br. at 18 (citing additional cases).

This is especially true here because AIB acknowledges both it and Allfirst, as banking institutions, were required by federal law to have in place a "no surprises" system of supervision and review of their proprietary trading. Resp. ¶ 3. Such a system is not provided when Rusnak's direct supervisor, Ray, abdicates his responsibility to supervise Rusnak's trading. ¶¶ 89-90. Such a system necessarily also requires having control personnel in place charged with reviewing and understanding the relevant information that was available to, and indeed directly reviewed by, Allfirst's managers. That admittedly did not happen here. The May 9, 2001 same-day option and related trades that AIB claims Rusnak used to cover up fake prime brokerage trades were indisputably reviewed by Allfirst's back office manager, a senior Allfirst officer who had access to and specifically reviewed those transactions and Citibank's confirmations of those transactions. ¶¶ 292-93, 295. When commentating on these transactions, [REDACTED] ¶ 295.[11] In addition, it was widely known at Allfirst and AIB that Rusnak was trading (including buying and selling) deep in the money options, ¶¶ 256-63, and the specific Feb. 20, 2001 option with Citibank resulted in a $125 million premium payment to Allfirst that appeared on a report which three of Allfirst's senior managers received on [REDACTED] ¶ 242.[12] Therefore, had anyone at Allfirst truly been

---

[11] [REDACTED] he clearly was familiar with the specific trades at issue. Moreover, nothing Citibank did or said could possibly justify Allfirst's back office's acceptance of Rusnak's suggestion that it simply ignore one of the trades that were confirmed on May 9. See Resp. ¶ 300.

[12] In 2001 Rusnak did five substantially similar transactions with five different financial institutions resulting in $270 million in premiums to Allfirst, none of which created any concern at Allfirst when they were done. ¶¶ 237, 252-63.

monitoring Rusnak's net balance sheet usage with reasonable diligence, they would have known that he temporarily reduced that usage by selling deep in the money options.

### C. Citibank Did Not Cause Allfirst's Losses

AIB concedes that standing alone, "Rusnak's deceit and Allfirst's control weakness[es] were largely sufficient for Rusnak to conceal his losses for the first four years of his fraud from 1997 through 2000." Opp. at 1. Accordingly, as to losses Allfirst incurred through 2000, it is undisputed that Citibank was neither the "but for" nor proximate cause. AIB nonetheless claims that despite the continuation of these same "sufficient" control failures until February 2002, Citibank was somehow the cause of Allfirst's post-2000 losses.

AIB argues that Citibank helped Rusnak evade an undocumented balance sheet limit of $250 million supposedly imposed by Cronin for 2001. AIB's causation theory is that (a) Rusnak was subject to this $250 million limit in 2001; (b) Allfirst regularly monitored this supposed limit; (c) it was Rusnak's exceeding this limit in early 2002 that led Cronin to halt Rusnak's trading that in turn lead to Allfirst finally seeking to confirm an option with an Asian counterparty and the discovery of the fraud; and (d) but for the supposed funding provided by Citibank (and other banks that traded identical large options with Rusnak), Rusnak would have exceeded that $250 million limit earlier and his fraud therefore would have been uncovered earlier. Not a single link of this alleged causal chain is supported by the record.

Indeed, the predicate for this entire theory, AIB's assertion of a $250 million limit, is precluded by the binding Rule 30(b)(6) testimony of Allfirst CFO Maurice Crowley, [redacted]

[redacted]

[redacted] ¶ 160. It is undisputed that Rusnak's reported balance sheet usage vastly exceeded that limit throughout the year, yet his trading was not halted. Resp. ¶ 159.



AIB offers an affidavit from Cronin that impermissibly contradicts AIB's 30(b)(6) testimony and Cronin's own deposition testimony, and thus cannot create an issue of fact.[13]

Resp. ¶ 161, he did not testify that this supposed limit led him to stop Rusnak's trading.

¶ 161.

¶ 161. This was the reason, Cronin testified, that he decided to ask Rusnak to wind down his trading. ¶ 161.[14]

Critically, in response to a question from AIB's own counsel,

¶ 161.

---

[13] "It is beyond cavil that a party may not create an issue of fact by submitting an affidavit in opposition to a summary judgment motion that contradicts the affiant's previous deposition testimony." Bickerstaff v. Vassar Coll., 196 F.3d 435, 455 (2d Cir. 1999) (internal quotation marks, punctuation and citation omitted); see also Perma Research & Dev. Co. v. Singer Co., 410 F.2d 572, 578 (2d Cir. 1969) ("If a party who has been examined at length on deposition could raise an issue of fact simply by submitting an affidavit contradicting his own prior testimony, this would greatly diminish the utility of summary judgment as a procedure for screening out sham issues of fact.").

[14] AIB's Rule 56.1 response similarly states that See Resp. ¶ 72 (emphasis added). Contrary to the implication in AIB's brief that Allfirst began tracking Rusnak's balance sheet usage via Daily Market Risk Summaries in early 2001 because of a new $250 million limit, Opp. at 6, the record indicates that Rusnak's usage was tracked simply because of his high cost of carry and the need to monitor that cost in assessing the profitability of his trading, ¶¶ 154-55, 161.

Of course, even assuming that an additional, undocumented $250 million balance sheet limit existed, the record shows that Rusnak violated every actual "limit" that Allfirst imposed for five years – including balance sheet, value at risk, and stop-loss limits – but was never called to account.[15] The suggestion that but for the Feb. 20 option something different would have happened here is entirely speculative. See 720 Lex Acquisition LLC v. Guess? Retail, Inc., No. 09 Civ. 7199, 2011 WL 5039780 (DAB), at *3 (S.D.N.Y. Oct. 21, 2011) (Batts, J.)

Similarly off-base and speculative is AIB's causation argument regarding the May 9, 2001 transactions. The undisputed record demonstrates that it was the incompetence of Allfirst's back office that was responsible for Rusnak's ability to misuse Citibank's May 9 confirmations:

- AIB agrees that Citibank did not provide confirmations for Rusnak's fake trades of April 9, 2001. See Resp. ¶ 288.
- AIB agrees that Rusnak entered additional fake trades in Allfirst's books on May 7 and 8 to offset the April 9 trades, but that Citibank refused to confirm these trades in response to a query from Allfirst. See Resp. ¶¶ 289-90.
- AIB agrees that Allfirst accepted Citibank's confirmations of the morning May 9 trades as confirmations for the May 7 and 8 trades that Citibank had refused to confirm, even though the dates of the May 9 confirmations did not match those of the May 7 and 8 trades. See Resp. ¶ 294.
- AIB agrees that Rusnak was able to use the afternoon May 9 trades with Citibank to finally offset his fake April 9 trades because Rusnak was able to instruct Allfirst's back office to ignore the confirmations received from Citibank for one of the two confirmed May 9 trades, so that cash flows matched. See Resp. ¶ 300.

No reasonable fact finder could blame Citibank for this series of Allfirst back office failures.

Apart from the lack of even "but for" causation, AIB does not distinguish any of the cases cited in Citibank's brief holding that no proximate causation exists for providing funding that was subsequently misused because of fraud and control failures. See Edwards & Hanly v.

[15] See, e.g., ¶ 160; Resp. ¶ 159 [redacted] ; Resp. ¶¶ 104, 151 [redacted] ; Resp. ¶ 151 [redacted] .

Wells Fargo Sec. Clearance Corp., 602 F.2d 478, 484 (2d Cir. 1979) (proximate cause was plaintiff's own failure to detect fraudster, not defendant bank's "lending [the fraudster] money, free of interest" or its failure to disclose the loans, even when bank knew the fraudster was losing large amounts of money via short selling).[16]

While AIB claims that it was foreseeable that Rusnak would lose money if he were permitted to continue trading, Opp. at 14-15, no evidence or logic supports this. Nothing Citibank did or is alleged to have known would have led it to believe Rusnak had been allowed to engage in four years of fraudulent trading before he began their relationship, that Allfirst would continue to allow this thereafter, or that Allfirst had determined (i) not to even attempt to confirm large option trades; (ii) to accept without verification fictitious "holdover" reports from Rusnak and (iii) not to even attempt to supervise his trading so that no one at Allfirst had any idea what he was actually doing.[17] Moreover, even if AIB were correct that Citibank could have foreseen Rusnak's hundreds of millions in losses from unsupervised trading, Rusnak's fraudulent behavior and Allfirst's control failures, at most, "operated upon but did not flow from" Citibank's trades, Food Holdings v. Bank of America Corp., 423 F. App'x 73, 76 (2d Cir. 2011) (quoting Derdiarian, 51 N.Y.2d at 315), and thus – as the long line of cases cited by Citibank makes clear – Rusnak's fraud and Allfirst's control failures were intervening causes that defeat

---

[16] See also cases cited in Br. at 23 n.23. The cases cited by AIB do not help it. Derdiarian v. Felix Contracting Corp., 51 N.Y.2d 308, 315 (1980) held that defendant had a specific duty to put up safety barriers, the absence of which caused injuries to a road worker, even if the driver who crashed into the site was epileptic. LNC Invs., Inc. v. First Fidelity Bank, No. 92 Civ. 7584, 1997 WL 528283 (MBM) (S.D.N.Y. Aug. 27, 1997) held that because the defendants had a specific duty to guard against fluctuating oil prices, Iraq's invasion of Kuwait was not a superseding cause of plaintiffs' harm. Sheehan v. City of New York, 40 N.Y.2d 496 (1976) held that even if a bus driver's decision to discharge passengers without pulling over could be viewed as the proximate cause of the bus being struck by a sanitation truck, the truck driver's negligence in failing to stop was a supervening cause – a result unhelpful to AIB.

[17] See Resp. ¶ 38 (Citibank did not assist Rusnak in creating fake options that Allfirst failed to confirm); Resp. ¶ 42 (Citibank not aware of Rusnak's ability to circumvent Allfirst's controls via fake options).

AIB's proximate causation argument as a matter of law. AIB's theory of proximate causation would turn the rule of Edwards & Hanly on its head. See 602 F.2d at 489.

## III. THE EQUITABLE CLAIMS ARE ALL BARRED

AIB only attempts to defend its purported rescission claim with respect to the Feb. 20 option.[18] First, even assuming Rusnak was not authorized to enter into loan transactions, AIB is estopped [redacted] ¶ 248. Moreover, Rusnak appears based on the banks' records to have been authorized to enter into the Feb. 20 option even if it were viewed as a loan. ¶¶ 33-34, 184. Second, in terms of ratification, the record of Allfirst's full knowledge of the material terms of the option is demonstrated by the following: (i) Citibank confirmed in writing to Allfirst all financial terms of the Feb. 20 option,[19] ¶¶ 243-44; (ii) the transaction appeared on Allfirst's internal financial and risk management reports, ¶ 242, 246; (iii) Allfirst accepted and retained Citibank's $125 million premium, ¶ 235; and (iv) Allfirst performed the transaction even after Rusnak's fraud was discovered, ¶ 249; U.S. Bank Nat'l Ass'n v. Ables & Hall Builders, 696 F. Supp. 2d 428, 439 (S.D.N.Y. 2010) (party ratifies a trade when it knowingly accepts the benefits of the transaction); Trs. of Am. Fed'n of Musicians & Emp'rs Pension Fund v. Steven Scott Enters., 40 F. Supp. 2d 503, 512 (S.D.N.Y. 1999) (performance with full knowledge of the facts constitutes ratification).

## CONCLUSION

For the foregoing reasons, Citibank respectfully requests that its motion for summary judgment be granted.

---

[18] AIB has abandoned its unjust enrichment and money had and received claims. See NML, 2009 WL 1528535, at *1 (a party waives its claim by failing to raise it in opposition to summary judgment).

[19] Both the IFEMA and the confirmation for the February 20 option contained objection clauses and AIB's failure to object in accordance with such clauses also acts as a ratification of the trade. Goldberg v. Kidder Peabody & Co., 991 F. Supp. 215, 221 (S.D.N.Y. 1997).

Dated: July 25, 2012
New York, New York

CLEARY GOTTLIEB STEEN & HAMILTON LLP

By: /s/ Thomas J. Moloney
Thomas J. Moloney tmoloney@cgsh.com
Howard S. Zelbo hzelbo@cgsh.com

One Liberty Plaza
New York, New York 10006
Telephone: (212) 225-2000
Facsimile: (212) 225-3999

Attorneys for Defendant and Counterclaim and Third-Party Plaintiff Citibank, N.A.