UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
--------------------------------------X
ALLIED IRISH BANKS, P.L.C.,

                Plaintiff,

                                  03-CV-3748 (DAB)
     v.                          MEMORANDUM AND ORDER

CITIBANK, N.A.,

                Defendant.
--------------------------------------X
DEBORAH A. BATTS, United States District Judge.

     Plaintiff Allied Irish Banks, P.L.C. ("AIB") brings suit against Defendant Citibank, N.A. ("Citibank"), arising out of Defendant's alleged involvement in a rogue-trading scheme with John Rusnak, who was at that time an employee of Plaintiff's former subsidiary, Allfirst Bank ("Allfirst").[1] AIB's claims include common law fraud, fraudulent inducement, aiding and abetting fraud, rescission, unjust enrichment and money had and received. Citibank moves pursuant to Fed. R. Civ. P. 56 for Summary Judgment on each of Plaintiff's claims.

     For the reasons set forth herein, Defendants' Motion for Summary Judgment is GRANTED in part and DENIED in part.

---

[1] AIB voluntarily dismissed its claims against Defendant Bank of America, N.A., on January 25, 2012. (See ECF No. 201.)

## I.  FACTUAL BACKGROUND

Unless otherwise noted, the following facts are not in dispute.

### A. The Parties

Plaintiff AIB is an Irish corporation with its principal place of business in Dublin, Ireland. At all times relevant here, Plaintiff was the sole owner of Allfirst Financial, Inc., a Delaware corporation with its principal place of business in Maryland. Allfirst Financial was the sole owner of Allfirst Bank, a subsidiary also chartered in Maryland. Defendant Citibank is a national banking association with its principal place of business in New York, New York. (Amended Complaint ¶ 16; Def.'s 56.1 Stmt. ¶ 1.)[2]

---

[2] Citibank has submitted a Reply 56.1 Statement consolidating its and AIB's 56.1 statements for the Court. Accordingly, in citing "Def.'s 56.1 Stmt." the Court refers to the undisputed facts it has gleaned from Citibank's Statement, AIB's Response, and Citibank's Reply. Additionally, where appropriate — either for the sake of clarity or in order to introduce facts not established elsewhere — the Court will occasionally refer specifically to AIB's Response to the 56.1 Statement of Defendant Citibank ("Pl.'s Resp. 56.1 Stmt."), to Citibank's Reply 56.1 Statement ("Def.'s Reply 56.1 Stmt.") or to AIB's Amended 56.1 Statement of Additional Material Facts ("Pl.'s 56.1 Stmt. Add'l Facts").

B. John Rusnak and Proprietary Foreign-Exchange Trading

Allfirst hired John Rusnak as a foreign exchange trader in 1993. As a foreign-exchange trader, Rusnak obtained and traded foreign currencies for Allfirst. By 1997, Rusnak was one of two traders engaging in foreign exchange transactions on Allfirst's behalf, known as proprietary trading. (Def.'s 56.1 Stmt. ¶ 32; Pl.'s 56.1 Stmt. Add'l Facts ¶ 5.)

Generally, foreign exchange trading is aimed at profiting from fluctuations in the relative value of currencies through speculation or arbitrage, and three kinds of transactions are common. In a "spot" transaction, which is generally completed within two business days, the trader purchases one currency with another currency. A "forward" trade also involves the purchase of one currency using another currency, but with the transaction to "prompt" or "settle" at a date in the future. Finally, in an "option" transaction, a trader pays a "premium" for the right to buy or sell a currency at the "strike price" on or before the "expiration date" of the option.

Rusnak's trading consisted primarily of spot and option trades and Allfirst understood his strategy to be based on low-risk arbitrage, which involves trading in large volumes to profit from minor pricing discrepancies in the currency markets. In reality, however, Rusnak's trading strategy was based on speculation that the Japanese yen would appreciate against the

dollar. (Def.'s 56.1 Stmt. ¶ 35.) As the value of the dollar rose against the yen, therefore, Rusnak's trading resulted in mounting losses for AllFirst. (Id. ¶ 36.)

Allfirst's Treasury Department sought to monitor Rusnak's trading in various ways. The primary limit on Rusnak's risk-taking was the Value at Risk ("VaR") measure, which sought to determine the risk to Allfirst of a given portfolio of open positions by calculating the maximum loss that portfolio was likely to suffer over a defined period of time. Rusnak was prohibited from exceeding $1.55 million VaR. (Moran Decl. Ex. 33, Expert Report of Riccardo Gomes ("Gomes Rep.") ¶¶ 48-50.) Allfirst also monitored Rusnak's profitability, and limited his monthly losses to no more than $200,000. As of August 24, 2000, Rusnak's VaR and month-to-date losses were reported on a daily basis to the Treasury Department via the Daily Market Risk Summary ("DMRS"). (Pl.'s 56.1 Stmt. Add'l Facts ¶¶ 12-13; Gomes Rep. ¶¶ 50, 53-54.) Rusnak's profit or loss was also reported to Treasury in a monthly report. (Pl.'s 56.1 Stmt. Add'l Facts ¶ 14.)

Rusnak began fraudulently disguising his trading losses no later than March 1997, but was able to stay within the limits Allfirst imposed through various means. (Id. ¶ 14.) First, and of primary importance throughout his fraud, Rusnak used fake options — more than 1,300 by the time the fraud was discovered —

4

to create illusory profits that appeared to offset his real losses. The fake options, purportedly transacted with counterparties in Asia, almost always fit the same pattern: an option pair with offsetting premiums and otherwise identical terms, one expiring the same day and the other weeks or months later. (Def.'s 56.1 Stmt. ¶¶ 38, 60.)

At the outset of his fraud, Rusnak relied on forged confirmations to place these fake options on Allfirst's books. (Id. ¶ 60; e.g., Kusmin Decl. Ex. D1 (forged confirmations).) In August 1998, Rusnak convinced Larry Smith, the employee in Allfirst's back office primarily responsible for confirming Rusnak's trades, that the fact that there was no net cash flow from these option pairs (as a result of the offsetting premiums) meant that the options did need not to be confirmed.[3] Rusnak convinced Smith that, if the terms in its books were incorrect, the counterparty would contact Allfirst because the payments would not net to zero.[4] (Def.'s 56.1 Stmt. ¶¶ 60, 195.) Thus, in

---

[3] Citibank contends, based on statements by Smith, that other back office employees and managers knew of Smith's failure to confirm this type of option because they were present at a meeting in which it was discussed. AIB disputes that, arguing that Smith's statements are self-serving, inconsistent and lacking in credibility and pointing to deposition transcripts in which several of the alleged attendees deny knowledge of the practice or attendance at the alleged meeting. (Def.'s 56.1 Stmt. ¶¶ 64-66.)

[4] Because the fake options were purportedly transacted with counterparties in Asia, any communication by phone regarding the confirmation of these options would have taken place out of

general, Rusnak no longer needed to create forged confirmations in order to place these fake options on Allfirst's books. Once they were on the books, the fake options made Rusnak's trading appear to be more profitable and less risky in Allfirst's daily and monthly reports. (Gomes Rep. ¶¶ 76, 92, 95.)

Rusnak employed other tactics, in addition to the fake options, to mask his day-to-day losses and evade the daily VaR and profit and loss measures that appeared in the DMRS. Rusnak used fake "holdover" trades — trades that had purportedly taken place after the back office closed its books for the day, and that therefore required the back office to rely on Rusnak to supply the trade details — to manipulate the overall position reported in the DMRS. (Id. ¶ 78.) Rusnak also manipulated the "revaluation rates," which take into account daily changes in currency prices, used by the back office to place a dollar value on open positions in the DMRS. (Def.'s 56.1 Stmt. ¶ 105.) Neither of these strategies could mask his fraud at month-end, however. (See Gomes Rep. ¶ 95.)

Nonetheless, as Rusnak's real trading losses mounted, so did the volume of fake options he used as the primary means of concealing those losses. Rusnak could not exercise those fake

---

necessity in the middle of the night; Smith's desire to avoid that may have made his decision to go along with Rusnak that much easier. (See Moran Decl. Ex. 8, Investigative Report of Eugene Ludwig ("Ludwig Rep.") at 11.)

options or realize the gains they represented, of course, so
they remained on Allfirst's balance sheet as notional but
unrealized profit. Because the obligations on its balance sheet
required Allfirst to borrow money while those assets matured, in
January 2001 Allfirst imposed a limit of $250 million on
Rusnak's "balance sheet usage," or the "net value of the
deferred assets and liabilities" incurred during trading, and
included his usage in the DMRS. (Shah Decl. Ex. Y7, Transcript
of the Deposition of David Cronin ("Cronin Tr."), at 450-53;
Gomes Rep. ¶ 57.)

   C. Citibank as Prime Broker to Allfirst

   Although Rusnak had traded with Citibank previously, in
early 2000 Citibank and Allfirst commenced a relationship as
"prime counterparties." (Def.'s 56.1 Stmt. ¶ 163.) On April 25,
2000, they executed an International Foreign Exchange Master
Agreement ("IFEMA") setting forth the terms of their foreign-
exchange trading relationship. (Id. ¶ 182; see Moran Decl. Ex.
31 (IFEMA).) Finally, on September 1, 2000, Allfirst opened a
prime brokerage account with Citibank. (Def.'s 56.1 Stmt. ¶ 163;
see Moran Decl. Ex. 32 (Prime Brokerage Agreement ("PBA")).)

   Opening an account with a prime broker, such as Citibank,
allows a customer, such as Allfirst, to trade with various
counterparties on the prime broker's credit. The customer

negotiates a transaction directly with a counterparty, and the prime broker acts as the counterparty of record in place of the customer and handles subsequent administration of the trade. The customer generally makes all payments to (and receives all payments from) the prime broker.

When the parties' prime brokerage relationship commenced, Citibank confirmed its transactions with Allfirst by sending an automated "SWIFT MT300" message to Allfirst's back office for each of their foreign exchange trades, including daily netted prime brokerage trades[5] and the underlying spot trades. (Def.'s 56.1 Stmt. ¶ 201; see Moran Decl. Ex. 125, Transcript of the Deposition of Anita Farrell, at 34-35.) On September 20, 2000, Citibank began, at Rusnak's request, to send him a "Daily Trade Recap" ("DTR")[6] spreadsheet via email regarding daily prime brokerage trading activity between Allfirst and Citibank. Citibank adapted the DTR email to a template provided by Rusnak. (Def.'s 56.1 Stmt. ¶¶ 201-04; Kusmin Decl. Ex. O5 (Rusnak email

---

[5] Each trading day, Allfirst and Citibank combined all of that day's spot transactions in each currency together into a single forward trade reflecting the net value. Each of these daily netting transactions settled on a single day each month or settlement period, the "net settlement date," when Allfirst and Citibank exchanged payment to settle their respective balances. (Def.'s 56.1 Stmt. ¶¶ 192-93.)

[6] The confirmatory emails sent by Citibank were also referred to as the "Daily Confirmation Report" or simply as "Email Confirms." (Def.'s 56.1 Stmt. ¶ 202.) For the sake of simplicity, the Court will refer to them as DTRs.

providing template for DTR); Moran Decl. Ex. 128 (Rusnak email approving form of DTR).) The DTR contained a summary of the parties' daily net trading activity by currency pair and Allfirst's net position by currency, which reflected the running total of netted daily transactions since the parties' last net settlement date. (Def.'s 56.1 Stmt. ¶ 204.) Although each day's DTR listed Smith as the recipient on behalf of Allfirst, Citibank sent the DTR only to Rusnak, who forwarded it to Smith.[7] (See Kusmin Decl. Exs. N5 (Transcript of phone call in which Smith confirms to Citibank that DTRs are forwarded to him), F5 (Citibank employee email confirming to Rusnak that DTRs are sent only to him).) Citibank also offered a website that provided information on its clients' trading activity as part of its prime brokerage services, but there is no evidence in the record that anyone at Allfirst other than Rusnak and Matt Kozak,

---

[7] There is no evidence in the record that Citibank sent its DTR emails to anyone other than Rusnak. Citibank alleges that it sent DTRs "to Allfirst." (Id. ¶ 202.) Allfirst disputes that characterization "to the extent Citibank implies" it sent DTRs "to anyone at Allfirst except for Rusnak." (Pl.'s Resp. 56.1 Stmt. ¶ 203.) Citibank argues, in response, that "other Allfirst employees, including Smith, received these DTRs, and Saba and Allfirst's auditors were aware that Allfirst received these DTRs from Citibank." (Def.'s Reply 56.1 Stmt. ¶ 203.) As noted above, Smith received the DTRs from Rusnak, not from Citibank, and a generalized awareness of DTR emails on the part of others at Allfirst or its auditors is not evidence that those individuals received DTR emails from Citibank. Citibank thus does not allege, nor does it cite evidence to suggest, that it sent DTRs to anyone other than Rusnak.

another foreign exchange trader, knew of the website's existence or accessed it.[8] (Def.'s 56.1 Stmt. ¶¶ 225, 227.)

On October 4, 2000, after conferring with Smith, Rusnak made a request to Citibank Foreign Exchange Prime Brokerage Head Len Campbell that Citibank stop confirming prime brokerage trades by phone or SWIFT message; Campbell agreed and relayed the change to Office Manager Brad Manganello. (See Def.'s 56.1 Stmt. ¶ 209; Moran Decl. Ex. 130 (transcript of October 4 call between Rusnak and Smith); Kusmin Decl. Exs. D5 (Manganello email to Campbell confirming change would be made), P5 (Campbell response to Rusnak email request, copying Manganello and confirming change).) Citibank thereafter stopped sending SWIFT messages with respect to the underlying spot trades but continued to send SWIFT messages confirming the parties' daily netted prime brokerage trades. (See Def.'s 56.1 Stmt. ¶¶ 205, 210.) At Rusnak's request on March 23, 2001, Citibank stopped

---

[8] Citibank contends that others at Allfirst knew about Citibank's website based on Allfirst Treasurer David Cronin's indirect acknowledgement of it during his deposition, and on contemporaneous evidence purportedly showing that several executives at Allfirst knew of Bank of America's prime brokerage website. (Def.'s 56.1 Stmt. ¶¶ 226, 228.) Allfirst argues that, in light of an email from Rusnak to Bank of America indicating that he didn't want his back office to have access to Bank of America's prime brokerage website, the "only plausible explanation" for Citibank's alleged reticence to provide access to its website is that Rusnak made a similar request to Citibank. (Pl.'s Resp. 56.1 Stmt. ¶ 227.) Neither party cites relevant, persuasive evidence in support of its position.

sending SWIFT messages altogether.[9] (Id. ¶ 212; Shah Decl. Ex.
O10.)

On April 24, 2001, Smith's supervisor, Gregory Saba,
directed Smith to confirm daily netted prime brokerage trades
via SWIFT messages instead of email because they were system-
generated and therefore a "stronger source of confirmation," and
Smith contacted Maylin Wilson in Citibank's back office to make
the request on April 25. (See Def.'s 56.1 Stmt. ¶¶ 216, 219;
Moran Decl. Ex. 126.)

### D. Disputed Transactions

The gravamen of Allfirst's claims is that, throughout 2001
and early 2002, Rusnak turned to Citibank and others to evade
the various limits Allfirst had placed on him. Allfirst alleges
that Citibank engaged in a series of sham transactions
(together, the "Disputed Transactions," the details of which
follow) that effectively enabled Rusnak to get under his $250
million balance sheet limit, convince his back office to confirm
various fake transactions, and extend his ongoing fraud.

---

[9] Allfirst contends that Citibank's failure in October 2000 to
suppress SWIFT messages regarding daily netted prime brokerage
trades was inadvertent, and the Parties disagree as to whether
Allfirst relied on the SWIFT messages that were sent in the
period between October 4, 2000 and March 23, 2001. (See Def.'s
56.1 Stmt. ¶¶ 205-06.)

### a. The Same-Day Options

AIB and Citibank are in sharp dispute as to the nature of a series of four structured transactions, each characterized by an option that expired on the day it was agreed to (the "Same-Day Options"). (See Def.'s 56.1 Stmt. ¶ 265.) In each,[10] Citibank paid a substantial premium to Allfirst and immediately exercised the option it purchased; the resulting spot trade and a related hedge trade obligated Allfirst to repay roughly the same amount at the next net settlement date. The three trades — option, spot and hedge — were confirmed by Citibank as separate transactions, and were not differentiated from ordinary foreign exchange trades. (Id. ¶¶ 271-72, 275-76, 279-80, 283-84.)

Eric Price, Citibank's Head of New York Foreign Exchange Sales, described the Same-Day Options as "monetizing transactions" that, according to Rusnak, were necessary to comply with Allfirst's requirement that any profit or loss exceeding $15 million at the end of a closing day be realized. (Kusmin Decl. Ex. Y2, Transcript of the Deposition of Eric Price ("Price Tr.") at 691-92, 701.) According to Price, they were intended to be exercised immediately and therefore lacked "optionality" and were "not, in the classical sense, trades"

---

[10] The Same-Day Options in dispute were transacted on January 25, 2001 ($15 million); April 23, 2001 ($30 million); September 18, 2001 ($18 million); and January 23, 2002 ($18 million). (Id. ¶¶ 267-68.)

because they did not "reflect a view" as to the value of the underlying currency. (Id. at 712-13, 757-58.)

AIB casts the Same-Day Options as "Disguised Cash Advances," and argues that they were shams used by Rusnak to reduce his balance sheet usage between monthly net settlement dates. (Pl.'s 56.1 Stmt. Add'l Facts ¶¶ 51, 61.) It also asserts that Rusnak and Allfirst in fact owed Citibank money at the time three of the four options purportedly "monetized" profits, and on that ground disputes Citibank's reasoning for the transactions. (See Pl.'s Resp. 56.1 Stmt. ¶ 265; Pl.'s 56.1 Stmt. Add'l Facts ¶¶ 97-99.)  AIB further contends that Citibank's internal "Embedded Financing Policy" required it to notify Allfirst's CEO or CFO of the details of the Same-Day Options prior to transacting them. (Pl.'s 56.1 Stmt. Add'l Facts ¶¶ 54-55.)

### b. The February 20, 2001 Options

On February 20, 2001, Rusnak entered into two foreign exchange options with Citibank (the "February 20 Options"). In the first, Citibank paid Allfirst a premium of $125 million for the right to sell Allfirst approximately ¥29.5 billion for $400 million a year later. In the second, Allfirst paid Citibank a premium of $56,000 for the right to sell Citibank $400 million for approximately ¥29.5 billion a year later. Taking into

account then-prevailing exchange rates, Citibank effectively paid $124,996,000 in exchange for $131,891,695 a year later. (Def.'s 56.1 Stmt. ¶ 235.) The February 20 Options brought Rusnak's balance sheet usage down from approximately $249 million to $133 million. (Gomes Rep. ¶ 128.)

AIB describes the February 20 Options as a "synthetic loan" and contends that the deposition testimony of Citibank's own agents demonstrates that it was not, in substance, a genuine foreign exchange transaction. (Pl.'s 56.1 Stmt. Add'l Facts ¶¶ 64-72; see Shah Decl. Ex. U8, Transcript of the Deposition of Citibank Head of Global Foreign Exchange Richard Moore, at 91-92 (describing February 20 Options as a "financing trade"); Kusmin Decl. Ex. I1, Transcript of the Deposition of Citibank Head of North American Foreign Exchange James Kemp, at 148 (noting the February 20 Options had "characteristics of a loan").) Further, AIB emphasizes that Eric Price, who first spoke to Rusnak about the options and handled the transactions for Citibank, was told to make sure there was "air cover" for the options. (Price Tr. at 469-70.) Price collaborated with North American Foreign Exchange COO Jan Navatkoski on an email, sent in the afternoon on February 20, that suggested that they had discussed the terms with Citibank risk managers prior to going through with the February 20 Options. (Shah Decl. Ex. N9 (Email dated February 20); see also Price Tr. at 342-43.) However, several employees

14

Price allegedly consulted either do not recall discussing the options or do not recall being consulted until after the transactions had already taken place. (Pl.'s 56.1 Stmt. Add'l Facts ¶ 115.)

Citibank contends that Rusnak stated that he "needed to fund his projected cost of carry," and doing so would cost significantly less at prevailing market rates. (Def.'s 56.1 Stmt. ¶ 236.) AIB disputes that explanation. It argues, first, that the notes taken by Price during his phone call with Rusnak are the best reflection of Rusnak's stated rationale. Price's notes indicate that Rusnak intended to "outsource balance sheet cost" or "rent" Citibank's balance sheet. (See Pl.'s Resp. 56.1 Stmt. ¶ 236; Kusmin Decl. Ex. F6 (Notes of Eric Price).) Second, AIB argues that Citibank's explanation is unreliable because it derives from a memorandum prepared after Rusnak's fraud was disclosed. (Pl.'s Resp. 56.1 Stmt. ¶ 236.)

### c. May 9, 2001 Transactions

On April 9, 2001, Rusnak booked two fake forward trades between Allfirst and Citibank; it is not clear whether or how the trades were confirmed by Allfirst's back office, although AIB contends that Rusnak most likely doctored the DTR that he sent to the back office. (Def.'s 56.1 Stmt. ¶¶ 287-88.) The April 9 trades had to be offset on Allfirst's books before the

next settlement date of May 11, however, or it would be apparent they were fake. Rusnak therefore booked two additional fake forwards on May 7 and 8 that offset the April 9 trades. (Id. ¶ 289.)

Lacking SWIFT confirmations for the May 7 and 8 trades,[11] Allfirst's back office contacted Maylin Wilson in Citibank's back office on May 8. (Id. ¶ 289.) Wilson could not locate the trades in Citibank's system. She conferred with George Reynolds at the trading desk, who knew nothing of the trades but told her that one of the missing trades was "way too big" for Allfirst. Wilson told Allfirst that Citibank did not have the trades in its system. (Moran Decl. Ex. 190-5 (Recording of May 8, 2001 Call).)

Early in the morning on May 9, Rusnak bought a same-day option from Citibank for a premium of $16.6 million. Rusnak exercised the option shortly thereafter, which obligated Citibank to pay Allfirst $16.6 million. (Pl.'s 56.1 Stmt. Add'l Facts ¶ 169.) At Rusnak's request, Citibank agreed to split the spot trade created by the option exercise into two separate spot

---

[11] AIB contends that Rusnak "did not realize that his back office had begun relying on SWIFT messages for confirmations" in the time between the fake April 9 trades and the fake May 7 and 8 trades. (See Pl.'s Resp. 56.1 Stmt. ¶ 297; supra Part I.C (noting that the back office was instructed to use SWIFT messages to confirm prime brokerage trades as of April 24, 2001).)

trades (the "split spot trades") at positions specified by
Rusnak. It also agreed to include the split spot trades in the
DTR it sent to Allfirst on the morning of May 9, pertaining to
trading that took place on May 8.[12] (Def.'s 56.1 Stmt. ¶ 293;
Moran Decl. Ex. 192 (Campbell email instructions to Citibank
employees); Pl.'s 56.1 Stmt. Add'l Facts ¶ 170.) The positions
specified by Rusnak for the split spot trades corresponded to
the unconfirmed May 7 and 8 trades, and Allfirst's back office
therefore treated Citibank's SWIFT confirmations regarding the
split spot trades as the confirmations it had been missing when
it called Citibank on May 8. (Def.'s 56.1 Stmt. ¶ 294; Pl.'s
56.1 Stmt. Add'l Facts ¶ 175.)

    With the fake May 7 and 8 trades now on both Citibank's and
Allfirst's books, those trades would no longer offset the April
9 fake trades, which were only on Allfirst's books. (Pl.'s 56.1
Stmt. Add'l Facts ¶ 178.) Thus, later on May 9, Citibank — again
at Rusnak's request — split the daily netted yen trade between
Allfirst and Citibank into two spot trades at rates and
positions specified by Rusnak. (Def.'s 56.1 Stmt. ¶ 298.) One of
those two trades was equal in value to the two April 9 trades
combined. (Gomes Rep. ¶ 164.) Rusnak convinced Saba to ignore

---

[12] The May 9 DTR specified that the split spot trades had a trade
date of May 9, unlike the remaining trades listed. (Def.'s 56.1
Stmt. ¶ 293.)

the SWIFT message pertaining to that trade by explaining that
Citibank was "reversing-out" a previous error rather than
confirming a new trade and, ironically, reassured Saba that if
he was wrong there would be a discrepancy with the parties' net
settlement the next day. (Kusmin Decl. Ex. Q7 (Transcript of
Rusnak Call with Saba), at 7-8.) By preventing that trade from
being entered on Allfirst's books, Rusnak in fact removed the
existing discrepancy created by the fake April 9 trades.

   E. Discovery of Rusnak's Rogue Trading

   Cronin "became very concerned" about Rusnak's trading in
January 2002, when his balance sheet usage spiked upward rapidly
following a year-end reduction below $150 million. (Ludwig Rep.
at 26.) Cronin ordered that certain of Rusnak's open positions
be closed down because doing so "would reveal any problems with
his trading," and instructed the back office to confirm several
options with counterparties in Asia that had appeared in the
meantime. Allfirst discovered Rusnak's fraud shortly thereafter.
(Id. at 26-27.)

   Allfirst announced the discovery of the fraud to the public
on February 6, 2002. It suffered losses of $691 million, and
Rusnak served approximately six years in prison. (Amended
Complaint ¶ 1; Def.'s 56.1 Stmt. ¶ 4.) After announcing the
fraud, AIB promptly commissioned an independent investigation,

18

led by one-time Comptroller of the Currency Eugene Ludwig, that
"cover[ed] the substance of the activities in question and
highlight[ed] the most significant oversight issues." (Ludwig
Rep. at 1-2.) The Ludwig Report, which was issued on March 12,
2002, did not examine "the activities of all third parties, such
as brokers." (Id. at 2.)

## II. DISCUSSION

### A. Legal Standard for Summary Judgment

A court should grant summary judgment when there is "no
genuine dispute as to any material fact" and the moving party is
entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a);
see Allianz Ins. Co. v. Lerner, 416 F.3d 109, 113 (2d Cir.
2005). Genuine issues of material fact cannot be created by
conclusory allegations. Victor v. Milicevic, 361 F. App'x 212,
214 (2d Cir. 2010). Summary judgment is appropriate only when,
after drawing all reasonable inferences in favor of a non-
movant, no reasonable juror could find in favor of that party.
Melendez v. Mitchell, 394 F. App'x 739, 740 (2d Cir. 2010).

In assessing when summary judgment should be granted,
"[t]he mere existence of a scintilla of evidence in support of
the plaintiff's position will be insufficient; there must be
evidence on which the jury could reasonably find for the
plaintiff." Id. (citation omitted). The non-movant may not rely

upon speculation or conjecture to overcome a motion for summary judgment. Burgess v. Fairport Cent. Sch. Dist., 371 F. App'x 140, 141 (2d Cir. 2010). Instead, when the moving party has documented particular facts in the record, "the opposing party must come forward with specific evidence demonstrating the existence of a genuine dispute of material fact." FDIC v. Great Am. Ins. Co., 607 F.3d 288, 292 (2d Cir. 2010). Establishing such evidence requires going beyond the allegations of the pleadings, as the moment has arrived "to put up or shut up." Weinstock v. Columbia Univ., 224 F.3d 33, 41 (2d Cir. 2000) (citation omitted).

B. In Pari Delicto

In Pari Delicto is the centuries-old legal doctrine "that the courts will not intercede to resolve a dispute between two wrongdoers." Kirschner v. KPMG LLP, 15 N.Y.3d 446, 464 (2010). The doctrine, which is "strong" in New York, id. at 464, has long barred a debtor from suing third parties for a fraud he or she was a party to. In re Bernard L. Madoff Inv. Sec. LLC, 721 F.3d 54 (2d Cir. 2013) (citing Barnes v. Hirsch, 212 N.Y.S. 536, 539 (1st Dep't 1925)). It applies equally to corporate wrongdoers because "the acts of agents, and the knowledge they acquire while acting within the scope of their authority are presumptively imputed" to the corporations they represent.

<u>Kirschner</u>, 15 N.Y.3d at 465. Indeed, "a corporation is represented by its officers and agents, and their fraud in the course of the corporate dealings is in law the fraud of the corporation." <u>Kirschner</u>, 15 N.Y.3d at 465 (internal brackets and quotation marks omitted).

The adverse interest exception to the normal rule of imputation concerns those circumstances in which "an agent is engaged in a scheme to defraud his principal . . . [and] cannot be presumed to have disclosed that which would expose and defeat his fraudulent purpose." <u>Center v. Hampton Affiliates</u>, 66 N.Y.2d 782, 784 (1985); <u>see also</u> <u>Kirschner</u>, 15 N.Y.3d at 465 (imputation is presumed "except where the corporation is actually the agent's intended victim"). In order to fall within the exception, the agent "must have <u>totally abandoned</u> his principal's interests and be acting <u>entirely</u> for his own or another's purposes." <u>Kirschner</u>, 15 N.Y.3d at 468 (citing <u>Center</u>, 66 N.Y.2d at 784-85). "This rule avoids ambiguity where there is a benefit to both the insider and the corporation, and reserves this most narrow of exceptions for those cases — outright theft or looting or embezzlement — where the insider's misconduct benefits only himself or a third party; i.e., where the fraud is committed against a corporation rather than on its behalf." <u>Kirschner</u>, 15 N.Y.3d at 466-67.

Citibank argues that Rusnak committed fraud in his capacity as Allfirst's agent, and the In Pari Delicto doctrine therefore bars AIB's claims in their entirety.[13] It contends that the adverse interest exception is inapplicable because there is no dispute that Rusnak did not engage in "outright theft or looting or embezzlement"; because his fraud benefitted Allfirst by concealing his losses from investors and lenders; and because his "continued efforts to win back his losses for Allfirst establish that his actions did not <u>totally abandon</u> Allfirst's interests and that his actions were not <u>entirely</u> for his own benefit." (Def.'s Mem. Law at 11-12.) AIB, by contrast, argues that "Rusnak's fraud operated at Allfirst's expense" and caused it to incur significant losses while the fraud was ongoing and,

---

[13] Citibank argues, additionally, that Allfirst's reckless failure to supervise Rusnak places it independently within the bar imposed by the In Pari Delicto doctrine. (Def.'s Mem. Law at 13.) However, to support its assertion that recklessness or negligence may trigger the In Pari Delicto bar, Citibank relies on Supreme Court authority inapposite to the issue at hand and case law from outside the Second Circuit. (<u>Id.</u> at 13 n.13 (citing, <u>inter alia</u>, <u>Pinter v. Dahl</u>, 486 U.S. 622, 633 (1988) (addressing application of In Pari Delicto to strict liability offense, not reckless or negligent conduct)).) In opposing this facet of Citibank's motion, AIB notes that, in the Second Circuit, "the plaintiff must be an active, voluntary participant in the wrongful conduct" for In Pari Delicto to apply. <u>S.E.C. v. Lee</u>, 720 F. Supp. 2d 305, 332 (S.D.N.Y. 2010) (citing <u>BrandAid Mktg. Corp. v. Biss</u>, 462 F.3d 216, 218 (2d Cir. 2006)). The Court agrees with AIB.

as a result, "the rationale for the adverse interest exception applies." (Pl.'s Mem. Law at 23.)

The central flaw in Citibank's argument is its failure to focus on Rusnak's fraudulent actions. Citibank emphasizes that Rusnak's scheme did not totally abandon Allfirst's interests insofar as he continued to trade and achieve occasional profits on Allfirst's behalf. However, the critical distinction is that Rusnak's genuine trading activity was not itself part of his fraudulent scheme, nor is the imputation of those actions an issue before the Court. This distinction is implicit in the cases Citibank cites, which focus on the fraudulent actions of agents (to the exclusion of conduct unrelated to the fraud itself) in assessing whether the adverse interest exception should apply. See, e.g., Kirschner, 15 N.Y.3d at 457-58 (imputing Refco officers' fraudulent maneuvers to hide uncollectible debts to corporation); Chaikovska v Ernst & Young, LLP, 913 N.Y.S.2d 449, 451-52 (App. Div. 4th Dep't 2010) (imputing acts of officers to the corporation where "the purpose of the fraudulent conduct" was to qualify for increased line of credit); In re Parmalat Sec. Litig., 659 F. Supp. 2d 504, 520 (S.D.N.Y. 2009) aff'd in part, vacated in part on other grounds sub nom. Parmalat Capital Fin. Ltd. v. Bank of Am. Corp., 412 F. App'x 325 (2d Cir. 2011)(imputing actions of employees who were "conducting the work of Parmalat, growing and expanding the

business, when they engaged in" fraud in order to secure
capital).

   The relevant question is therefore whether Rusnak's
fraudulent actions totally abandoned Allfirst's interests. The
answer is clear: Rusnak was not engaged in conducting the work
of Allfirst when he carried out his deception. Indeed, it is
beyond dispute that none of Rusnak's fraudulent actions were
taken on behalf of Allfirst, or to benefit Allfirst. Instead,
Rusnak's fraudulent actions harmed Allfirst both presently and
prospectively because they prevented Allfirst from discovering
massive trading losses.

   That the success of Rusnak's scheme was premised on
Allfirst's lack of knowledge further belies any benefit to
Allfirst. Kirschner, for instance, presented miscreants who
acted under far different circumstances: the Refco officers
"created a falsely positive picture of Refco's financial
condition" by hiding its uncollectible debts from regulators and
the public, and "senior officers of AIG set up a fraudulent
scheme to misstate AIG's financial performance in order to
deceive investors into believing that the company was more
prosperous and secure than it really was." 15 N.Y.3d at 458,
462. Rusnak, by contrast, was not an officer of Allfirst and
actively hid his scheme not only from the public but from
Allfirst as well while continuing to incur trading losses to

                              24

Allfirst's detriment. As the Court in <u>Kirschner</u> explained,
"[t]he rationale for the adverse interest exception illustrates
its narrow scope. . . [T]he presumption that an agent will
communicate all material information to the principal operates
except in the narrow circumstance where the corporation is
actually the victim of a scheme undertaken by the agent." <u>Id.</u> at
467. Rusnak's fraudulent scheme was directed at defrauding
Allfirst, not defrauding others on its behalf, compelling this
Court's conclusion that it would be inappropriate to impute his
actions and knowledge to Allfirst.

Moreover, it is inapposite to point out, as Citibank does,
that Rusnak's trading gains accrued to Allfirst. It bears
repeating that, in order to fall within the adverse interest
exception, it must be shown that the allegedly wrongful or
fraudulent conduct of an agent reflected a total abandonment of
the principal's interests. The relevant conduct is the wrongful
conduct, and the relevant inquiry is whether the agent was
acting entirely in his own interest in engaging in that wrongful
conduct.[14] Rusnak committed fraud to conceal from Allfirst the

---

[14] The fallacy of Citibank's argument is readily illustrated.
Would the actions of an accountant engaged in embezzling
corporate funds — the classic example of the adverse interest
exception — be imputed to the corporation because he embezzled
funds from one account and maintained accurate, honest records
for a dozen others? It would defy common sense to apply In Pari
Delicto in that instance, yet according to Citibank's logic the
hypothetical accountant could not be said to have "entirely"

losses he incurred trading on its behalf, and his fraud was therefore devoted entirely to his own self-preservation.

Nor is the Court persuaded by Citibank's narrow reading of the adverse interest exception's requirement of total abandonment, which Citibank would limit strictly to the examples cited in Kirschner, "outright theft or looting or embezzlement." 15 N.Y.3d at 466. Those examples are paradigmatic because they involve self-dealing, and it is difficult to fathom any benefit accruing to the principal amidst self-dealing of that nature. Citibank cites no support for the proposition that an agent must engage in self-dealing in order to totally abandon his principal's interests, however, and the Court finds none. Indeed, Citibank effectively urges the Court to impute Rusnak's conduct to Allfirst merely because he was an incompetent trader rather than a rapacious one. The Court declines to do so.

Finally, Citibank's contention that Rusnak's fraud enabled Allfirst to "attract investors and customers and raise funds for corporate purposes" is similarly misplaced. See Kirschner, 15 N.Y.3d at 468. Although in some sense each of Rusnak's acts of fraud delayed Allfirst's discovery of Rusnak's losses and

---

abandoned the corporation's interests. So it is with Rusnak, whose genuine (albeit misguided) bets against the dollar have little relevance to Citibank's In Pari Delicto defense other than to provide the rationale behind Rusnak's fraudulent activities.

thereby delayed the financial reckoning that was inevitably to follow, this is not the classic case of a corporate officer falsely portraying financial health to third party investors or shareholders. Rusnak was not a corporate officer, nor is there any evidence from which a reasonable factfinder could infer that Rusnak's fraud altered Allfirst's financial health in the eyes of the public prior to its discovery. "[A] company victimized by fraud is always likely to suffer long-term harm once the fraud becomes known." Kirschner, 15 N.Y.3d at 471. Under the circumstances, Citibank's argument merely restates the Court's observation in Kirschner.

C. Fraud Claims

To prevail on its fraud claims AIB must show by clear and convincing evidence: (1) a material misrepresentation or omission of fact; (2) made by Citibank with knowledge of its falsity; (3) intended to induce AIB's reliance; (4) which AIB did reasonably rely upon; and (5) which caused injury to AIB. See Crigger v. Fahnestock & Co., 443 F.3d 230, 234 (2d Cir. 2006); see also Laugh Factory, Inc. v. Basciano, 608 F. Supp. 2d 549, 558 (S.D.N.Y. 2009) (applying clear and convincing evidence standard at summary judgment stage). To sustain a claim of fraudulent concealment, it must also show that there was a duty to disclose the omitted facts. Gladstone Bus. Loan, LLC v. Randa

27

Corp., No. 09 Civ. 4225, 2009 WL 2524608, at *5 (S.D.N.Y. Aug. 17, 2009); see also Merrill Lynch & Co. v. Allegheny Energy, Inc., 500 F.3d 171, 181 (2d Cir. 2007).

To make out a claim of aiding and abetting fraud under New York law, the plaintiff must show "(1) the existence of a fraud; (2) the defendant's knowledge of the fraud; and (3) that the defendant provided substantial assistance to advance the fraud's commission." Lerner v. Fleet Bank, N.A., 459 F.3d 273, 292 (2d Cir. 2006) (internal brackets omitted). Actual knowledge of the fraud is required; neither constructive knowledge nor recklessness as to obvious warning signs will suffice. See id. at 292-93; de Abreu v. Bank of Am. Corp., 812 F. Supp. 2d 316, 322-23 (S.D.N.Y. 2011).

Citibank moves for summary judgment as to the material misrepresentation, reasonable reliance and causation elements of AIB's fraud claims.

### 1. Material Misrepresentation or Omission[15]

---

[15] Citibank argues summarily that imputation of Rusnak's knowledge to Allfirst is sufficient to defeat AIB's allegation that it made a material misrepresentation or omission. (See Def.'s Mem. Law at 14.) The Court has already concluded that imputation is inappropriate under the circumstances, and will not revisit the issue here.

At the heart of this case is AIB's argument that Citibank materially misrepresented[16] the nature and purpose of the Disputed Transactions by confirming them as genuine foreign exchange transactions. Citibank contends that it provided accurate written confirmations of the financial terms of each of the Disputed Transactions to Allfirst, and that AIB therefore cannot demonstrate a material misrepresentation or omission. Citibank also disputes that it corrupted the confirmation process for Prime Brokerage trades or concealed the existence of its Prime Brokerage website, as AIB alleges. (Def.'s Mem. Law at 14-15.)

Despite their prolixity, Citibank's submissions largely fail to address the issues before the Court.[17] Most prominently, Citibank's repeated assertions that it "confirmed in writing . . . all financial terms of each of the six complained-of trades" are simply beside the point.[18] (Id. at 15.) AIB is not alleging

_____

[16] AIB argues, in the alternative, that Citibank's confirmations constituted material omissions insofar as Citibank had a duty to disclose the true purpose of the underlying transactions. (Pl.'s Mem. Law at 17 n.18.) The distinction does not alter the Court's conclusions.
[17] Citibank's reliance on AIB's statements to the IRS are among its arguments that obfuscate rather than clarify. (Id. at 16; Def.'s 56.1 Stmt. ¶¶ 51, 248.) The positions taken by AIB and its subsidiaries regarding the tax treatment of the Disputed Transactions were matters of tax law with limited relevance to this case, and in any event were not inconsistent with the positions AIB takes here.
[18] The cases Citibank relies on to support its argument are inapposite for a similar reason: AIB does, in fact, allege that

29

that Citibank misrepresented the particulars when it provided
confirmations pertaining to the Disputed Transactions. Rather,
AIB contends that it was misleading to confirm the Disputed
Transactions as foreign exchange trades at all.

There is credible evidence in the record, as set forth
above, to support AIB's claims that the Disputed Transactions
were not intended to speculate on the price of foreign
currencies, as ordinary foreign exchange transactions do. Yet
Citibank made no effort to verify the propriety of the Disputed
Transactions with Allfirst, either before or after the
transactions took place. Given how lucrative Rusnak's trading
was to Citibank, it would not be far-fetched to infer that
Citibank did so because it was motivated to keep Rusnak happy.
The Court therefore finds that there is ample evidence in the
record to allow a reasonable factfinder to conclude that
Citibank's confirmation of the Disputed Transactions as ordinary
foreign exchange trades amounted to a material
misrepresentation.

Next, Citibank argues that "there is no merit to the claim
that [it] hid that it had compromised the prime brokerage

---

Citibank misrepresented the "fundamental characteristics" of the
Disputed Transactions. (Def.'s Mem. Law at 16 (citing <u>Granite
Partners, L.P. v. Bear, Stearns & Co. Inc.</u>, 17 F. Supp. 2d 275,
287 (S.D.N.Y. 1998)); <u>see also</u> <u>Phillips v. Am. Int'l Grp., Inc.</u>,
498 F. Supp. 2d 690, 697 (S.D.N.Y. 2007); <u>Gaidon v. Guardian
Life Ins. Co. of Am.</u>, 94 N.Y.2d 330, 350 (1999).)

account confirmation process." (Def.'s Mem. Law at 17.) Yet once
again Citibank largely fails to address the specific allegations
underlying the claim. AIB alleges that "Citibank corrupted the
confirmation process by sending the [DTRs] directly to Rusnak,
suppressing them at Rusnak's request, doctoring them on April
24, 2001, and May 9, 2001, and agreeing" to split two trades on
May 9. (Pl.'s Resp. 56.1 Stmt. ¶¶ 231.) In support of its
claims, AIB provides evidence that it was contrary to Citibank
policy to send confirmations to a trader rather than directly to
the back office, and that on several occasions Citibank tailored
the DTR to Rusnak's specifications or suppressed it entirely.
(Pl.'s 56.1 Stmt. Add'l Facts ¶¶ 140, 151-57.) Citibank does not
address these allegations. There is, in any event, more than
enough evidence to permit a reasonable factfinder to conclude
that Citibank knowingly sent its confirmations to Allfirst
through John Rusnak rather than directly to the back office, and
acceded to Rusnak's request to split the May 9, 2001
transactions and tailor the confirmations to Rusnak's
specifications without any plausible rationale for doing so.

Finally, Citibank maintains that there is no evidence it
hid its website from Allfirst. (Def.'s Mem. Law at 17.) The
Court agrees. AIB does not dispute that Rusnak and Kozak had
access to the website, and Kozak's knowledge must be imputed to
Allfirst absent any evidence to the contrary. (See Pl.'s Resp.

56.1 Stmt. ¶ 225.) According to AIB, Citibank never referred other Allfirst employees to its website, although both sides "would have benefitted" and Citibank "would have saved an enormous amount of work for itself" by doing so because it would have made email confirmations redundant. (Id. ¶ 227.) Relying on an email Rusnak sent to Bank of America stating that he did not want his back office to be able to access its website, AIB argues that the "only plausible explanation" for Citibank's alleged reticence to provide access to its website "is that Citibank had received the same instruction from Rusnak." (Id. ¶ 227; see also Kusmin Decl. Ex. W5 (Rusnak email to Bank of America).) However, there is no similar communication pertaining to Citibank in the record, or even a request for access that was avoided or refused. Speculative arguments are not evidence, much less clear and convincing evidence, and are not sufficient at this stage to create a triable issue of fact. Accordingly, the Court GRANTS Citibank's Motion as it pertains to concealing access to its website.

2. Reasonable Reliance

Reasonable reliance entails a duty to investigate where the "plaintiff was placed on guard or practically faced with the facts." Mallis v. Bankers Trust Co., 615 F.2d 68, 81 (2d Cir. 1980). "[I]f the plaintiff 'has the means of knowing, by the

32

exercise of ordinary intelligence, the truth, or the real quality of the subject of the representation, he must make use of those means, or he will not be heard to complain that he was induced to enter into the transaction by misrepresentations.'" Schlaifer Nance & Co. v. Estate of Warhol, 119 F.3d 91, 98 (2d Cir. 1997) (quoting Mallis, 615 F.2d at 80-81). "In assessing the reasonableness of a plaintiff's alleged reliance, we consider the entire context of the transaction, including factors such as its complexity and magnitude, the sophistication of the parties, and the content of any agreements between them." Emergent Capital Inv. Mgmt., LLC v. Stonepath Group, Inc., 343 F.3d 189, 195 (2d Cir. 2003) (citation omitted). However, whether a party acted reasonably in its reliance "is ordinarily a question of fact to be determined at trial." Meisel v. Grunberg, No. 07 Civ. 11610, 2010 WL 4966443, at *3 (S.D.N.Y. Nov. 30, 2010).

Citibank argues that Allfirst was a sophisticated financial institution with all of the information it needed to discover Rusnak's fraud "staring [it] in the face in the form of the confirmations Citibank provided" and Allfirst's own monitoring and risk reporting. (See Def.'s Mem. Law at 18-19.) However, a reasonable factfinder might readily conclude otherwise. Allfirst reviewed Rusnak's trading in the aggregate and maintains that this method of review was reasonable given its understanding

33

that Rusnak was pursuing a high-volume, arbitrage-based trading strategy.[19] (See Pl.'s 56.1 Stmt. Add'l Facts ¶¶ 15-16.) Even if Allfirst had been reviewing Rusnak on a trade-by-trade basis, an issue of fact would remain as to whether its back office should have had the requisite expertise in foreign exchange trading to understand the true nature of Rusnak's complex trades. Compounding that difficulty, the Disputed Transactions were each structured transactions whose constituent trades were confirmed separately. Thus, under the circumstances, the Court cannot conclude that it was unreasonable as a matter of law for Allfirst to rely on Citibank's confirmation of the Disputed Transactions as ordinary foreign exchange trades.

To support its position, Citibank relies on case law in which reliance was placed on an expressly non-binding representation, or obvious warning signs presaged the underlying fraudulent activity. E.g., BPI Energy Holdings, Inc. v. IEC (Montgomery), LLC, 664 F.3d 131, 139 (7th Cir. 2011) (reliance on "expressly nonbinding" representations). Neither circumstance is present here. Allfirst was entitled to rely on the form and content of Citibank's confirmations. And Citibank points to

---

[19] Citibank repeatedly chides Allfirst for its lack of diligence in overseeing Rusnak. However, it has cited no evidence to dispute that Allfirst understood Rusnak's trading strategy to be based on arbitrage, nor to undermine AIB's position that reviewing his trading in the aggregate was appropriate given that understanding.

nothing in its representations to Allfirst that directly contradicts its confirmation of the Disputed Transactions as ordinary foreign exchange transactions. Certainly, disputed issues of fact remain as to whether it was reasonable for the back office at Allfirst, a sophisticated entity in both banking and investment, to supervise Rusnak and review his trading without more closely examining the multimillion dollar trades he executed on its behalf. What is clear, however, is that Citibank has failed to adduce evidence sufficient as a matter of law to preclude Allfirst's reliance on those representations.

   3. Causation

   AIB's fraud claims require that it demonstrate both but-for and proximate causation. To show Citibank was a proximate cause, AIB must prove that its injuries were the "natural and probable consequence" of Citibank's allegedly fraudulent representations, or that Citibank "ought reasonably to have foreseen" AIB's injuries as a probable consequence of those representations. See Hunt v. Enzo Biochem, Inc., 530 F. Supp. 2d 580, 592 (S.D.N.Y. 2008) (quoting Suez Equity Investors, L.P. v. Toronto-Dominion Bank, 250 F.3d 87, 104-05 (2d Cir. 2001)).

   There is ample evidence in the record for a factfinder to conclude that Rusnak's fraud would have been discovered earlier but for Citibank's alleged fraud. AIB contends that the February

20 Options allowed Rusnak to elude Allfirst's limits on his
balance sheet usage and the May 9 trades allowed Rusnak to dupe
his back office into believing certain fake transactions had
been confirmed. (See Ludwig Rep. at 13 (concluding that February
20 Options helped to enable Rusnak "to fund his losses and keep
trading").) Citibank points to inconsistencies in the record
regarding the actual balance sheet limit Allfirst imposed, and
how closely that limit was monitored. (Def.'s Mem. Law at 21;
Def.'s Mem. Law Reply at 8-10.) At most, however, that argument
creates a disputed issue of fact to be resolved by the
factfinder. Citibank otherwise fails to cite specific evidence
as to but-for causation beyond its bare assertion that Rusnak
"obviously would have continued" hiding his losses through fraud
"with or without Citibank, so long as Allfirst . . . failed to
police his activity." (Def.'s Mem. Law at 21.) Accordingly,
Citibank has failed to show it is entitled to summary judgment
on the issue of but-for causation.

Citibank further contends that proximate cause is lacking
because it was unforeseeable to Citibank that Rusnak would
commit fraud as he did or that Allfirst would fail to have
controls in place to prevent him from doing so. (Id. at 21-23.)
It is not in dispute that Allfirst bears a measure of
responsibility for the losses it incurred. That does not absolve
Citibank of responsibility for its role in facilitating the

fraud, however. Instead, AIB need only show that a reasonable factfinder could conclude that Citibank was "a substantial factor in the sequence of responsible causation." Charney v. Zimbalist, No. 07 Civ. 6272, 2014 WL 5064860, at *32 (S.D.N.Y. Sept. 29, 2014) (quoting First Nationwide Bank v. Gelt Funding Corp., 27 F.3d 763, 769 (2d Cir. 1994)).

It was not unforeseeable to Citibank that Rusnak would commit fraud, or that his unorthodox requests to Citibank would be used to evade the controls that Allfirst had placed on him. For instance, to the extent Citibank had a duty to confirm the Disputed Transactions differently from ordinary foreign exchange transactions, that duty derived from the risk that unauthorized funding for Rusnak could be a red flag for fraud. In other words, Citibank's actions resulted in "foreseeable harm of the same nature [it] had the duty to guard against." LNC Investments, Inc. v. First Fid. Bank, No. 92 Civ. 7584, 1997 WL 528283, at *31 (S.D.N.Y. Aug. 27, 1997). The harm suffered by Allfirst and AIB was thus the "natural and probable consequence" of Citibank closing its eyes to the reality of Rusnak's behavior.

Citibank fails to grapple with the facts of this case, and instead relies on authority inapposite to the record here. See, e.g., Edwards & Hanly v. Wells Fargo Sec. Clearance Corp., 602 F.2d 478, 484 (2d Cir. 1979) (Defendant not proximate cause of

losses sustained by third party investor Plaintiffs to whom it owed no duty); Food Holdings Ltd. v. Bank of Am. Corp., 423 F. App'x 73, 76 (2d Cir. 2011) (collapse of Parmalat an unforeseeable event, and Defendant's failure to disclose therefore not proximate cause of Plaintiff's loss); Bloor v. Carro, Spanbock, Londin, Rodman & Fass, 754 F.2d 57, 62 (2d Cir. 1985) (omissions in documents related to securities offering not proximate cause of subsequent looting). The Court finds that a reasonable factfinder could conclude that Citibank was, at a minimum, a substantial factor in causing the harm suffered by AIB.

Citibank's Motion for Summary Judgment as to AIB's fraud claims is therefore DENIED.


D. Equitable Claims

Citibank argues that AIB's claims in equity — rescission, unjust enrichment, and money had and received — must be dismissed because the transactions in question were governed by valid and enforceable contracts. (Def.'s Mem. Law at 24.) AIB fails to respond to Citibank's Motion as to its unjust enrichment and money had and received claims, and has therefore waived any objection to dismissal of those claims. (See generally Pl.'s Mem. Law.) As to AIB's claim for rescission of the February 20 Options, there is, at a minimum, a factual

dispute regarding Rusnak's authorization to enter into transactions of that nature on behalf of Allfirst. (<u>See</u> Def.'s 56.1 Stmt. ¶¶ 33-34.) Citibank's remaining arguments for dismissal of the rescission claim are thoroughly unconvincing.

Accordingly, the Court DENIES Citibank's Motion for Summary Judgment as to AIB's claim for rescission of the February 20 Options and GRANTS Citibank's Motion for Summary Judgment as to AIB's unjust enrichment and money had and received claims.

<u>III. CONCLUSION</u>

For the foregoing reasons, Citibank's Motion for Summary Judgment is GRANTED as to AIB's unjust enrichment and money had and received claims and DENIED in all other respects.

Proposed Findings of Fact and Conclusions of Law, a Joint Pre-trial Statement ("JPTS"), and Memoranda of Law addressing those issues raised in the JPTS shall be submitted no later than August 21, 2015 and shall conform to the Court's Individual Practices and Supplemental Trial Procedure Rules. Responses to the Memoranda shall be submitted no later than September 11, 2015. There shall be no replies.

SO ORDERED.

Dated:      New York, New York
            June 30, 2015

                                     Deborah A. Batts
                            United States District Judge

40