UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---------------------------------------- X
                                         :
ALLIED IRISH BANKS, p.l.c.,              :
                                         :
                            Plaintiff,   :   Index No. 03 Civ. 3748 (DAB) (GWG)
                                         :
              v.                         :
                                         :
BANK OF AMERICA, N.A.                    :
and CITIBANK, N.A.,                      :
                                         :
                        Defendants.      :
---------------------------------------- X
                                         :
BANK OF AMERICA, N.A.                    :
and CITIBANK, N.A.,                      :
                                         :
                   Counterclaim and      :
                   Third-Party Plaintiffs, :
                                         :
              v.                         :
                                         :
ALLIED IRISH BANKS, p.l.c.,              :
                                         :
                   Counterclaim Defendant, :
                                         :
              and                        :
                                         :
M&T BANK CORPORATION and                 :
MANUFACTURERS AND TRADERS                :
TRUST COMPANY,                           :
                                         :
                   Third-Party Defendants. :
---------------------------------------- X


### JOINT PRE-TRIAL STATEMENT

The undersigned attorneys hereby affirm that this Joint Pre-Trial Statement is submitted in conformity with the Individual Rules of Judge Deborah A. Batts, dated September 17, 2013.

## I.   BRIEF, NON-ADVERSARIAL STATEMENT OF THE BASIC NATURE OF THE CASE

This case concerns Allied Irish Banks, P.L.C. ("AIB")'s claim that Citibank, N.A. ("Citibank") participated in a rogue trading scheme with John Rusnak, who was at the time an employee of AIB's former subsidiary, Allfirst Bank ("Allfirst"). Specifically, and as modified by various pre-trial rulings, AIB asserts claims for fraud, aiding and abetting fraud, and rescission.

Citibank denies the allegations and states that it is not liable. It also asserts various affirmative defenses as well as claims and counterclaims against AIB and Third Party Defendants M&T Bank Corporation and Manufacturers and Traders Trust Company ("M&T") (as successors to Allfirst) including for indemnity and contribution, contractual indemnification, and breach of contract.

## II.   SPECIFIC, FACTUAL BASIS FOR JURISDICTION AND VENUE

AIB contends that this Court has subject matter jurisdiction under 28 U.S.C. 1332(a)(2). At the time the original complaint was filed, AIB was, and remains today, a corporation organized under the laws of Ireland, with its principal place of business in Dublin, Ireland, and Citibank was a national banking association, organized under United States law, with its main office and principal place of business in New York. The amount in controversy requirement is satisfied because AIB's complaint alleges damages of more than $75,000. Citibank asserts that this Court lacks jurisdiction to hear this dispute because AIB does not have standing to bring this action. AIB notes that the Court considered this challenge to jurisdiction in its 2006 decision on Citibank's Motion to Dismiss, and decided that issue against Citibank. In response, Citibank notes that the 2006 decision was not based on a complete record, that standing may be raised at

any time, and that plaintiff bears the burden at trial of proving facts establishing its standing to bring the claims it asserts.

The parties agree that venue is proper because Citibank is resident in the Southern District of New York and, separately, because a substantial part of the alleged conduct of which AIB complains took place in New York.

## III.   DESIGNATION OF THE CASE AS JURY OR NON-JURY

Non-jury.

## IV.   RELIEF SOUGHT

AIB seeks damages in the amount of $372 million; pre-judgment interest of at least an additional $500 million as of the start of trial, punitive damages, costs, fees, and expenses, all in an amount to be determined at trial; and dismissal of Citibank's counterclaims and third-party claims.  Citibank seeks dismissal of AIB's claims, and judgment on its counterclaims in an amount to be determined at trial, as well as costs, fees and expenses.  Alternatively, if Citibank is found liable on AIB's claims, Citibank seeks indemnity and contribution, as well as a ruling that damages be barred or reduced based on Allfirst and AIB's fault and be apportioned among tortfeasors according to their respective fault in accordance with applicable statutory and common law.  M&T seeks dismissal of Citibank's third-party claims.

## V.   UNDISPUTED FACTS

The parties conferred and exchanged drafts in an effort to arrive at a joint statement of undisputed facts, but were unable to agree on a shared approach.  The parties agreed, accordingly, that each would present their version of the facts.

## VI.   PLAINTIFF'S ASSERTIONS OF DISPUTED FACTS

The following is intended to be a summary of the facts that Plaintiff understands will be disputed at trial.  Plaintiff understands that the June 30, 2015 Memorandum and Order disposing

of Citibank's summary judgement motion (the "Order") significantly narrowed the legal and
factual issues that remain for trial, and has sought to address the key factual disputes between the
parties.  However, Plaintiff reserves the right to produce evidence on additional topics, including
as necessary to rebut Citibank's defenses and counterclaims.

In addition, wherever applicable, the Plaintiff has cited to the facts the Court found to be
undisputed in its Order.  Plaintiff understands that these facts have been established in this case,
as provided for in Federal Rule of Civil Procedure 56(g).  However, Citibank contests that point,
and, therefore, Plaintiff has included those facts in its Assertions of Disputed Facts, and cited
them to the Order.

### A.  __The Parties__

1.      Plaintiff Allied Irish Bank ("AIB") is an Irish corporation with its principal place
of business in Dublin, Ireland.  Summary Judgment Memorandum and Order dated June 30,
2015 ("Order") at 2.

2.      At all times relevant here, Plaintiff was the sole owner of Allfirst Financial, Inc., a
Delaware corporation with its principal place of business in Maryland.  Order at 2.

3.      Allfirst Financial was the sole owner of Allfirst Bank ("Allfirst"), a subsidiary
also chartered in Maryland.  Order at 2.

4.      Defendant Citibank is a national banking association with its principal place of
business in New York, New York.  Order at 2.

### B.  __John Rusnak and Proprietary Foreign-Exchange Trading__

5.      Allfirst hired John Rusnak as a foreign exchange trader in 1993.  Order at 3.

6.      As a foreign exchange trader, Rusnak obtained and traded foreign currencies for
Allfirst.  Order at 3.

7.      By 1997, Rusnak was one of two traders engaging in foreign exchange transactions on Allfirst's behalf, an activity known as proprietary trading.  Order at 3.

8.      Generally, foreign exchange trading is aimed at profiting from fluctuations in the relative value of currencies through speculation or arbitrage, and three kinds of transactions are common.  Order at 3.

9.      In a "spot" transaction, which is generally completed within two business days, the trader purchases one currency with another currency.  Order at 3.

10.      A "forward" trade also involves the purchase of one currency using another currency, but with the transaction to "prompt" or "settle" at a date in the future.  Order at 3.

11.      Finally, in an "option" transaction, a trader pays a "premium" for the right to buy or sell a currency at the "strike price" on or before the "expiration date" of the option.  Order at 3.

12.      Rusnak's trading consisted primarily of spot and option trades and Allfirst understood his strategy to be based on low-risk arbitrage, which involves trading in large volumes to profit from minor pricing discrepancies in the currency markets.  Order at 3.

13.      In reality, however, Rusnak's trading strategy was based on speculation that the Japanese yen would appreciate against the dollar.  Order at 3-4.

14.      As the value of the dollar rose against the yen, therefore, Rusnak's trading resulted in mounting losses for Allfirst.  Order at 4.

15.      Allfirst's Treasury Department sought to monitor Rusnak's trading in various ways.  Order at 4.

16.      The primary limit on Rusnak's risk-taking was the Value at Risk ("VaR") measure, which sought to determine the risk to Allfirst of a given portfolio of open positions by

calculating the maximum loss that the portfolio was likely to suffer over a defined period of time.  Rusnak was prohibited from exceeding $1.55 million VaR.  Order at 4.

17.     Allfirst also monitored Rusnak's profitability and limited his monthly losses to no more than $200,000.  Order at 4.

18.     As of August 24, 2000, Rusnak's VaR and month-to-date losses were reported on a daily basis to the Treasury Department via the Daily Market Risk Summary ("DMRS"). Rusnak's profit or loss was also reported to Treasury in a monthly report.  Order at 4.

19.     Rusnak began fraudulently disguising his trading losses no later than March 1997, but was able to stay within the limits Allfirst imposed through various means.  Order at 4.

20.     First, and of primary importance throughout his fraud, Rusnak used fake options—more than 1,300 by the time the fraud was discovered—to create illusory profits that appeared to offset his real losses.  Order at 4-5.

21.     The fake options, purportedly transacted with counterparties in Asia, almost always fit the same pattern: an option pair with offsetting premiums and otherwise identical terms, one expiring the same day and the other weeks or months later.  Order at 5.

22.     At the outset of his fraud, Rusnak relied on forged confirmations to place these fake options on Allfirst's books.  Order at 5.

23.     In August 1998, Rusnak convinced Larry Smith, the employee in Allfirst's back office primarily responsible for confirming Rusnak's trades, that the fact that there was no net cash flow from these option pairs (as a result of the offsetting premiums) meant that the options did not need to be confirmed.  Order at 5.

24.     Rusnak convinced Smith that if the terms in its books were incorrect, the counterparty would contact Allfirst because the payments would not net to zero.  Thus, in

general, Rusnak no longer needed to create forged confirmations in order to place these fake options on Allfirst's books.  Order at 5-6.

25.     Once they were on the books, the fake options made Rusnak's trading appear to be more profitable and less risky in Allfirst's daily and monthly reports.  Order at 6.

26.     Rusnak employed other tactics, in addition to the fake options, to mask his day-to-day losses and evade the daily VaR and profit and loss measures that appeared in the DMRS.  Order at 6.

27.     Rusnak used fake "holdover" trades—trades that had purportedly taken place after the back office closed its books for the day, and that therefore required the back office to rely on Rusnak to supply the trade details—to manipulate the overall position reported in the DMRS.  Order at 6.

28.     Rusnak also manipulated the "revaluation rates," which take into account daily changes in currency prices, used by the back office to place a dollar value on open positions in the DMRS.  Order at 6.

29.     Neither of these strategies could mask his fraud at month-end, however.  Order at 6.

30.     Nonetheless, as Rusnak's real trading losses mounted, so did the volume of fake options he used as the primary means of concealing those losses.  Order at 6.

31.     Rusnak could not exercise those fake options or realize the gains they represented, of course, so they remained on Allfirst's balance sheet as notional but unrealized profit.  Order at 6-7.

32.     Because the obligations on its balance sheet required Allfirst to borrow money while those assets matured, in January 2001 Allfirst imposed a limit of $250 million on Rusnak's

"balance sheet usage," or the "net value of the deferred assets and liabilities" incurred during trading, and included his usage in the DMRS.  Order at 7; see also PTX 467 (Statement of Facts to Rusnak's Plea Agreement) at 8 (explaining that as Rusnak's "actual losses mounted, [he] came under pressure from the Bank's management to reduce his balance sheet"); PTX 543 (Cronin Dec.) at ¶¶ 24, 26, 27 and Ex. B & C; Cronin Dep. at 450-52.

33.     David Cronin also arranged for Rusnak's balance sheet usage to be reported on a daily basis in the DMRS.  PTX 543 (Cronin Dec.) at ¶¶ 25, 26.

34.     Cronin reviewed Rusnak's balance sheet usage to ensure that he brought his usage below $250 million.  PTX 543 (Cronin Dec.) at ¶ 26; Cronin Dep. at 450-52.

35.     He expected that Rusnak would reduce his balance sheet usage by closing out his existing options (which is where nearly all of the usage had accumulated) or exercising them when they matured.  PTX 253 (Gomes Rep.) at ¶¶ 125-126; PTX 254 (Gomes Rebuttal Rep.) at ¶ 87; PTX 543 (Cronin Dec.) at ¶ 29.

C.     **Rusnak's Disguised Funding: Same-Day**
**Options and the February 20, 2001 Options**

36.     Beginning on January 19, 2001, Rusnak embarked on a scheme of circumventing the Bank's limit on his funding by seeking disguised funding from Bank of America (the other defendant in this case until it settled in 2012) and Citibank.

i.     **The Same-Day Options**

37.     The Same-Day Options in dispute were transacted on January 25, 2001 ($15 million); April 23, 2001 ($30 million); September 18, 2001 ($18 million); and January 23, 2002 ($18 million).  Order at 12.

38.     In each, Citibank paid a substantial premium to Allfirst and immediately exercised the option it purchased.  The resulting spot trade and a related hedge trade obligated Allfirst to repay roughly the same amount at the next net settlement date.  Order at 12.

39.     The Same-Day Options had no optionality and could not be used for legitimate foreign exchange trading.  PTX 255 (Said Rep.) at ¶ 49; PTX 258 (Mesrobian Rep.) at ¶¶ 71, 72; PTX 260 (Rua Rep.) at ¶ 42.

40.     The options were part of structured transactions that provided Rusnak with a short-term cash advance.  PTX 253 (Gomes Rep.) at ¶¶ 118, 160; PTX 258 (Mesrobian Rep.) at ¶¶ 73-77; PTX 260 (Rua Rep.) at ¶¶ 43-45; PTX 255 (Said Rep.) at ¶¶ 50-53; PTX 69 (reflecting that each Same-Day Option transaction consisted of an option and two short trades that had the same "Product Number" on Citibank's books and records); PTX 185 at 10.

41.     Citibank knew the options had no optionality and could not be used for genuine foreign exchange trading.  See, e.g., PTX 70 (reflecting that Price covered the first Same-Day Option); Price Dep. at 719:19-24, 741:13-743:4, 756:25-757:7.

42.     Citibank knew the options were part of a structured transaction that provided Rusnak with a short-term cash advance.  See, e.g., Price Dep. at 741:13-743:4.

43.     The three trades—option, spot, and hedge—were confirmed by Citibank as separate transactions, and were not differentiated from ordinary foreign exchange trades.  Order at 12.

44.     Citibank knew the trades were related and they were linked as part of the same transactions on Citibank's books.  See, e.g., PTX 69 (reflecting that each Same-Day Option transaction consisted of an option and two spot trades that had the same "Product Number" on

Citibank's books and records); PTX 185 at 10 (letter from Citibank's counsel authenticating the information reflected in PTX 69); Henrikson Dep. at 211:11-212:4.

45.     Confirming these transactions as unrelated, genuine options and spot trades was inadequate to represent their actual purpose and created the misimpression that they were genuine foreign exchange trades.  PTX 258 (Mesrobian Rep.) at ¶ 89; PTX 260 (Rua Rep.) at ¶ 82; PTX 255 (Said Rep.) at ¶ 62; PTX 188 (Campbell acknowledging that the Same-Day Options "circumvent any flag raising" and "[k]ind of get[] undetected").

46.     Citibank maintained a policy that required heightened disclosure of these transactions, including a written communication with the counterparty's CEO or CFO confirming their actual purpose.  PTX 125 at Citi-AIB 015965-67; PTX 90 at Citi-AIB 014540-542, 015966; Azhar Dep. at 182:12-18.

47.     Citibank knew that confirming these trades as unrelated, genuine options was inadequate to represent their actual purpose.  PTX 125 at Citi-AIB 015965-67; PTX 90 at Citi-AIB 014540; PTX 188 (Campbell acknowledging that the Same-Day Options "circumvent any flag raising" and "[k]ind of get[] undetected"); Azhar Dep. at 182:12-18; Price Dep. at 757 (Price acknowledging that "I don't think there's any disagreement that these are not, in the classical sense, trades").

48.     Citibank's contention that it understood that Rusnak was executing these transactions pursuant to an internal credit policy which required it to pre-settle profits or losses in excess of $10 million is not credible because the Same-Day Options circumvented two standard, well-established and transparent methods of addressing counterparty credit exposure and Rusnak did not have the profits he was purporting to monetize at the time of the transaction.  Moreover, Rusnak never pre-settled losses.  (The Same-Day Option on May 9, 2001 was a round-trip and

therefore could never have pre-settled losses.)  PTX 258 (Mesrobian Rep.) at ¶¶ 84-88; PTX 258

(Mesrobian Rebuttal Rep.) at ¶¶ 75-77; PTX 260 (Rua Rep.) at ¶¶ 49-50; PTX 261 (Rua Rebuttal

Rep.) at ¶¶ 83-85; PTX 255 (Said Rep.) at ¶¶ 58-61; PTX 257 (Said Rebuttal Rep.) at ¶¶ 77-81;

PTX 274 (Campbell referred to Rusnak's rationale an "excuse" and Moore called it "horrible"

and not "believable"); PTX 258 (Mesrobian Rep.), Ex. B at ¶ 35 (at the close of trading on

January 24, 2001, Rusnak had $4.1 million in profits in his Prime Brokerage account but

Citibank provided him with a $15 million cash advance the next day); PTX 258 (Mesrobian

Rep.), Ex. B at ¶ 41 (at the close of trading on April 20, 2001, Rusnak had $24.8 million in

mark-to-market gains in his Citibank Prime Brokerage account but aggregate credit exposure to

Citibank of $119.7 million as a result of the February 20, 2001 Options, and Citibank provided

Rusnak with a $30 million cash advance); PTX 258 (Mesrobian Rep.), Ex. B at ¶ 45 (at the close

of trading on September 17, 2001, Rusnak had $18 million in gains in his Citibank Prime

Brokerage account but aggregate credit exposure to Citibank of $126.2 million as a result of the

February 20, 2001 Options, and Citibank provided Rusnak with a $17.7 million cash advance the

next day); PTX 258 (Mesrobian Rep.), Ex. B at ¶ 47 (at the close of trading on January 22, 2002,

Rusnak had $17.4 million in gains in his Citibank Prime Brokerage account but aggregate credit

exposure to Citibank of $161.8 million as a result of the February 20, 2001 Options, and

Citibank provided Rusnak with an $18 million cash advance the next day); PTX 276 at 4-5

(reflecting Marra's recognition on January 23, 2002 that Rusnak's supposed rationale could not

apply); PTX 274 (Campbell's acknowledgment that Rusnak never used the Same-Day Options to

settle losses).

49.     Citibank's foreign exchange business sought to conceal the actual purpose of the

Same-Day Options from Citibank's risk managers by obscuring their purpose on internal risk

reports.  See PTX 71 (internal risk report reflecting spot trades related to January 23, 2002 Same-Day Option and Len Campbell's handwritten note to risk managers that they should "see Eric Price" for a description of the "option strategy" underlying the transaction—when Campbell knew there was no options strategy); PTX 112 at Citi-AIB 009610 (internal risk report reflecting spot trades related to January 23, 2002 Same-Day Option and Campbell's handwritten note to risk managers that one of the trades "related to the exercise of same-day option trades" with the Citibank sales desk—when Campbell knew that the transaction was not a genuine option transaction but a cash advance).

50.     Despite knowing why Rusnak transacted the Same-Day Options and how they worked, and despite evidence that Campbell approved the transactions, he also sought to conceal his knowledge of and role in these transactions in his deposition.  Compare Price Dep. at 758 (explaining that Campbell understood the purpose of the Same-Day Options) and PTX 276 at 5 (reflecting the fact that Marra needed Campbell's approval to do a Same-Day Option) with Campbell Dep. at 403-410 (Campbell testifying that he was not involved in carrying out these transactions or consulted about them).

51.     Citibank suspected that Rusnak was using these transactions to deceive Allfirst, not to fulfill an internal credit requirement, and deliberately avoided confirming that Allfirst understood the actual purpose of the transactions.  PTX 188 (Campbell acknowledging that the Same-Day Options "circumvent[] any . . . flag raising" and "kind of get[] undetected"); PX 274 (Campbell describing Rusnak's rationale for the transactions as an "excuse" and admitting that he never confirmed Rusnak's rationale with Allfirst's credit department because they "never put anything in writing").

52.     In 2001, when Citibank provided Rusnak with these cash advances, Rusnak was the most important customer on Eric Price and Len Campbell's desks, and one of the most important customers in North America.  PTX 136 (Allfirst Relationship Summary) at Citi-AIB 235995 (describing Allfirst as the "number one and the largest customer of Citigroup in Foreign Exchange); PTX 12 at Citi-AIB 381406-7 (reflecting Rusnak as the most lucrative customer on Price's desk in 2000 and year-to-date in June 2001); PTX 152 (reflecting that Rusnak was the most important customer on Campbell's Prime Brokerage desk in 2001 and accounted for more than 85% of the desk's revenues and trading volume year-to-date in May 2001).

53.     Rusnak's supervisors did not know that Rusnak was using Same-Day Options to take short-term cash advances on his trading.  See, e.g., Ray Dep. at 194:18-24.  They did not review his trading on an individual basis and it was appropriate for them to review his trading in the aggregate.  PTX 254 (Gomes Rebuttal Rep.) at ¶¶ 74-90; PTX 256 (Gomes Dec.) at ¶ 17; Ray Dep. at 116:8-16; Feig Dep. at 175-179 (explaining that Citibank also supervised its proprietary traders in the aggregate and did not review their trades on an individual basis); (expected testimony of David Cronin).

54.     Allfirst's back office employees confirmed these Same-Day Options as ordinary foreign exchange options, and were not expected to review or to understand the actual purpose of the Same-Day Options.  PTX 31; PTX 43; PTX 321; PTX 472; PTX 262 (Christodoulou Rebuttal Rep.) at ¶ 25; PTX 256 (Gomes Dec.) at ¶ 16; Citibank's SMF at ¶¶ 271, 277, 279, 283.

### ii.     The February 20, 2001 Options

55.     On February 20, 2001, Rusnak entered into two foreign exchange options with Citibank (the "February 20 Options").  Order at 13.

56.     In the first, Citibank paid Allfirst a premium of $125 million for the right to sell Allfirst approximately ¥29.5 billion for $400 million a year later.  In the second, Allfirst paid

Citibank a premium of $56,000 for the right to sell Citibank $400 million for approximately ¥29.5 billion a year later.  Taking into account then-prevailing exchange rates, Citibank effectively paid $124,996,000 in exchange for $131,891,695 a year later.  Order at 13-14.

57.    The February 20, 2001 Options produced a synthetic forward or synthetic loan of $125 million with an implied interest rate, and could not be used for genuine foreign exchange trading.  PTX 258 (Mesrobian Rep.) at ¶¶ 90-98, 107; PTX 259 (Mesrobian Rebuttal Rep.) at ¶¶ 51-64; PTX 260 (Rua Rep.) at ¶¶ 53-56; PTX 261 (Rua Rebuttal Rep.) at ¶¶ 51-52; PTX 255 (Said Rep.) at ¶¶ 63-69; PTX 257 (Said Rebuttal Rep.) at ¶¶ 50-63; PTX 253 (Gomes Rep.) at ¶ 128; DTX Q131 (DeRosa Rep.) at ¶ 286.

58.    The Options were part of a structured transaction.  PTX 258 (Mesrobian Rep.) at ¶¶ 97-98; PTX 260 (Rua Rep.) at ¶¶ 55-56; PTX 255 (Said Rep.) at ¶ 68; PTX 253 (Gomes Rep.) at ¶ 128.

59.    Citibank knew the transaction produced a synthetic forward or synthetic loan of $125 million with an implied interest rate, and could not be used for genuine foreign exchange trading.  See, e.g., PTX 288 at 4-5 (Price and Kemp agreeing that the February 20, 2001 Options transaction was "effectively a loan"); PTX 273 at 7-8 (Campbell insisting that the February 20, 2001 Options transaction was a "loan.  Yeah that's exactly what it was."); PTX 10.1; PTX 106; PTX 283 at 5 (Price explaining to Moore that Rusnak told him that he was doing the transaction to fund his trading, and Moore recalling that that was Rusnak's justification for the transaction); Craven Dep. at 31:5-33:16, 36:11-37:20, 40-41; Price Dep. at 311:5-20, 383:6-385:11, 719, 741:13-743:4, 756:19-757:7; Kemp Dep. at 147:25-148:18; Campbell Dep. at 371:9-373:10, 375:2-378:16; Azhar Dep. at 218:9-219:15; Pusch Dep. at 103:1-104:12; Moore Dep. at 83:21-86:23, 91:25-92:21.

60.     Citibank knew the Options were part of a structured transaction.  PTX 69; Price Dep. at 293:8-295:10.

61.     Citibank confirmed the February 20, 2001 Options as unrelated, genuine options. Citibank's SMF at ¶ 238; PTX 266 (reflecting Citibank's Warren Irons confirming the two options with Larry Smith as ordinary foreign exchange options).

62.     Citibank knew the options were related, as they were linked as part of the same transactions on Citibank's books.  PTX 260 (Rua Rep.); PTX 69; Price Dep. at 293:8-295:10, 422:4-25, 425:1-426:6.

63.     Confirming these transactions as unrelated, genuine options was inadequate to represent their actual purpose and created the misimpression that they were genuine foreign exchange trades.  PTX 90; PTX 125; PTX 258 (Mesrobian Rep.) at ¶ 107; PTX 260 (Rua Rep.) at ¶ 70; PTX 255 (Said Rep.) at ¶ 80.

64.     Citibank maintained a policy that required heightened disclosure of these transactions, including a written communication with the counterparty's CEO or CFO confirming their actual purpose.  PTX 90; PTX 125; PTX 83 (Peter Anguilla explaining that he passed along the policy requiring heightened disclosure of the February 20, 2001 Options to Price and Navatkoski); PTX 291 at 4-5; PTX 106; Azhar Dep. at 191:14-192:4 (testifying that the policy applied to the February 20, 2001 Options and that he expected Citibank's foreign exchange business to follow all of the policy's requirements before doing the trade); Price Dep. at 430:1-432:25 (acknowledging that he knew of the policy requiring heightened disclosure when he did the trade but decided not to "follow the procedure that was listed there to the letter"); Reid Dep. at 146:12-147:17.

65.     Citibank knew that confirming these trades as unrelated, genuine options was inadequate to represent their actual purpose.  See supra ¶¶ 59-64.

66.     Citibank's North American foreign exchange business created a fraudulent email (the "email air cover") intended to create the misimpression that the Bank's risk managers and the relationship manager for Allfirst had approved the transaction in advance when, in fact, they did not learn of the transactions until after it was done, and none of the people identified in the fraudulent email ever approved it.  PTX 108 (fraudulent "email air cover" representing that Barnes, Pusch, Kennedy, and Anguilla had approved the transaction before it was done); Navatkoski Dep. at 176:11-177:20 (testifying falsely that she sought the approval of Barnes, Pusch and Kennedy before the trade was done); Price Dep. at 327:5-333:25, 338:7-344:17, 346:5-25, 361:12-367:6, 485:3-10 (testifying falsely that he and Navatkoski had sought pre-approval from Barnes, Pusch, and Kennedy, as well as Anguilla); Kennedy Dep. at 143:5-148:3, 170:22-172:7 (testifying that she never discussed the transaction with Navatkoski or Price and that her job responsibilities did not include reviewing individual transactions); Barnes Dep. at 64:19-65:12, 72:11-73:2, 75:1-76:4 (testifying that he was never asked to approve the trade and he never offered his approval of the trade); Pusch Dep. at 20:4-24, 36:6-9, 91:3-92:25, 114:19-24, 118:1-121:15, 179:9-180:7, 96:2-101:15, 102:9-104:12, 108:14-109:6, 110:25-111:12, 126:13-128:21 (testifying that he never discussed the transaction with either Navatkoski or Price and no one ever sought his approval); Anguilla Dep. at 14:12-16, 22:4-25:11, 38:6-12, 226:2-11, 217:12-16, 219:17-225:17 (testifying that he was not the relationship manager and did not approve the transaction from a "KYC perspective").

67.     The credit risk manager responsible for Citibank's trading with Allfirst and the risk manager responsible for the North American foreign exchange business told the business to

follow the internal policy requiring Citibank to communicate the transaction's actual purpose to Allfirst's CFO or CEO.  But the salesperson who executed the trade, Eric Price, and the chief-of-staff of the North American foreign exchange business, Jan Navatkoski, deliberately avoided contacting Allfirst to confirm that the transaction was authorized.  PTX 106; PTX 83; PTX 291 at 4-5 (reflecting Price acknowledging that he knew the policy applied but "didn't follow the procedure to the letter, we did a version of following it, if you, if you get what I mean"); Azhar Dep. at 190:11-192:4 (testifying that the policy applied).

68.     When Rusnak's fraud was disclosed, and Citibank's management and in-house lawyers were investigating Citibank's relationship with Rusnak, Price sought to conceal his role in the transaction and the fact that the "email air cover" misrepresented the approval process. Jayanti Dep. at 85:4-86:14, 101:15-102:4, 104:22-107:19, 147:7-150:10, 158:7-160:9, 163:21-167:7, 169:8-13 (acknowledging that she had to rewrite her memo to Citibank's senior management and in-house counsel because Price had concealed the fact that he did the trades and had also misrepresented the fact that Anguilla, Kennedy, and Barnes learned of the transaction after it was done).  Compare PTX 159 (original "Jayanti Memo" suggesting that Barnes, Kennedy, Anguilla, and Moore had approved the trade before it was executed) with PTX 165 (corrected "Jayanti Memo" clarifying that Price did the transaction and that he had not discussed the trade with Barnes, Kennedy, and Moore until the after the trade was executed) and PTX 167 (email from senior credit officer Andy Williams clarifying further that the corrected Jayanti Memo still misrepresented the role of Anguilla, who never learned of the trade details until after the trade was done).

69.     Notwithstanding the fact that Citibank's management eventually learned the truth about the approval process, when Citibank's employees were examined about the approval

-16-

process in their depositions, multiple Citibank employees continued to misrepresent the process. See, e.g., Price Dep. at 264:10-265:17, 306:8-311:20, 416-426, 465:22-470:6, 631:13-21, 474:20-475:24, 330:5-333:25, 333:13-25, 338:7-342:24, 318:8-322:20 (testifying that he sought the approvals described in the "email air cover" before the trade was done); Navatkoski Dep. at 176:11-177:20 (same).

70.     In fact, even James Kemp, who represented Citibank on the New York Federal Reserve Bank's Foreign Exchange Committee, testified that he discussed the trade with Price and Navatkoski on the morning before the trade was done, when, in fact, he was out of the office on a ski vacation.  PTX 13 (Kemp's calendar obtained after his deposition reflecting the fact that he was out of the office on the morning of the trade); PTX 251 at 50 (Response to Request for Admission 192) (belatedly acknowledging that Price never discussed the trade with Kemp); Kemp Dep. at 50:7-55:16.

71.     In addition, in their depositions, multiple Citibank employees sought to deny that the transaction was a loan even though their contemporaneous statements admitted that the transaction was effectively a loan.  Compare, e.g., PTX 270 (acknowledging that the transaction was "effectively a loan") with Price Dep. at 381 (denying that the transaction was effectively a loan).  Compare PTX 270 (acknowledging that the transaction was "effectively a loan") with Kemp Dep. at 148, 209-10 (testifying that he could only say that the transaction had "some of the characteristics of a loan because [he was] parsing [his] words a bit more carefully" than he had previously).  And compare Moore Dep. at 92 ("I remember learning that the trade was a financing trade"), with Moore Dep. at 85 (denying that the February 20, 2001 Options constituted a "financing transaction").

72.     Citibank suspected that the February 20, 2001 Options were unauthorized and that Rusnak was using them to circumvent limits on his funding, but avoided confirming whether that was so.  PTX 283 at 4, 10 (Price acknowledging in different forms and in response to different questions that he suspected Rusnak was a rogue); PTX 290 at 3 (same); PTX 106; Azhar Dep. at 191-192, 209:5-211:11, 216:25-219:15, 226:13-230:14 (testifying that he recognized that Rusnak could be using the February 20, 2001 Options to circumvent limits on his authority to borrow and that he sent PTX 106 to the foreign exchange business to ensure that they were aware of the risk).

73.     Citibank earned $228,000 in sales commission on the February 20, 2001 Options (PTX 87; Price Dep. at 839-40), which was more than the North American foreign exchange business had earned year-to-date in the aggregate from all trading with any other customer.  PTX 151.

74.     In February 2001, when Citibank agreed to execute the February 20, 2001 Options, Rusnak was one of the most important customers of the North American Foreign Exchange business.  PTX 151.

75.     Rusnak's supervisors did not know that Rusnak was using the February 20, 2001 Options to borrow $125 million in disguised funding from Citibank.  PTX 254 (Gomes Rebuttal Rep.) at ¶ 87, n.27; PTX 256 (Gomes Dec.) at ¶¶ 14-16; Cronin Dep. at 388-89; Ray Dep. at 417:14 to 418:3; PTX 543 (Cronin Dec.) at ¶ 34.  They did not review his trading on an individual basis and it was appropriate for them to review his trading in the aggregate.  See supra ¶ 53.

76.     The back office confirmed these options as ordinary foreign exchange options. See supra ¶ 54; PTX 266.

D.      **The Impact of Citibank's Disguised Funding**

77.     The Same-Day Options and February 20, 2001 Options reduced Rusnak's reported balance sheet usage on the DMRS.  PTX 253 (Gomes Rep.) at ¶¶ 125-133.

78.     The February 20, 2001 Options reduced Rusnak's balance sheet usage from $248.7 million to $132.8 million.  Order at 14.

79.     These transactions created the misimpression that Rusnak had legitimately decreased his use of the Bank's funding and gave him the capacity he needed to continue his unauthorized risk-taking and to conceal his losses without exceeding the limit on his funding. PTX 253 (Gomes Rep.) at ¶¶ 128, 133; PTX 254 (Gomes Rebuttal Rep.) at ¶¶ 110-116; PTX 467 at 8-9 (Statement of Facts to Rusnak's plea agreement) (explaining that in response to pressure from the Bank's management to "reduce his 'balance sheet,' that is, the amount of money the Bank needed to set aside to fund his trading activities, Rusnak decided to reduce his 'balance sheet' and obtain an infusion of cash to offset his mounting losses by entering into . . . 'deep in the money' currency options"); Culp Rep. at ¶ 448 (Citibank's expert witness explaining that the February 20, 2001 Options "generated significant cash inflows for Allfirst, which helped reduce Mr. Rusnak's need to fund Allfirst's losses through the bank's Treasury funding desk").

80.     In fact, with $125 million in capacity to continue concealing his losses, Rusnak increased his unauthorized risk-taking to the point where he was risking close to $100 million of Allfirst's capital.  But the value of the yen continued to fall, and Rusnak lost more than $88 million by March 7, and $200 million by the end of March.  Allfirst's undisclosed losses skyrocketed from a total of $300 million at the beginning of 2001 to more than $500 million by the end of March 2001.  PTX 253 (Gomes Rep.) at Ex. E.

81.     If Rusnak had not received this disguised funding, he would have had to substantially reduce his position to avoid the risk of incurring additional losses and needing to

124062643 v3

conceal them with fake assets; this would have caused him to increase his balance sheet usage. PTX 253 (Gomes Rep.) at ¶¶ 128, 133.

82.     If Rusnak's balance sheet usage had remained well above $250 million in 2001, Cronin would have shut down his trading.  PTX 543 (Cronin Dec.) at ¶ 31.

83.     Cronin would have shut down Rusnak's trading if anyone had told him that Rusnak was seeking $125 million in funding because he would have understood that by surreptitiously borrowing $125 million Rusnak was seeking to circumvent the limits that Cronin had placed on his funding.  PTX 543 (Cronin Dec.) at ¶ 34.

84.     Rusnak's balance sheet usage remained below $250 million until the yen fell again at the end of 2001.  PTX 253 (Gomes Rep.) at ¶¶ 166, 181-184.

85.     Cronin "became very concerned" about Rusnak's trading in January 2002, when his balance sheet usage spiked upward rapidly following a year-end reduction below $150 million.  Order at 18.

86.     Cronin shut down Rusnak's trading, which led to the discovery of Rusnak's fraud. PTX 543 (Cronin Dec.) at ¶ 31.

87.     Rusnak lost another $372 million in total before Cronin shut down his trading in January 2002.  PTX 253 (Gomes Rep.) at ¶ 129.

   **E.     Citibank's Corruption of the Confirmation
            Process and the May 9, 2001 Transactions**

      **i.     Citibank as Prime Broker to Allfirst**

88.     Although Rusnak had traded with Citibank previously, in early 2000 Citibank and Allfirst commenced a relationship as "prime counterparties."  Order at 7.

89.     On April 25, 2000, they executed an International Foreign Exchange Master Agreement setting forth the terms of their foreign-exchange trading relationship.  Order at 7.

90.     Finally, on September 1, 2000, Allfirst opened a Prime Brokerage account with Citibank.  Order at 7.

91.     Opening an account with a prime broker, such as Citibank, allows a customer, such as Allfirst, to trade with various counterparties on the prime broker's credit.  Order at 7.

92.     The customer negotiates a transaction directly with a counterparty, and the prime broker acts as the counterparty of record in place of the customer and handles subsequent administration of the trade.  Order at 7-8.

93.     The customer generally makes all payments to (and receives all payments from) the prime broker.  Order at 8.

94.     When the parties' Prime Brokerage relationship commenced, Citibank confirmed its transactions with Allfirst by sending an automated "SWIFT MT300" message to Allfirst's back office for each of their foreign exchange trades, including daily netted Prime Brokerage trades[1] and the underlying spot trades.  Order at 8.

###     ii.     The Corruption of the Confirmation Process

95.     On September 20, 2000, Citibank began, at Rusnak's request, to send him a "Daily Trade Recap" ("DTR")[2] spreadsheet via email regarding daily Prime Brokerage trading activity between Allfirst and Citibank.  Order at 8.

96.     Citibank adapted the DTR email to a template provided by Rusnak.  Order at 8.

---

[1]  Each trading day, Allfirst and Citibank combined all of that day's spot transactions in each currency together into a single forward trade reflecting the net value.  Each of these daily netting transactions settled on a single day each month or settlement period, the "net settlement date," when Allfirst and Citibank exchanged payment to settle their respective balances.

[2]  The confirmatory emails sent by Citibank were also referred to as the "Daily Confirmation Report" or simply as "Email Confirms."

97.     The DTR contained a summary of the parties' daily net trading activity by currency pair and Allfirst's net position by currency, which reflected the running total of netted daily transactions since the parties' last net settlement date.  Order at 9.

98.     Although each day's DTR listed Smith as the recipient on behalf of Allfirst, Citibank sent the DTR only to Rusnak.  Order at 9.

99.     Citibank also offered a website that provided information on its clients' trading activity as part of its Prime Brokerage services.  Order at 9.

100.    On October 4, 2000, after conferring with Smith, Rusnak made a request to Citibank Foreign Exchange Prime Brokerage Head Len Campbell that Citibank stop confirming Prime Brokerage trades by phone or SWIFT message.  Campbell agreed and relayed the change to Back Office Manager Brad Manganello.  Order at 10.

101.    Citibank thereafter stopped sending SWIFT messages with respect to the underlying spot trades but continued to send SWIFT messages confirming the parties' daily netted Prime Brokerage trades.  Order at 10.

102.    Citibank's continued transmission of SWIFT messages for the netted trades was inadvertent.  See infra ¶ 117; see also PTX 235 (reflecting email memo by Campbell and Manganello acknowledging that Citibank only relied on SWIFTs to confirm Rusnak's underlying trades with third-party give-up banks).

103.    To replace the SWIFTs, Campbell and Manganello agreed to confirm Rusnak's netted trades by sending the DTR to Rusnak rather than to his back office.  See, e.g., PTX 13 (Prime Brokerage employee confirming to Rusnak that Citibank will only send the DTR to him and not to his back office).

104.    Campbell and Manganello knew that sending confirmations to traders violated bank policy and industry practice and was not a valid form of confirmation.  Campbell Dep. at 91:16-94:10, 199:10-200:3; Manganello Dep. at 66:17-67:12.

105.    Citibank initially asked Rusnak to arrange for his back office to communicate its agreement to the trade details reflected in the confirmation.  PTX 113.

106.    Rusnak never arranged for his back office to communicate its agreement to the trade details reflected in the confirmation.  Citibank knew that without confirmation from Allfirst's back office the trade would be recorded as unconfirmed in Citibank's systems.  PTX 305 at 6-7 (Manganello admitting that the DTR (or email confirmation) was not a valid form of confirmation because Allfirst's back office never communicated its agreement to the trade details reflected in the confirmation); Manganello Dep. at 92:19-99:18 (explaining that Citibank did not recognize passive confirmation).

107.    In December 2000, upon realizing that Smith was not acknowledging the DTRs that Citibank was sending to Rusnak, Manganello asked Rusnak again to arrange for Smith to acknowledge the emails.  PTX 111.

108.    Rusnak ignored Manganello's email, and Citibank never contacted Allfirst's back office to address the lack of valid confirmation.  (Expected testimony of Len Campbell, Brad Manganello, and Maylin Wilson.)

109.    Rather, between December 21, 2000 and January 8, 2001, Campbell and Manganello sought legal advice from Citibank's in-house lawyers to address their concern.  PTX 19 (Citibank's Privilege Log 2009, entries 1475, 596, 1241); PTX 251 at 45-46 (Responses to Requests for Admission 173-76).

110.     Even after Campbell and Manganello sought legal advice from Citibank's in-house lawyers, neither they nor Citibank's in-house counsel ever contacted Allfirst's back-office to address the lack of valid confirmation.  (Expected testimony of Len Campbell and Brad Manganello.)

111.     Rather, Campbell and Manganello placed a "disclaimer" to the DTR that was intended to protect Citibank in the event that Rusnak was not providing the DTR to Allfirst's back office or was concealing or misrepresenting the details of his trading.  PTX 251 at 45-46 (Responses to Requests for Admission 174-78).

112.     Citibank took this step because it knew it was not relying on any other forms of trade confirmation and it believed that this was the only form of trade confirmation on which Allfirst was relying.  See, e.g., PTX 235 (email prepared by Campbell and Manganello, purportedly at the request of counsel, reflecting their belief that the DTR was the only form of confirmation on which Citibank and Allfirst were relying).

113.     Citibank sought to rely on such "passive confirmation" of Rusnak's netted trades even though it was specifically prohibited by Citibank's policy and would not constitute a valid confirmation in Citibank's systems.  PTX 305 at 6-7 (reflecting Manganello admitting that the DTR was not a valid form of confirmation because Allfirst's back office never communicated its agreement to the trade details reflected in the confirmation).

114.     In January 2001, Campbell and Manganello also agreed to allow the salespeople on Citibank's Prime Brokerage desk to send the DTR to Rusnak rather than Citibank's back office.  Permitting the sales desk to send confirmations of Rusnak's trades was a violation of Citibank policy and industry practice.  PTX 235 (Campbell and Manganello acknowledging that they agreed to allow the Prime Brokerage desk rather than Citibank's back office to send the

DTR to Rusnak); Campbell Dep. at 342:14-343:20 (acknowledging that it was a fundamental principle of Citibank policy and the foreign exchange business that confirmations should be sent from back office to back office).

115.    Thus, beginning in or around the middle of January 2001, Citibank's back office employee, Maylin Wilson, would prepare the DTR for Rusnak's trading.  Ms. Wilson would then send the DTR to the Prime Brokerage desk whether or not Rusnak had traded, and then one of the salespeople on the Prime Brokerage desk would send the DTR directly to Rusnak, generally whether or not he traded.  See, e.g., PTX 444; PTX 445; PTX 446; PTX 103; PTX 128.

116.    Citibank's records indicate that the Prime Brokerage desk's number one objective with respect to Rusnak's account in the first quarter of 2001 was to introduce "Confirmation on the Web" or "COW" to Allfirst's back office.  COW was a proprietary Citibank confirmation system that would have ensured that Citibank's back office and Allfirst's back office were matching confirmations.  PTX 81.  But Citibank deliberately decided not to contact Allfirst's back office about COW.

117.    In or around March 23, 2001, Rusnak learned that Citibank was still sending SWIFTs for the netted trades between Allfirst and Citibank and asked Campbell to stop sending them.  Campbell and Manganello agreed to stop sending those SWIFT messages because they believed that they had stopped sending them in October 2000, and they believed that neither Citibank nor Allfirst was relying on them for confirmation.  Order at 10-11; PTX 99.  Citibank did not send any SWIFT messages for Rusnak's netted trades until April 25th when Smith asked Citibank to reactivate the SWIFTs.  Citibank's SMF at ¶ 212.

118.    In March and April 2001, the salespeople on the Prime Brokerage desk deliberately suppressed Rusnak's DTR.  On these dates, Wilson prepared the DTR and sent it to

the Prime Brokerage desk for the Prime Brokerage desk to send to Rusnak.  See, e.g., PTX 119; see also PTX 435.26; PTX 435.27; PTX 435.28.  But at Rusnak's request, the Prime Brokerage desk never sent the DTR to anyone at Allfirst.  Rusnak created fake netted trades on some of these dates.  PTX 253 (Gomes Rep.), Ex. D.

119.    On April 24, 2001, when Rusnak's back office had been unable to confirm a rate change relating to one of Rusnak's fake trades, George Reynolds agreed to prepare a customized DTR for Rusnak.  See PTX 107 (reflecting the customized DTR).  Rusnak then used the forged confirmation to convince Allfirst's back office that Citibank had a position on its books that matched the fake April 16 trade.  PTX 20.

120.    Reynolds knew that preparing the customized DTR for Rusnak corrupted the confirmation process.  Reynolds Dep. at 130-32.  He knew that Citibank policy prohibited salespeople from participating in the confirmation process, and he also knew that customizing a DTR at the request of a trader was highly improper and highly likely to be used for fraudulent purposes.

121.    On April 24, 2001, Smith's supervisor, Gregory Saba, directed Smith to confirm daily netted Prime Brokerage trades via SWIFT messages instead of email because they were system-generated and therefore a "stronger source of confirmation."  Smith contacted Wilson in Citibank's back office to make the request on April 25.  Order at 11.  Thereafter, Smith memorialized the confirmation of Rusnak's netted trades by attaching the incoming SWIFT message to the "Long Proof Journal" (or trade ticket) generated for that trade by Allfirst's Devon system.  See, e.g., PTX 60; Smith Dep. at 626-31.

122.    However, Campbell and Manganello still believed that the parties were relying on the DTRs to confirm Rusnak's netted trades.  See, e.g., PTX 235.

### iii.     The May 9, 2001 Transactions

123.     The culmination of Campbell and Manganello's agreement to corrupt the confirmation process occurred on May 9, 2001.

124.     On April 9, 2001, Rusnak booked two fake forward trades between Allfirst and Citibank.  Order at 15.

125.     The April 9 trades had to be offset on Allfirst's books before the next settlement date of May 11, however, or it would be apparent they were fakes.  Order at 15-16.

126.     Rusnak therefore booked two additional fake forwards on May 7 and 8 that offset the April 9 trades.  Order at 16.

127.     Lacking SWIFT confirmations for the May 7 and 8 trades, Allfirst's back office contacted Wilson in Citibank's back office on May 8.  Order at 16.

128.     Wilson could not locate the trades in Citibank's system.  She conferred with Reynolds at the trading desk, who knew nothing of the trades but told her that one of the missing trades was "way too big" for Allfirst.  Wilson told Allfirst that Citibank did not have the trades in its system.  Order at 16.

129.     Early in the morning on May 9, Rusnak bought a same-day option from Citibank for a premium of $16.6 million.  Rusnak exercised the option shortly thereafter, which obligated Citibank to pay Allfirst $16.6 million.  Order at 16.

130.     The May 9, 2001 Option was a sham.  It had no optionality and could never have been used for legitimate foreign exchange trading.  PTX 255 (Said Rep.) at ¶ 86; PTX 258 (Mesrobian Rep.) at ¶¶ 113-14; PTX 260 (Rua Rep.) at ¶¶ 76-77.

131.     Nor could the option have been used to pay or receive a cash advance because it was a pure round-trip.  The net effect of this transaction was that Rusnak paid Citibank $16.6 million on May 11, 2001, and Citibank paid Allfirst the exact same amount on the exact same

date.  PTX 255 (Said Rep.) at ¶ 86; PTX 258 (Mesrobian Rep.) at ¶ 114; PTX 260 (Rua Rep.) at ¶ 77.

133.    At Rusnak's request, Citibank agreed to split the spot trade created by the option exercise into two separate spot trades at amounts specified by Rusnak (the "Morning Engineered Trades").  Order at 16-17.


132.    Citibank knew the May 9, 2001 Option was a sham and a round-trip and that Rusnak could not be settling losses.  (See, e.g., expected testimony of Eric Price, Len Campbell, and George Reynolds.)

133.    At Rusnak's request, Citibank agreed to split the spot trade created by the option exercise into two separate spot trades at amounts specified by Rusnak (the "Morning Engineered Trades").  Order at 16-17.

134.    The Morning Engineered Trades were shams.  They were not genuine foreign exchange trades, and they could never have been used for legitimate foreign exchange trading. PTX 255 (Said Rep.) at ¶¶ 87-90, 93; PTX 258 (Mesrobian Rep.) at ¶¶ 115-18; PTX 260 (Rua Rep.) at ¶¶ 78-81; PTX 257 (Said Rebuttal Rep.) at ¶¶ 32-33; PTX 259 (Mesrobian Rebuttal Rep.) at ¶¶ 36, 46-47.

135.    Citibank also agreed to include the Morning Engineered Trades in the DTR it sent to Allfirst on the morning of May 9, pertaining to trading that took place on May 8.  Order at 17.

136.    The positions specified by Rusnak for the split spot trades corresponded to the unconfirmed May 7 and 8 trades, and Allfirst's back office therefore treated Citibank's SWIFT confirmations regarding the split spot trades as the confirmations it had been missing when it called Citibank on May 8.  Order at 17.

137.    With the fake May 7 and 8 trades now on both Citibank's and Allfirst's books, those trades would no longer offset the April 9 fake trades, which were only on Allfirst's books. Order at 17.

138.     Thus, later on May 9, Citibank—again at Rusnak's request—split the daily netted yen trade between Allfirst and Citibank into two spot trades at rates and positions specified by Rusnak (the "Afternoon Engineered Trades").  Order at 17.

139.     The Afternoon Engineered Trades were shams.  They were not genuine foreign exchange trades and they could never have been used for legitimate foreign exchange trading. PTX 255 (Said Rep.) at ¶¶ 87-90, 93; PTX 258 (Mesrobian Rep.) at ¶¶ 115-18; PTX 260 (Rua Rep.) at ¶¶ 78-81; PTX 257 (Said Rebuttal Rep.) at ¶¶ 32-33; PTX 259 (Mesrobian Rebuttal Rep.) at ¶¶ 36, 46-47.

140.     One of those two Afternoon Engineered Trades was equal in value to the two April 9 trades combined.  Order at 17.

141.     Rusnak convinced Saba to ignore the SWIFT messages pertaining to that trade by explaining that Citibank was "reversing-out" a previous error rather than confirming a new trade and, ironically, reassured Saba that if he was wrong there would be a discrepancy with the parties' net settlement the next day.  Order at 17-18.

142.     By preventing that trade from being entered on Allfirst's books, Rusnak in fact removed the existing discrepancy created by the fake April 9 trades.  Order at 18.

143.     The parties confirmed the net settlement amount the next morning.  Citibank's SMF at ¶ 301.

144.     Rusnak lost $225 million from continued trading after the date of the May 9 transactions.  PTX 253 (Gomes Rep.) at ¶ 165, Ex. E.

145.     Citibank knew that the Morning and Afternoon Engineered Trades were shams and not genuine foreign exchange trades and could not have been used for legitimate foreign exchange trading.  PTX 299 (recorded telephone call in which Campbell recalls that he agreed to

include the Morning Engineered Trades on the DTR for May 9 "as if [the trades had been] done

with yesterday's business," and then acknowledges that agreeing to assist Rusnak in creating that

misimpression was "wrong" and "[h]e should never have done that"); Campbell Dep. at 61:9-12,

613:11-617:4 (testifying that there was no legitimate purpose for splitting a trade into two new

trades at off-market rates); Reynolds Dep. at 156:19-24, 161:18-162:3, 172 (testifying that there

was no economic substance to the Morning Engineered Trades and no legitimate trading reason

for them, and also admitting that it was improper to include the Morning Engineered Trades on

the DTR for May 8).

146.    Citibank knew that Rusnak was using the May 9 Option, the Morning Engineered

Trades, and the Afternoon Engineered Trades to manufacture phony positions and confirmations

reflecting currency amounts and rates that would not have been available to him in genuine,

market transactions, and therefore, that he was deceiving Allfirst about his trading.  PTX 115

(Campbell directing Reynolds, et. al. to exclude the spot trade exercising the May 9 Option from

Citibank's trading systems, split them into the Morning Engineered Trades, and then confirm

them separately on the DTR for May 8); PTX 117 (the May 8 DTR); see also supra ¶ 145.

147.    Campbell knew that assisting Rusnak with his deception was wrong.  See supra

¶ 145.  But on May 9, Rusnak's trading accounted for more than 85% of the revenue and trading

volume on Campbell's desk and without Rusnak's business, neither Campbell nor Reynolds

would have had a desk to run.  PTX 152.

148.    Campbell's consciousness of his participation in Rusnak's corruption of the

confirmation process is also reflected in his efforts to conceal his participation in creating the

Morning Engineered Trades and Afternoon Engineered Trades from Citibank's risk managers by

misrepresenting them in an internal Citibank report intended to enable the risk managers to

review off-market transactions.  PTX 114 (internal report reflecting Morning Engineered Trades and Afternoon Engineered Trades with Campbell's handwritten note obscuring the purpose of both transactions); Campbell Dep. at 611-12 (testifying that he had a duty to understand why Rusnak had used off-market rates to engineer the Afternoon Engineered Trades and that his handwritten note does not explain it).

149.    In addition, Campbell's consciousness of his wrongdoing is reflected in his deposition testimony in which he testified that he did not remember anything about the May 9 transactions.  Campbell Dep. at 523:11-525:16, 551:21-24, 553:7-13, 611:14-24, 614:13-615:19. But a recorded telephone call produced _after_ his deposition impeached his testimony by revealing that he recalled the transaction in detail, knew it was wrong, and knew he should not have done it at the time.  PTX 299 (Campbell admitting that his agreement to include the Morning Engineered Trades on his Email Confirm for May 9 was "wrong" and "[h]e should never have done that").

150.    Citibank confirmed the May 9, 2001 transactions as genuine foreign exchange trades.  PTX 32; Citibank's SMF at ¶¶ 292, 293, 298-99 (describing confirmation of the option by phone, and of the Morning and Afternoon Engineered Trades by SWIFT); PTX 117 (May 8 DTR including the Morning Engineered Trades); PTX 512.

151.    Confirming the May 9, 2001 Option, Morning Engineered Trades, and Afternoon Engineered Trades as genuine foreign exchange trades was inadequate and created the misimpression that they were genuine trades.  PTX 258 (Mesrobian Rep.) at ¶ 121; PTX 260 (Rua Rep.) at ¶ 82; PTX 255 (Said Rep.) at ¶ 93 ("These requests might as well have had fraud and deception stamped on each front page.  At an absolute minimum . . . Citibank should have

contacted a senior manager at Allfirst to ensure that management was aware of the actual

purpose of these transactions, and to obtain Allfirst's consent.").

152.    Rusnak's supervisors did not know that Rusnak had executed a sham option to

manufacture phony positions and then confirmations of those positions.  See, e.g., Ray Dep. at

194-95.

153.    The back office confirmed the May 9 Option, the Morning Engineered Trades,

and one of the two Afternoon Engineered Trades as genuine foreign exchange trades.  PTX 32;

PTX 26; PTX 27; PTX 512.

### F.    Citibank's Knowledge that Rusnak Was a Rogue

154.    Citibank knew that Rusnak's disguised funding transactions were deceptive,

unauthorized, and that Rusnak was using them to circumvent limits on his trading.  See supra

¶¶ 36-76.

155.    That's why Len Campbell said that he was uncomfortable with the Same-Day

Options and that he understood that their actual purpose was undetectable and intended to

circumvent any flag-raising.  PTX 188.

156.    That's also why:  (i) Richard Moore said that the February 20 Options "smelled"

(PTX 283 at ¶ 5); (ii) Pusch said that they were likely to be unauthorized (PTX 127; Pusch Dep.

at 96:2-101:15, 102:9-104:12, 108:14-109:6, 110:25-111:12, 126:13-128:21); and (iii) Azhar

wrote that they could be "vehicles for misconduct" (Azhar Dep. at 218:11-219:15, 226:13-

230:14).  Citibank's knowledge that the February 20, 2001 Options were likely to be

unauthorized also explains why, when Moore asked Price whether he suspected that anyone at

Citibank had colluded with Rusnak, Price as much as admitted that he had known "for a long

time" that Rusnak was likely to be a rogue.  PTX 283 at 4; PTX 290 at 3.

157.    Citibank also knew that the May 9 trades were deceptive, that Rusnak was using them to misrepresent his trading, and that Citibank's assistance was wrong.  Shortly after Rusnak's fraud was disclosed, Campbell admitted that his conduct on May 9 was wrong, and that he never should have agreed to report Rusnak's phony positions on the DTR as if they had been done the day before.  PTX 299.

158.    Kemp, Price, Campbell, and others at Citibank also knew that Rusnak's profile as a proprietary trader for a regional, retail bank could not be reconciled with his risk-taking and losses.  Kemp Dep. at 113:7-114:21 (testifying that he knew Rusnak had a $100 million net open position limit and that even Citibank's global spot desk had a net open position limit of $500 million); Price Dep. at 894:13-25 (testifying that like Kemp he understood that Rusnak had a $100 million net open position limit); PTX 258 (Mesrobian Rep.) at ¶¶ 122-136; PTX 260 (Rua Rep.) at ¶¶ 83-95 (explaining that Rusnak's average net open position in 2001 was $556 million with a peak net open position of $2.4 billion); PTX 258 (Mesrobian Rep.) at ¶¶ 94-110; PTX 253 (Gomes Rep.) at Exhibit I (Chart of Allfirst Net Open Positions with Citibank).  For example, Citibank knew throughout the period when it was providing Rusnak with disguised funding and manufacturing phony positions that Rusnak's net open position was frequently in excess of $1 billion (putting $30 million of Allfirst's money at risk).  That was twice the size of the risk limit on Citibank's global spot desk, one of the largest foreign exchange trading desks in the world.  Reynolds Dep. at 247:18-248:7 (testifying that the Prime Brokerage desk monitored Rusnak's net open position); PTX 426 (reflecting the fact that Campbell monitored Rusnak's net open position and knew that his net open position had climbed as high as $2.4 billion in late 2001).

159.    Thus, Citibank knew that Rusnak was misrepresenting his trading to Allfirst and subjecting his bank to unauthorized losses.  That's what Price meant when he said to Moore in

their first conversation after AIB's public disclosure of Rusnak's fraud: "you know, for a long time if we're really honest, and this, you know, James [Kemp], me, you everyone . . . all along, it's just we've always wondered how this worked.  That's about as much as I'll say . . . ."  PTX 283.  Price said this after Moore tried to cut him off, to prevent him from saying anything incriminating on a taped telephone line.  PTX 283.  The only explanation for Price's statement to Moore is that none of the people Price identified ever understood how a proprietary trader for a regional, retail bank would be authorized to seek $125 million in external funding, take $1 billion open positions, and incur tens of millions in losses.

160.    Citibank contacted AIB in March 2000, allegedly about an increase in trading between Citibank and Allfirst and the absence of netting documentation between the two.  At the time, Rusnak's net open position was flat and the net settlement amount was $910,445.  PTX 253 (Gomes Rep.) at ¶ 119.

161.    By contrast, one year later, when Rusnak had net open positions of over $1.3 billion and was settling a loss of $25.1 million (PTX 253 (Gomes Rep.) at ¶ 119), Citibank deliberately avoided contacting AIB or Allfirst despite policies and market practice that required Citibank to contact Allfirst's senior management about the Same-Day Options, February 20, 2001 Options, and May 9 transactions.  See supra, e.g., ¶¶ 46, 64, 67.

162.    Citibank's defense of this litigation also manifests its knowledge that its relationship with Rusnak was culpable.

163.    In the immediate aftermath of AIB's disclosure of Rusnak's fraud, the senior executives in Citibank's foreign exchange business reviewed their relationship with Rusnak in the context of providing information to the senior executive responsible for supervising the foreign exchange business, Tom Maheras, and Citibank's senior in-house counsel.  PTX 274 at

10 (reflecting Richard Moore asking Anu Jayanti to prepare a memo for Tom Maheras describing Citibank's relationship with Allfirst); PTX 165 (reflecting Jayanti providing the "Jayanti memo" to Citibank's senior in-house counsel, Marcy Engel, and Richard Moore, who then provided the memo to Maheras).

164.     In conference calls and emails, many of which were intended to develop the information that would be included in the Jayanti Memo, the executives of the foreign exchange business acknowledged in no uncertain terms that the February 20, 2001 Options were a loan or were intended to "fund" Rusnak's trading, see supra ¶ 59, and Moore acknowledged that he never thought Rusnak's supposed explanation for the transaction was credible.  PX 274 at 9 (acknowledging that he never thought Rusnak's explanation made sense and that is why he asked for "email air cover" and also believed that he had asked Citibank's relationship manager to contact AIB about the trade).

165.     In this context, Maheras and Citibank's in-house counsel also learned that the email documenting the approval process was a fraud.  PTX 165 (email forwarding final draft of the Jayanti memo to Maheras and Engel, and acknowledging that Price obtained Kennedy and Barnes's approval post-trade and never obtained Pusch's approval, thus contradicting the email air cover); PTX 167 (subsequent email from Peter Anguilla's supervisor to Jayanti explaining that Price had never sought Anguilla's approval before the trade was done and Anguilla learned of the trade on his own); see also supra ¶ 68 (citing Jayanti Dep. at 85:4-86:14, 101:15-102:4, 104:22-107:19, 147:7-150:10, 158:7-160:9, 163:21-167:7, 169:8-13 (acknowledging that she had to rewrite her memo to Maheras and Engel because Price had concealed the fact that he did the trades and had also misrepresented the fact that Anguilla, Kennedy, and Barnes learned of the transaction after it was done)).

166.     Maheras and Engel also presumably learned that the February 20, 2001 Options were subject to a policy that required Citibank to contact Allfirst's CEO or CFO, but Eric Price and Jan Navatkoski had deliberately decided not to follow the policy.  PTX 291 (Jayanti, in the course of her investigation, asking Price about the policy and Price admitting that he "didn't follow the procedure that was listed there to the letter, [he] did a version of following it, if you, if you get what I mean," and Jayanti telling him that they were "going to have to be very open about what we didn't do right").

167.     Similarly, Citibank's in-house counsel learned that the back office and Prime Brokerage desk had "agree[d] to send the confirmation [i.e., the DTR] directly between front offices as the client requested."  PTX 235 (email from Campbell and Manganello prepared days after the disclosure of Rusnak's fraud and "at the request of council[sic]" and purporting to describe the "bespoke confirmation process under Prime Brokerage (PB) with Allfirst").

168.     In these calls and emails, the executives of the foreign exchange business also learned that so-called Same-Day Options had no optionality and had only been done to pay cash advances to Rusnak.  PTX 274 at 16-17 (reflecting Campbell explaining to Moore that the Same-Day Options were for the purpose of "monetiz[ing]" his profits, which Moore understood could not be done through a genuine option transaction).  They also learned that Rusnak never used the Same-Day Options to pay cash to Citibank, see id., which meant that they also knew that monetizing profits or losses could not be invoked to rationalize the Same-Day Option on May 9, 2001.  That option, unlike the rest of the Same-Day Options, involved the payment of a premium by Rusnak to Citibank

169.     But rather than acknowledge these facts and, thus, its wrongdoing, Citibank decided to circle its wagons and deny these truths throughout the litigation.  For example,

multiple Citibank witnesses sought to deny that the February 20, 2001 Options were a loan.  <u>See</u> <u>supra</u> ¶ 71.

170.    Similarly, even though the executives of the foreign exchange business, and presumably Maheras and Engel, had determined within days of the disclosure of Rusnak's fraud that the "email air cover" was a fraud, Price and Navatkoski still testified as if the email were true, insisting that they sought approval of the transaction in advance from each of the people identified in the email.  <u>See</u> <u>supra</u> ¶¶ 66, 69.

171.    Likewise, Eric Price and James Kemp each testified that they had discussed the February 20, 2001 Options the morning of the transaction, even though Kemp had actually been on vacation.  <u>See</u> <u>supra</u> ¶¶ 69, 70.  AIB only learned that Kemp had been on vacation when it requested his calendar from Citibank, a request that Citibank resisted until AIB moved to compel its production from Magistrate Judge Gorenstein.  PTX 524.  AIB also learned from one of Kemp's colleagues that he had actually checked his calendar shortly after reading the Ludwig report and confirmed that he was not in the office that day.  Feig Dep. at 201-202.

172.    Similarly, Manganello and Campbell each denied knowing that the DTR was intended to be Citibank's confirmation of Rusnak's netted trades.  Manganello testified that the netted trades were confirmed by telephone with Allfirst's back office and that the SWIFT messages were a "secondary notification," and he denied that the DTR was intended to be a confirmation.  Manganello Dep. at 207, 273-74.  Campbell testified that Citibank did not use the DTR as a confirmation.  Campbell Dep. at 352.  Each of them gave that testimony before AIB uncovered their February 11, 2001 memo, prepared "at the request of council [sic]."  In that memo, they admitted that Rusnak "requested PB confirm daily net currency positions and new net open trade activity using the [DTR]" and that their "oversight was agreeing to send the

confirmation directly between front offices as the client requested," conclusively contradicting their deposition testimony.  PTX 235; PTX 236.  AIB only obtained this document after moving to compel its production from Citibank's privilege log, and, therefore, the document had not been produced at the time of Campbell and Manganello's depositions.  PTX 525.

173.    Campbell also denied recalling Rusnak's request to manufacture the Morning Engineered Trades and to include them on the DTR for the prior day's trading.  Campbell Dep. at 565-566.  But in a recorded conversation that Citibank did not produce until well after Campbell's deposition, Campbell can be heard admitting that he knew it was wrong when he accommodated Rusnak's request.  PTX 299.

174.    Citibank's decision to circle the wagons in defense of this litigation is also reflected in who it decided to discipline after its investigation.  █████████████████████
███████████████████████████████████ ███████████████████████████████
██████████████   But neither Len Campbell, Eric Price (who engineered the fraudulent "email air cover" and disregarded Citibank's credit policy), nor anyone else at Citibank was ever disciplined for accommodating Rusnak's requests for assistance.

175.    Rather, against all of the evidence to the contrary, Citibank continues to maintain that the Same-Day Options, February 20, 2001 Options, and May 9, 2001 trades were genuine foreign exchange transactions and that none of their employees breached any market practices or Citibank policies to accommodate Rusnak's requests.

### G.    The Disclosure of Rusnak's Fraud and the Ludwig Report

176.    Allfirst announced the discovery of the fraud to the public on February 6, 2002. Order at 18.

177.    Allfirst suffered losses of $691 million, and Rusnak served approximately six years in prison.  Order at 18.

178.     After announcing the fraud, AIB promptly commissioned an independent investigation, led by one-time Comptroller of the Currency Eugene Ludwig, that "cover[ed] the substance of the activities in question and highlight[ed] the most significant oversight issues." Order at 18-19.

179.     The Ludwig Report, which was issued on March 12, 2002, did not examine "the activities of all third parties, such as brokers." Order at 19.

## VII.   DEFENDANT'S ASSERTIONS OF DISPUTED FACTS

Citibank understands that all major issues in this case are disputed between the parties, and respectfully refers the Court to the pleadings and prior filings, which provide significant details on many of the disputed issues.  Citi respectfully disagrees with Plaintiff's assertion that the Court's opinion on summary judgment established facts as undisputed for purposes of trial.  The purpose of summary judgment is not to establish undisputed facts, and at no time has Plaintiff (or the Court) suggested that such a rule would apply.  Defendants submit that plaintiff bears the burden of proving facts at trial sufficient to establish the elements of all of its claims.

As a general overview, we understand the following facts are disputed by AIB:

### A.     Standing

1.     AIB does not have standing to bring the claims asserted against Citibank.  (*E.g.*, documents including DTX X2, DTX Y4.)

2.     Allfirst did not properly assign or transfer its rights and obligations under the IFEMA and PBA to AIB.  (*E.g.*, expected testimony of G. Thoreson; documents including DTX X2, DTX Y4.)

3.     Allfirst needed to obtain Citibank's permission to assign or transfer any rights under the IFEMA or PBA to AIB before making any such assignment and failed to do so.  (*E.g.*, expected testimony of G. Thoreson; documents including DTX X2, DTX Y4.)

4.      Allfirst did not properly assign the claims asserted against Citibank to AIB.  (*E.g.*, expected testimony of G. Thoreson; documents including DTX X2, DTX Y4.)

**B.      False Statements or Omissions**

5.      The statements attributed to Citibank were not false or misleading.  (*E.g.*, expected testimony of L. Campbell, A. Jayanti, J. Kemp, R. Marra, E. Price, B. Manganello, C. Culp, D. DeRosa; documents including DTX D137, DTX U38, DTX V38, DTX W38, DTX K38, DTX B37, DTX A40, DTX J7, DTX K22, DTX B38, DTX L38, DTX M38, DTX Z38, DTX A39, DTX E137, DTX N38, DTX B39, DTX D39, DTX F137, DTX F39, DTX F23, DTX I39, DTX G65, DTX H65, DTX H39, DTX M95.)

6.      Citibank never concealed any material information from, or misrepresented any of the transactions with, Allfirst.  (*E.g.*, expected testimony of L. Campbell, A. Jayanti, R. Marra, E. Price, B. Manganello, C. Culp, D. DeRosa; documents including DTX D137, DTX U38, DTX V38, DTX W38, DTX K38, DTX B37, DTX A40, DTX J7, DTX K22, DTX B38, DTX L38, DTX M38, DTX Z38, DTX A39, DTX E137, DTX N38, DTX B39, DTX D39, DTX F137, DTX F39, DTX F23, DTX I39, DTX G65, DTX H65, DTX H39, DTX M95.)

7.      None of the disputed transactions was false or misleading.  (*E.g.*, expected testimony of L. Campbell, A. Jayanti, R. Marra, E. Price, B. Manganello, C. Culp, D. DeRosa; documents including DTX D137, DTX U38, DTX V38, DTX W38, DTX K38, DTX B37, DTX A40, DTX J7, DTX K22, DTX B38, DTX L38, DTX M38, DTX Z38, DTX A39, DTX E137, DTX N38, DTX B39, DTX D39, DTX F137, DTX F39, DTX F23, DTX I39, DTX G65, DTX H65, DTX H39, DTX M95.)

8.      No one at Citibank made a false statement to Allfirst.  (*E.g.*, expected testimony of D. Cronin, L. Campbell, A. Jayanti, R. Marra, E. Price, B. Manganello.)

9. No one at Citibank made a material omission to Allfirst. (*E.g.*, expected testimony of L. Campbell, A. Jayanti, R. Marra, E. Price, B. Manganello, C. Culp, D. DeRosa.)

10. All of the disputed transactions were genuine foreign exchange transactions. (*E.g.*, expected testimony of L. Campbell, A. Jayanti, R. Marra, E. Price, J. Kemp, C. Culp, D. DeRosa.)

11. The disputed transactions fall within the parties agreed definition of "FX Transaction." (*E.g.*, expected testimony of L. Campbell, A. Jayanti, R. Marra, E. Price, J. Kemp; documents including DTX Y4.)

12. Citibank accurately provided the terms of each disputed foreign exchange transaction to Allfirst. (*E.g.*, expected testimony of L. Campbell, A. Jayanti, J. Kemp, R. Marra, E. Price, B. Manganello; documents including DTX D137, DTX U38, DTX V38, DTX W38, DTX K38, DTX B37, DTX A40, DTX J7, DTX K22, DTX B38, DTX L38, DTX M38, DTX Z38, DTX A39, DTX E137, DTX N38, DTX B39, DTX D39, DTX F137, DTX F39, DTX F23, DTX I39, DTX G65, DTX H65, DTX H39, DTX M95.)

13. Citibank's confirmations of each disputed transaction were accurate. (*E.g.*, expected testimony of L. Campbell, A. Jayanti, J. Kemp, R. Marra, E. Price, B. Manganello; documents including DTX D137, DTX U38, DTX V38, DTX W38, DTX K38, DTX B37, DTX A40, DTX J7, DTX K22, DTX B38, DTX L38, DTX M38, DTX Z38, DTX A39, DTX E137, DTX N38, DTX B39, DTX D39, DTX F137, DTX F39, DTX F23, DTX I39, DTX G65, DTX H65, DTX H39, DTX M95.)

14. Allfirst knew all of the terms of each of the disputed transactions. (*E.g.*, expected testimony of D. Cronin, G. Thoreson, L. Campbell, A. Jayanti, J. Kemp, R. Marra, E. Price, B. Manganello, J. Rusnak; depositions of W. Hurtt 266:22-268:14, Feb. 2, 2009, G. Saba 241:5-

242:16, May 18, 2009, L. Smith 395:1-396:12, Aug. 15, 2008; documents including DTX D137, DTX U38, DTX V38, DTX W38, DTX K38, DTX B37, DTX A40, DTX J7, DTX K22, DTX B38, DTX L38, DTX M38, DTX Z38, DTX A39, DTX E137, DTX N38, DTX B39, DTX D39, DTX F137, DTX F39, DTX F23, DTX I39, DTX G65, DTX H65, DTX H39, DTX M95.)

15.     Citibank's documentation of each disputed transaction was not partial and ambiguous.  (*E.g.*, expected testimony of L. Campbell, A. Jayanti, J. Kemp, R. Marra, E. Price, B. Manganello, C. Culp, D. DeRosa; documents including DTX D137, DTX U38, DTX V38, DTX W38, DTX K38, DTX B37, DTX A40, DTX J7, DTX K22, DTX B38, DTX L38, DTX M38, DTX Z38, DTX A39, DTX E137, DTX N38, DTX B39, DTX D39, DTX F137, DTX F39, DTX F23, DTX I39, DTX G65, DTX H65, DTX H39, DTX M95.)

16.     Allfirst and AIB had sufficient information to evaluate the terms of each disputed transaction.  (*E.g.*, expected testimony of L. Campbell, A. Jayanti, J. Kemp, R. Marra, E. Price, B. Manganello, C. Culp, D. DeRosa; documents including DTX D137, DTX U38, DTX V38, DTX W38, DTX K38, DTX B37, DTX A40, DTX J7, DTX K22, DTX B38, DTX L38, DTX M38, DTX Z38, DTX A39, DTX E137, DTX N38, DTX B39, DTX D39, DTX F137, DTX F39, DTX F23, DTX I39, DTX G65, DTX H65, DTX H39, DTX M95.)

17.     Allfirst had access to information about the losses generated by Mr. Rusnak. (*E.g.*, expected testimony of D. Cronin, L. Campbell, A. Jayanti, B. Manganello, R. Marra, E. Price, G. Reynolds, C. Culp, D. DeRosa, R. Stulz; documents including DTX E36, DTX G36.)

18.     Citibank did not corrupt Allfirst's confirmation process.  (*E.g.*, expected testimony of L. Campbell, A. Jayanti, B. Manganello, R. Marra, E. Price, G. Reynolds, C. Culp, D. DeRosa; deposition of L. Smith 691:9-692:9, Dec. 18, 2008.)

19.      None of the disputed transactions was disguised as a genuine foreign exchange trade; all were genuine foreign exchange trades.  (*E.g.*, expected testimony of L. Campbell, A. Jayanti, R. Marra, E. Price, J. Kemp, D. DeRosa, C. Culp.)

20.      Citibank never used sham options to make disguised cash advances to Allfirst. (*E.g.*, expected testimony of L. Campbell, A. Jayanti, R. Marra, E. Price, J. Kemp, C. Culp, D. DeRosa.)

21.      Citibank never used sham options to provide Allfirst with a synthetic loan.  (*E.g.*, expected testimony of L. Campbell, A. Jayanti, R. Marra, E. Price, J. Kemp, C. Culp, D. DeRosa.)

22.      Citibank never created phony confirmations for any transaction with Allfirst. (*E.g.*, expected testimony of L. Campbell, A. Jayanti, B. Manganello, R. Marra, E. Price, G. Reynolds, M. Wilson, D. DeRosa, C. Culp.)

23.      The January 25, 2001 foreign exchange transaction between Allfirst and Citibank was not a sham option or disguised cash advance.  (*E.g.*, expected testimony of L. Campbell, E. Price, J. Kemp, C. Culp, D. DeRosa; deposition of A. Henrikson 183:24-184:10, Oct. 28, 2008; documents including DTX D137, DTX U38, DTX V38, DTX W38, DTX K38.)

24.      The February 20, 2001 foreign exchange transactions were not "sham options" or a "synthetic loan."  (*E.g.*, expected testimony of M. Barnes, E. Price, L. Campbell, A. Brady, J. Kemp, C. Meyer, R. Moore, J. Navatkoski, T. Reid, C. Culp, D. DeRosa; documents including DTX B37, DTX A40, DTX J7, DTX K22, DTX B38.)

25.      The February 20, 2001 option transaction between Allfirst and Citibank exposed Allfirst to significant market risk.  (*E.g.*, expected testimony of M. Barnes, E. Price, L.

Campbell, C. Culp, D. DeRosa; documents including DTX B37, DTX A40, DTX J7, DTX K22, DTX B38.)

26.    Citibank did not provide Allfirst with a loan at an exorbitant interest rate. (*E.g.*, expected testimony of M. Barnes, E. Price, L. Campbell, A. Brady, J. Kemp, C. Meyer, R. Moore, J. Navatkoski, T. Reid, D. DeRosa.)

27.    The April 23, 2001 foreign exchange transaction between Allfirst and Citibank was not a sham option or disguised cash advance. (*E.g.*, expected testimony of L. Campbell, E. Price, D. DeRosa; deposition of A. Henrikson 183:24-185:10, Oct. 28, 2008; documents including DTX L38, DTX Q38, DTX Y38, DTX V13.)

28.    The May 9, 2001 foreign exchange transactions were not sham options manufactured to create phony confirmations. (*E.g.*, expected testimony of E. Price, G. Reynolds, D. DeRosa; documents including DTX F39, DTX F23, DTX I39, DTX G65, DTX H65, DTX H39, DTX M95.)

29.    The yen trades that Allfirst netted with Citibank on May 9, 2001, were not phony trades at off-market prices manufactured to create mirror trades. (*E.g.*, expected testimony of E. Price, G. Reynolds, D. DeRosa; documents including DTX F39, DTX F23, DTX I39, DTX G65, DTX H65, DTX H39, DTX M95.)

30.    The September 18, 2001 foreign exchange transaction between Allfirst and Citibank was not a sham option or disguised cash advance. (*E.g.*, expected testimony of L. Campbell, E. Price, D. DeRosa; deposition of A. Henrikson, 183:24-185:10, Oct. 28, 2008; documents including DTX M38, DTX Z38, DTX A39, DTX E137.)

31.    The January 23, 2002 foreign exchange transaction between Allfirst and Citibank was not a sham option or disguised cash advance. (*E.g.*, expected testimony of L. Campbell, E.

Price, D. DeRosa; deposition of A. Henrikson 183:24-185:10, Oct. 28, 2008; documents including DTX N38, DTX B39, DTX C39, DTX D39, DTX F137.)

32.    None of the disputed transactions was off-market.  (*E.g.*, expected testimony of L. Campbell, J. Kemp, E. Price, G. Reynolds, D. DeRosa; documents including DTX D137, DTX U38, DTX V38, DTX W38, DTX K38, DTX B37, DTX A40, DTX J7, DTX K22, DTX B38, DTX L38, DTX M38, DTX Z38, DTX A39, DTX E137, DTX N38, DTX B39, DTX D39, DTX F137, DTX F39, DTX F23, DTX I39, DTX G65, DTX H65, DTX H39, DTX M95.)

33.    Because Citibank did not have a duty of disclosure to Allfirst, Citibank did not omit any information it was required to disclose to Allfirst.  (*E.g.*, expected testimony of L. Campbell, J. Kemp, E. Price, G. Reynolds, C. Culp, D. DeRosa, R. Stulz; documents including DTX D137, DTX U38, DTX V38, DTX W38, DTX K38, DTX B37, DTX A40, DTX J7, DTX K22, DTX B38, DTX L38, DTX M38, DTX Z38, DTX A39, DTX E137, DTX N38, DTX B39, DTX D39, DTX F137, DTX F39, DTX F23, DTX I39, DTX G65, DTX H65, DTX H39, DTX M95.)

34.    With respect to each of the disputed transactions, Citibank did not violate any supposed duty of disclosure to Allfirst.  (*E.g.*, expected testimony of L. Campbell, J. Kemp, E. Price, G. Reynolds, C. Culp, D. DeRosa, R. Stulz; documents including DTX D137, DTX U38, DTX V38, DTX W38, DTX K38, DTX B37, DTX A40, DTX J7, DTX K22, DTX B38, DTX L38, DTX M38, DTX Z38, DTX A39, DTX E137, DTX N38, DTX B39, DTX D39, DTX F137, DTX F39, DTX F23, DTX I39, DTX G65, DTX H65, DTX H39, DTX M95.)

35.    Citibank never failed to disclose material facts concerning Mr. Rusnak's and Allfirst's trading.  (*E.g.*, expected testimony of L. Campbell, J. Kemp, E. Price, G. Reynolds, C. Culp, D. DeRosa; documents including DTX D137, DTX U38, DTX V38, DTX W38, DTX

124062643 v3

K38, DTX B37, DTX A40, DTX J7, DTX K22, DTX B38, DTX L38, DTX M38, DTX Z38,

DTX A39, DTX E137, DTX N38, DTX B39, DTX D39, DTX F137, DTX F39, DTX F23, DTX

I39, DTX G65, DTX H65, DTX H39, DTX M95, DTX G25, DTX T34.)

36.     Allfirst was aware that Mr. Rusnak traded in same-day options.  (*E.g.*, Documents

including DTX D18(b); expected testimony of J. Rusnak; deposition of G. Saba 191:20-192:10,

May 18, 2009.)

37.     Mr. Rusnak traded same-day options with banks other than Citibank.  (*E.g.*,

expected testimony of J. Rusnak, R. Stulz; documents including DTX T31.)

38.     Allfirst and AIB were aware that Mr. Rusnak traded in-the-money-options.  (*E.g.*,

expected testimony of J. Rusnak; deposition of M. Kozak 196:2-200:18, June 10, 2008;

documents including DTX E2, DTX F2.)

39.     Mr. Rusnak traded in-the-money-options with banks other than Citibank.  (*E.g.*,

expected testimony of J. Rusnak; documents including DTX E2, DTX H38, DTX Y48.)

40.     Allfirst knew that Mr. Rusnak's activities included the purchasing and selling of

"deep-in-the-money-options."  (*E.g.*, expected testimony of J. Rusnak; deposition of M. Kozak

196:2-200:18, June 10, 2008; documents including DTX E2, DTX F2.)

41.     Mr. Rusnak traded "deep-in-the-money options" with banks other than Citibank.

(*E.g.*, expected testimony of J. Rusnak; documents including DTX E2, DTX H38, DTX Y48.)

42.     AIB traded "deep-in-the-money" options with Allfirst.  (*E.g.*, documents

including DTX R1.)

### C.     **Materiality**

43.     The alleged misstatements or omissions were not material.

### D.   <u>Scienter and Actual Knowledge</u>

44.      No Citibank employee acted with scienter in connection with the disputed transactions.  (*E.g.*, expected testimony of E. Price, R. Marra, L. Campbell, A. Jayanti, J. Kemp.)

45.      No Citibank employee had the motive or opportunity to perpetrate the alleged fraud.  (*E.g.*, expected testimony of E. Price, R. Marra, L. Campbell, A. Jayanti, J. Kemp.)

46.      No one at Citibank acted with malice toward Allfirst.  (*E.g.*, expected testimony of E. Price, R. Marra, L. Campbell, A. Jayanti, J. Kemp.)

47.      No one at Citibank engaged in conscious misbehavior with respect to Allfirst's rights and interests.  (*E.g.*, expected testimony of E. Price, R. Marra, L. Campbell, A. Jayanti, J. Kemp.)

48.      No one at Citibank acted with a reckless disregard of Allfirst's rights and interests.  (*E.g.*, expected testimony of E. Price, R. Marra, L. Campbell, A. Jayanti, J. Kemp.)

49.      No one at Citibank intended to deceive Allfirst.  (*E.g.*, expected testimony of E. Price, R. Marra, L. Campbell, A. Jayanti, J. Kemp.)

50.      Citibank, at all times, acted in good faith.  (*E.g.*, expected testimony of E. Price, R. Marra, L. Campbell, A. Jayanti, J. Kemp.)

51.      All Citibank employees acted reasonably and in good faith.  (*E.g.*, expected testimony of M. Barnes, A. Brady, L. Campbell, B. Crowe, T. Golden, A. Jayanti, J. Kemp, B. Manganello, R. Marra, C. Meyer, R. Moore, J. Navatkoski, E. Price, T. Reeves, T. Reid,  G. Reynolds, M. Wilson.)

52.      Richard Marra, Eric Price, and Len Campbell were not "enablers."  (*E.g.*, expected testimony of E. Price, R. Marra, L. Campbell.)

53.      Mr. Marra acted reasonably and in good faith.  (*E.g.*, expected testimony of R. Marra.)

124062643 v3

54.     Mr. Marra did not create any "sham options," "disguised cash advances," "synthetic loans," "phony confirmations," or "phony trades" to perpetrate a fraud on Allfirst or substantially assist Mr. Rusnak perpetrate a fraud.  (*E.g.*, expected testimony of R. Marra, C. Culp, D. DeRosa.)

55.     Mr. Marra did not believe at the time that any of Allfirst's trades involved "sham options," "disguised cash advances," "synthetic loans," "phony confirmations," or "phony trades."  (*E.g.*, expected testimony of R. Marra.)

56.     Mr. Marra did not know that Mr. Rusnak misrepresented his trading or engaged in any other misconduct related to his trading activities.  (*E.g.*, expected testimony of R. Marra.)

57.     Mr. Marra did not know that Mr. Rusnak circumvented Allfirst's controls or that Mr. Rusnak mispresented his trading to Allfirst.  (*E.g.*, expected testimony of R. Marra.)

58.     Mr. Price acted reasonably and in good faith.  (*E.g.*, expected testimony of E. Price.)

59.     Mr. Price did not create any "sham options," "disguised cash advances," "synthetic loans," "phony confirmations," or "phony trades" to perpetrate a fraud on Allfirst or substantially assist Mr. Rusnak perpetrate a fraud.  (*E.g.*, expected testimony of E. Price, C. Culp, D. DeRosa.)

60.     Mr. Price did not believe at the time that any of Allfirst's trades involved "sham options," "disguised cash advances," "synthetic loans," "phony confirmations," or "phony trades."  (*E.g.*, expected testimony of E. Price.)

61.     Mr. Price did not know that Mr. Rusnak misrepresented his trading or engaged in any other misconduct related to his trading activities.  (*E.g.*, expected testimony of E. Price.)

62.     Mr. Price did not know that Mr. Rusnak circumvented Allfirst's controls or that Mr. Rusnak mispresented his trading to Allfirst.  (*E.g*., expected testimony of E. Price.)

63.     Mr. Campbell acted reasonably and in good faith.  (*E.g*., expected testimony of L. Campbell.)

64.     Mr. Campbell did not create any "sham options," "disguised cash advances," "synthetic loans," "phony confirmations," or "phony trades" to perpetrate a fraud on Allfirst or substantially assist Mr. Rusnak perpetrate a fraud.  (*E.g*., expected testimony of L. Campbell, C. Culp, D. DeRosa.)

65.     Mr. Campbell did not believe at the time that any of Allfirst's trades involved "sham options," "disguised cash advances," "synthetic loans," "phony confirmations," or "phony trades."  (*E.g*., expected testimony of L. Campbell.)

66.     Mr. Campbell did not know that Mr. Rusnak misrepresented his trading or engaged in any other misconduct related to his trading activities.  (*E.g*., expected testimony of L. Campbell.)

67.     Mr. Campbell did not know that Mr. Rusnak circumvented Allfirst's controls or that Mr. Rusnak mispresented his trading to Allfirst.  (*E.g*., expected testimony of L. Campbell.)

68.     No one at Citibank created any "sham options," "disguised cash advances," "synthetic loans," "phony confirmations," or "phony trades" to perpetrate a fraud on Allfirst or substantially assist Mr. Rusnak perpetrate a fraud.  (*E.g*., expected testimony of E. Price, R. Marra, L. Campbell, A. Jayanti, J. Kemp, C. Culp, D. DeRosa; documents including DTX D137, DTX U38, DTX V38, DTX W38, DTX K38, DTX B37, DTX A40, DTX J7, DTX K22, DTX B38, DTX L38, DTX R38, DTX Z38, DTX A39, DTX E137, DTX N38, DTX B39, DTX D39, DTX F137, DTX F39, DTX F23, DTX I39, DTX G65, DTX H65, DTX H39, DTX M95.)

69.     No one at Citibank believed that any of the disputed transactions involved "sham options," "disguised cash advances," "synthetic loans," "phony confirmations," or "phony trades."  (*E.g*., expected testimony of E. Price, R. Marra, L. Campbell, A. Jayanti, J. Kemp; documents including DTX D137, DTX U38, DTX V38, DTX W38, DTX K38, DTX B37, DTX A40, DTX J7, DTX K22, DTX B38, DTX L38, DTX R38, DTX Z38, DTX A39, DTX E137, DTX N38, DTX B39, DTX D39, DTX F137, DTX F39, DTX F23, DTX I39, DTX G65, DTX H65, DTX H39, DTX M95.)

70.     No one at Citibank knew that Mr. Rusnak misrepresented his trading or engaged in any other misconduct related to his trading activities.  (*E.g*., expected testimony of M. Barnes, A. Brady, L. Campbell, B. Crowe, T. Golden, A. Jayanti, J. Kemp, B. Manganello, R. Marra, C. Meyer, R. Moore, J. Navatkoski, E. Price, T. Reeves, T. Reid,  G. Reynolds, M. Wilson.)

71.     No one at Citibank knew that Mr. Rusnak circumvented Allfirst's controls or that Mr. Rusnak mispresented his trading to Allfirst.  (*E.g*., expected testimony of M. Barnes, A. Brady, L. Campbell, B. Crowe, T. Golden, A. Jayanti, J. Kemp, B. Manganello, R. Marra, C. Meyer, R. Moore, J. Navatkoski, E. Price, T. Reeves, T. Reid,  G. Reynolds, M. Wilson.)

72.     No one at Citibank understood at the time that Mr. Rusnak was a "rogue trader." (*E.g*., expected testimony of M. Barnes, A. Brady, L. Campbell, B. Crowe, T. Golden, A. Jayanti, J. Kemp, B. Manganello, R. Marra, C. Meyer, R. Moore, J. Navatkoski, E. Price, T. Reeves, T. Reid,  G. Reynolds, M. Wilson.)

73.     No one at Citibank believed at the time that the January 25, 2001 foreign exchange transaction between Allfirst and Citibank was a sham option or disguised cash advance.  (*E.g*., expected testimony of L. Campbell, E. Price; documents including DTX D137, DTX U38, DTX V38, DTX W38, DTX K38.)

74.     No one at Citibank believed at the time that the February 20, 2001 foreign exchange transactions were a synthetic loan.  (*E.g.*, expected testimony of M. Barnes, E. Price, L. Campbell, A. Brady, J. Kemp, C. Meyer, R. Moore, J. Navatkoski, T. Reid; documents including DTX B37, DTX A40, DTX J7, DTX K22, DTX B38.)

75.     No one at Citibank believed at the time that the April 23, 2001 foreign exchange transaction between Allfirst and Citibank was a sham option or disguised cash advance.  (*E.g.*, expected testimony of L. Campbell, E. Price; DTX L38, DTX Q38, DTX Y38, DTX V13.)

76.     No one at Citibank believed at the time that the May 9, 2001 foreign exchange transactions between Allfirst and Citibank were sham options or phony trades.  (*E.g.*, expected testimony of E. Price, G. Reynolds; documents including DTX F23, DTX F39, DTX I39, DTX G65, DTX H65, DTX H39, DTX M95.)

77.     No one at Citibank believed at the time that the September 18, 2001 foreign exchange transaction between Allfirst and Citibank was a sham option or disguised cash advance.  (*E.g.*, expected testimony of L. Campbell, E. Price; documents including DTX M38, DTX Z38, DTX A39, DTX E137.)

78.     No one at Citibank believed at the time that the January 23, 2002 foreign exchange transaction between Allfirst and Citibank was a sham option or disguised cash advance.  (*E.g.*, expected testimony of L. Campbell, E. Price; documents including DTX N38, DTX B39, DTX C39, DTX D39, DTX F137.)

79.     No one at Citibank knew that Mr. Rusnak was taking enormous risks that were inconsistent with Allfirst's professed trading strategy.  (*E.g.*, expected testimony of L. Campbell, R. Marra, E. Price, G. Reynolds; deposition of M. Moroney 295:12-296:22, Oct. 17, 2008.)

80.     No one at Citibank knew the full extent of Mr. Rusnak's or Allfirst's foreign exchange trading activity.  (*E.g.*, expected testimony of M. Barnes, A. Brady, L. Campbell, B. Crowe, T. Golden, A. Jayanti, J. Kemp, B. Manganello, R. Marra, C. Meyer, R. Moore, J. Navatkoski, E. Price, T. Reeves, T. Reid,  G. Reynolds, M. Wilson; deposition of M. Moroney 295:12-296:22, Oct. 17, 2008.)

81.     No one from Citibank had actual knowledge of Mr. Rusnak's fraud, consciously avoided obtaining knowledge of Mr. Rusnak's fraud, or was willfully blind about Mr. Rusnak's fraud.  (*E.g.*, expected testimony of M. Barnes, A. Brady, L. Campbell, B. Crowe, T. Golden, A. Jayanti, J. Kemp, B. Manganello, R. Marra, C. Meyer, R. Moore, J. Navatkoski, E. Price, T. Reeves, T. Reid,  G. Reynolds, M. Wilson.)

82.     No one at Citibank knew that Mr. Rusnak engaged in any unauthorized trading. (*E.g.*, expected testimony of M. Barnes, A. Brady, L. Campbell, B. Crowe, T. Golden, A. Jayanti, J. Kemp, B. Manganello, R. Marra, C. Meyer, R. Moore, J. Navatkoski, E. Price, T. Reeves, T. Reid,  G. Reynolds, M. Wilson.)

83.     Various statements captured on voice recordings do not reflect scienter, "conscious avoidance," "guilty knowledge," or "false exculpatory statements."  (*E.g.*, expected testimony of M. Barnes, A. Brady, L. Campbell, B. Crowe, T. Golden, A. Jayanti, J. Kemp, B. Manganello, R. Marra, C. Meyer, R. Moore, J. Navatkoski, E. Price, T. Reeves, T. Reid,  G. Reynolds, M. Wilson.)

**E.     Substantial Assistance**

84.     Citibank did not substantially assist Mr. Rusnak in committing fraud.  (*E.g.*, expected testimony of R. Marra, E. Price, L. Campbell.)

85.     Mr. Marra did not affirmatively help Mr. Rusnak conceal his trading losses. (*E.g.*, expected testimony of R. Marra.)

86.     Mr. Marra did not, by virtue of failing to act when required to do so, enable Mr. Rusnak's fraud to proceed.  (*E.g.*, expected testimony of R. Marra, E. Price.)

87.     Mr. Marra did not substantially assist Mr. Rusnak by concealing the website; corrupting the confirmation process; engaging in sham options, disguised cash advances, synthetic loans, and phony trades; or falsely documenting any transaction.  (*E.g.*, expected testimony of R. Marra.)

88.     Mr. Price did not affirmatively help Mr. Rusnak advance and conceal his fraud.  (*E.g.*, expected testimony of E. Price.)

89.     Mr. Price did not, by virtue of failing to act when required to do so, enable Mr. Rusnak's fraud to proceed.  (*E.g.*, expected testimony of E. Price.)

90.     Mr. Price did not substantially assist Mr. Rusnak by concealing the website; corrupting the confirmation process; engaging in sham options, disguised cash advances, synthetic loans, and phony trades; or falsely documenting any transaction.  (*E.g.*, expected testimony of E. Price.)

91.     Mr. Campbell did not affirmatively help Mr. Rusnak advance and conceal his fraud.  (*E.g.*, expected testimony of L. Campbell.)

92.     Mr. Campbell did not, by failing to act when required to do so, enable Mr. Rusnak's fraud to proceed.  (*E.g.*, expected testimony of L. Campbell.)

93.     Mr. Campbell did not substantially assist Mr. Rusnak by concealing the website; corrupting the confirmation process; engaging in sham options, disguised cash advances, synthetic loans, and phony trades; or falsely documenting any transaction.  (*E.g.*, expected testimony of L. Campbell.)

124062643 v3

94.     No one at Citibank affirmatively helped Mr. Rusnak advance and conceal his fraud.  (*E.g.*, expected testimony of M. Barnes, A. Brady, L. Campbell, B. Crowe, T. Golden, A. Jayanti, J. Kemp, B. Manganello, R. Marra, C. Meyer, R. Moore, J. Navatkoski, E. Price, T. Reeves, T. Reid,  G. Reynolds, M. Wilson.)

95.     No one at Citibank, by virtue of failing to act when required to do so, enabled Mr. Rusnak's fraud to proceed.  (*E.g.*, expected testimony of M. Barnes, A. Brady, L. Campbell, B. Crowe, T. Golden, A. Jayanti, J. Kemp, B. Manganello, R. Marra, C. Meyer, R. Moore, J. Navatkoski, E. Price, T. Reeves, T. Reid,  G. Reynolds, M. Wilson.)

96.     No one at Citibank substantially assisted Mr. Rusnak by concealing the website; corrupting the confirmation process; engaging in sham options, disguised cash advances, synthetic loans, and phony trades; or falsely documenting any transaction.  (*E.g.*, expected testimony of M. Barnes, A. Brady, L. Campbell, B. Crowe, T. Golden, A. Jayanti, J. Kemp, B. Manganello, R. Marra, C. Meyer, R. Moore, J. Navatkoski, E. Price, T. Reeves, T. Reid,  G. Reynolds, M. Wilson.)

### F.     **Actual and Reasonable Reliance**

97.     Allfirst did not rely on any false statement or omission made by Citibank.  (*E.g.*, expected testimony of D. Cronin; deposition of G. Saba 192:8-10, May 9, 2009; documents including DTX D5, DTX D18.)

98.     No one at Allfirst actually relied on any false statement or omission made by Citibank.  (*E.g.*, expected testimony of D. Cronin; documents including DTX D5, DTX D18.)

99.     AIB's supposed reliance in support of its fraud claim was unreasonable. (*E.g.*, expected testimony of D. Cronin, C. Culp; documents including DTX D5, DTX D18, DTX Q, DTX V, DTX K12, DTX M12, DTX Z1.)

100.    Allfirst represented to Citibank that it was not relying on Citibank in making a decision to enter into any of the disputed transactions.  (*E.g.*, documents including DTX X2, DTX Y4.)

101.    Allfirst was a sophisticated investor, supported by one of the largest banks in Ireland, and was capable of evaluating each of the transactions at issue.  (*E.g.*, expected testimony of D. Cronin, J. Rusnak, R. Stulz; documents including DTX M35.)

102.    Allfirst made its own independent judgment to enter into each of the disputed transactions.  (*E.g.*, expected testimony of D. Cronin, L. Campbell, R. Marra, E. Price, G. Reynolds, J. Rusnak; documents including DTX X2, DTX Y4.)

103.    Allfirst understood and accepted the terms, conditions, and risks of each of the disputed transactions.  (*E.g.*, expected testimony of D. Cronin, J. Rusnak; documents including DTX X2, DTX Y4, DTX K38, DTX K22, DTX B38, DTX L38, DTX M38, DTX N38, DTX F23.)

104.    Allfirst confirmed and accepted each of the disputed transactions.  (*E.g.*, expected testimony of B. Manganello; deposition of W. Hurtt 258:8-263:7, Feb. 2, 2009; documents including DTX D137, DTX U38, DTX V38, DTX W38, DTX K38, DTX B37, DTX A40, DTX J7, DTX K22, DTX B38, DTX L38, DTX M38, DTX Z38, DTX A39, DTX E137, DTX N38, DTX B39, DTX D39, DTX F137, DTX F39, DTX F23, DTX I39, DTX G65, DTX H65, DTX H39, DTX M95.)

105.    All of the transactions between Allfirst and Citibank were at arms-length.  (*E.g.*, expected testimony of R. Marra, E. Price, L. Campbell, D. DeRosa; documents including DTX X2, DTX Y4.)

106.    Allfirst and AIB had an opportunity to obtain an accurate picture of Mr. Rusnak's activities without any assistance from Citibank.  (*E.g.*, expected testimony of D. Cronin, J. Rusnak, G. Reynolds, C. Culp, D. DeRosa, R. Stulz; documents including DTX D137, DTX U38, DTX V38, DTX W38, DTX K38, DTX B37, DTX A40, DTX J7, DTX K22, DTX B38, DTX L38, DTX M38, DTX Z38, DTX A39, DTX E137, DTX N38, DTX B39, DTX D39, DTX F137, DTX F39, DTX F23, DTX I39, DTX G65, DTX H65, DTX H39, DTX M95.)

107.    The information that AIB alleges Citibank failed to disclose was available to Allfirst and AIB.  (*E.g.*, expected testimony of L. Campbell, D. Cronin, B. Manganello, G. Reynolds, D. DeRosa; depositions of G. Saba 210:18-211:4, 257:24-259:24, May 18, 2009, R. Ray 331:14-332:7, June 25, 2008, W. Hurtt 70:11-24, Feb. 2, 2009; documents including DTX D137, DTX U38, DTX V38, DTX W38, DTX K38, DTX B37, DTX A40, DTX J7, DTX K22, DTX B38, DTX L38, DTX M38, DTX Z38, DTX A39, DTX E137, DTX N38, DTX B39, DTX D39, DTX F137, DTX F39, DTX F23, DTX I39, DTX G65, DTX H65, DTX H39, DTX M95, DTX E36, DTX Z3, DTX V2.)

### G.    **Allfirst's and AIB's Conduct and Rusnak's Trading**

108.    Neither Allfirst nor AIB informed Citibank that issues with Mr. Rusnack's trading had caused Allfirst to bar Mr. Rusnack from using Prime Brokerage accounts for a period in 1999. (*E.g.*, documents including DTX A.)

109.    No one at Citibank knew of Allfirst's and AIB's significant failures to monitor, supervise, control, and manage Mr. Rusnak's activities.  (*E.g.*, expected testimony of M. Barnes, A. Brady, L. Campbell, B. Crowe, T. Golden, A. Jayanti, J. Kemp, B. Manganello, R. Marra, C. Meyer, R. Moore, J. Navatkoski, E. Price, T. Reeves, T. Reid,  G. Reynolds.)

110.     Allfirst and AIB failed to inform Citibank of Allfirst's and AIB's significant failures to monitor, supervise, control, and manage Mr. Rusnak's activities.  (*E.g.*, expected testimony of D. Cronin, L. Campbell, B. Manganello, R. Marra, E. Price, G. Reynolds.)

111.     Allfirst and AIB failed for an extended period of time to monitor, supervise, and control Mr. Rusnak's trading and activities.  (*E.g.*, expected testimony of  D. Cronin; depositions of R. Ray 177:15-178:15, 245:10-246:19, June 24, 2008, F. Bramble 40:4-41:8, Apr. 16, 2009; documents including DTX A, DTX C13.)

112.     Allfirst and AIB exercised inadequate supervision over Mr. Rusnak.  (*E.g.*, expected testimony of D. Cronin, C. Culp; deposition of F. Bramble 40:4-41:8, Apr. 16, 2009; documents including DTX A, DTX B17, DTX C13.)

113.     Mr. Rusnak's superiors failed adequately to supervise Mr. Rusnak's activities. (*E.g.*, expected testimony of D. Cronin, C. Culp; deposition of F. Bramble 40:4-41:8, Apr. 16, 2009; documents including DTX A, DTX B17, DTX C13.)

114.     Allfirst's FX proprietary trading business was inadequately supervised.  (*E.g.*, expected testimony of D. Cronin, C. Culp, D. DeRosa; deposition of F. Bramble 40:4-41:8, Apr. 16, 2009; documents including DTX A, DTX C13)

115.     Allfirst's and AIB's responses to information they received or were aware of concerning Mr. Rusnak and Mr. Rusnak's activities were inadequate.  (*E.g.*, expected testimony of D. Cronin, C. Culp, D. DeRosa; documents including DTX A, DTX C13, DTX D3; *see also infra* ¶¶ 139-60.)

116.     A flawed and weak control environment existed at Allfirst.  (*E.g.*, expected testimony of D. Cronin, C. Culp, D. DeRosa; documents including DTX A, DTX Q5, DTX C13.)

117.     Treasury management weaknesses at Allfirst contributed to the environment that allowed Mr. Rusnak's fraud to occur. (*E.g.*, expected testimony of D. Cronin; deposition of F. Bramble 40:4-41:8, Apr. 16, 2009; documents including DTX A, DTX C13.)

118.     The risk assessment group at Allfirst failed adequately to review the control environment in Treasury.  (*E.g.*, deposition of A. Williams 144:9-145:4, Sept. 26, 2008; documents including DTX A, DTX C13.)

119.     Senior management at Allfirst and AIB did not focus sufficient attention on Allfirst's proprietary trading operation.  (*E.g.*, expected testimony of D. Cronin, C. Culp; deposition of F. Bramble 40:4-41:8, Apr. 16, 2009; documents including DTX A, DTX L3, DTX C13.)

120.     Allfirst and AIB failed fully to implement audit and supervisory recommendations.  (*E.g.*, expected testimony of D. Cronin, C. Culp; documents including DTX A, DTX C13.)

121.     Allfirst and AIB failed to appreciate regulatory concerns.  (*E.g.*, expected testimony of D. Cronin, C. Culp; documents including DTX A, DTX C13, DTX R7, DTX F10, DTX N, DTX N35.)

122.     Allfirst and AIB inadequately responded to issues with Mr. Rusnak's trading and activities that were identified.  (*E.g.*, expected testimony of D. Cronin, C. Culp, D. DeRosa, R. Stulz; documents including DTX A, DTX D3, DTX C13.)

123.     Allfirst and AIB did not carefully scrutinize Mr. Rusnak's trading activities. (*E.g.*, expected testimony of D. Cronin, C. Culp, D. DeRosa, R. Stulz; documents including DTX A, DTX C17, DTX C13.)

124.    Allfirst enabled Mr. Rusnak to create fake option trades that appeared to offset real losses and risk exposure by failing to confirm all of Mr. Rusnak's trades.  (*E.g.*, expected testimony of J. Rusnak, C. Culp, D. DeRosa, R. Stulz; deposition of F. Bramble, 40:4-41:8, Apr. 16, 2009; documents including DTX A, DTX C17, DTX C13, DTX G36, DTX F12, DTX U4.)

125.    Allfirst and AIB ignored numerous warnings signs of Mr. Rusnak's fraud and ignored other information about Mr. Rusnak's activities that should have prompted further inquiry by Allfirst and AIB.  (*E.g.*, expected testimony of D. Cronin; depositions of F. Bramble, 40:4-41:8, Apr. 16, 2009, J. Palmer, 59:10-12, Nov. 17, 2008; documents including DTX A, DTX C17, DTX C13, DTX G25, DTX T34; *see also infra* ¶ 148.)

126.    Allfirst and AIB missed numerous opportunities to detect Mr. Rusnak's fraud. (*E.g.*, expected testimony of D. Cronin, G. Thoreson, J. Rusnak, C. Culp, D. DeRosa, R. Stulz; depositions of F. Bramble 40:4-41:8, Apr. 16, 2009, J. Palmer, 59:10-12, Nov. 17, 2008; documents including DTX A, DTX C17, DTX C13, DTX G25, DTX T34; *see also infra* ¶ 148.)

127.    David Cronin and Robert Ray—the principle persons responsible for Mr. Rusnak's supervision—failed for an extended period of time to monitor Mr. Rusnak's trading.  (*E.g.*, expected testimony of D. Cronin, J. Rusnak, C. Culp, D. DeRosa; deposition of F. Bramble 40:4-41:8, Apr. 16, 2009; documents including DTX A, DTX B17, DTX C13, DTX E3, DTX K8.)

128.    Others at Allfirst had actual knowledge that Mr. Rusnak was executing false trades and recording them in Allfirst's books and records.  (*E.g.*, expected testimony of J. Rusnak.)

129.     Others at Allfirst were aware that software had been installed on computers used by Mr. Rusnak and others to delete incriminating evidence.  (*E.g.*, expected testimony of J. Rusnak.)

130.     Rusnak was aware that Allfirst purged the DEVON system every month (*e.g.*, depositions of G. Saba 397:23-25, May 19, 2009; K. Wenner 332:19-333:1, Jan. 29, 2009; DTX Q18(b)), and he used this system rather than the OPICS system in part for that reason. Management was aware of this discrepancy as early as 2000, but allowed it to continue and never forced Rusnak to switch to the more sophisticated OPICS system.  (*E.g.*, documents including DTX Q18(b).)  A switch to the OPICS system would have immediately revealed Rusnak's trading losses.

### H.     Causation

131.     Citibank's actions or inactions were not the cause of Allfirst's losses.  (*E.g.*, expected testimony of R. Stulz; deposition of B. King 277:24-278:14, Feb. 27, 2009; documents including DTX A, DTX S35, DTX D15.)

132.     There is no causal link between Citibank's alleged actions and AIB's alleged losses from Mr. Rusnak's fraud.  (*E.g.*, expected testimony of R. Stulz, C. Culp; documents including DTX A, DTX S35, DTX C13.)

133.     Several intervening causes, which have nothing to do with Citibank, are responsible for AIB's claimed damages.  (*E.g.*, expected testimony of R. Stulz, C. Culp; depositions of F. Bramble 40:4-41:8, Apr. 16, 2009, M. Buckley 236:3-9, June 26, 2008; documents including DTX A, DTX B17, DTX D15, DTX C13, DTX M35.)

134.     There is no evidence that Mr. Rusnak would not have been able to continue his fraud without each of the disputed transactions.  (*E.g.*, expected testimony of R. Stulz, C. Culp; documents including DTX A, DTX C13.)

135.    Allfirst's and AIB's conduct enabled Mr. Rusnak to perpetrate his fraud and caused the losses.  (*E.g.*, expected testimony of D. Cronin, J. Rusnak, C. Culp, R. Stulz; deposition of F. Bramble 40:4-41:8, Apr. 16, 2009; documents including DTX A, DTX C17, DTX C13, DTX M35.)

136.    Mr. Rusnak's fraud and Allfirst's losses came as a result of numerous deficiencies in the control environment at Allfirst.  (*E.g.*, expected testimony of D. Cronin, J. Rusnak, C. Culp, R. Stulz; deposition of F. Bramble 40:4-41:8, Apr. 16, 2009; documents including DTX A, DTX C17, DTX C13, DTX M35.)

137.    Mr. Rusnak was able to perpetrate his fraud because of internal control failures at Allfirst and AIB, as well as, at the very least, negligent conduct by Allfirst and AIB employees. (*E.g.*, expected testimony of D. Cronin, J. Rusnak, C. Culp, R. Stulz; depositions of F. Bramble 40:4-41:8, Apr. 16, 2009, M. Kozak 422:14-423:4, June 11, 2008, J. Palmer, 59:10-12, Nov. 17, 2008; documents including DTX B17, DTX A, DTX C17, DTX C13, DTX M35.)

138.    Allfirst could have stopped Mr. Rusnak's fraud at any point in time, both before and after Allfirst's trading with Citibank, if Allfirst had confirmed each transaction or properly implemented sound risk management practices.  (*E.g.*, expected testimony of D. Cronin, J. Rusnak; depositions of F. Bramble 40:4-41:8, Apr. 16, 2009, M. Kozak 422:14-423:4, June 11, 2008, J. Palmer, 59:10-12, Nov. 17, 2008; documents including DTX A, DTX C17, DTX C13, DTX M35.)

139.    Allfirst failed to take basic steps that would have uncovered Mr. Rusnak's fraud, including, but not limited to, failing to confirm transactions with counterparties.  (*E.g.*, expected testimony of D. Cronin, J. Rusnak, C. Culp, R. Stulz; depositions of F. Bramble 40:4-41:8, Apr.

16, 2009, J. Palmer, 59:10-12, Nov. 17, 2008, M. Kozak 422:14-423:4, June 11, 2008;

documents including DTX A, DTX C17, DTX C13, DTX M35.)

**I.      Examples of Instances in Which Others at Allfirst and AIB Were Aware of the Activities on which Plaintiff's Claims Are Based[3]**

140.    No one at Allfirst paid any attention to one-day options that expired and were not exercised.  (*E.g.*, expected testimony of D. Cronin; J. Rusnak, C. Culp, R. Stulz; documents including DTX A; DTX D18.)

141.    Employees at Allfirst were aware that options with counterparties in Asia were not being confirmed.  (*E.g.*, expected testimony of J. Rusnak; deposition of  L. Smith 76:4-77:6, 98:11-17, Aug. 14, 2008, 560:12-561:14, Dec. 18, 2008; documents including DTX A.)

142.    Employees at Allfirst were aware of the possibility that Mr. Rusnak could manipulate the Value at Risk (VaR) calculation and expressly warned Allfirst management of such a risk.  (*E.g.*, expected testimony of D. Cronin, J. Rusnak; depositions of S. Murphy, 234:16-24, 235:9-16, May 6, 2008, M. Kozak 331:9-13, 336:13-17, June 11, 2008; documents including DTX A, DTX C, DTX F6.)

143.    Employees at Allfirst were aware that underlying trades for netted foreign exchange transactions were not being confirmed.  (*E.g.* expected testimony of J. Rusnak; deposition of L. Smith, 689:23-690:24, Dec. 18, 2008; documents including DTX O13, DTX L21.)

144.    Allfirst management permitted Mr. Rusnak to trade on vacations and from home in contravention of well-established guidelines that bar traders from trading two weeks per year as a mechanism for uncovering fraud.  (*E.g.*, expected testimony of D. Cronin, J. Rusnak;

---

[3]  The following section provides a sample of the numerous instances in which others at Allfirst and AIB were aware of the activities on which plaintiff's claims are based to demonstrate that there is a dispute between the parties about Allfirst's and AIB's awareness of these activities.  At trial, Citibank will establish additional instances of Allfirst's and AIB's awareness of the activities on which plaintiff's claims are based.

124062643 v3

deposition of M. Kozak, 151:16-152:2, June 10, 2008; documents including DTX A, DTX V1, DTX S2.)

145.    Allfirst's 1999 and 2000 10-K filed with the SEC clearly illustrated that the notional value of Allfirst's foreign exchange trading was in the billions of dollars.  (*E.g.* documents including DTX C5, DTX F36.)

146.    In April 1999, treasury operations at Allfirst informed Mr. Cronin that Mr. Rusnak had instructed the back office to perform "controlled settlements" and, around the same time, the back office complained about the inability to obtain confirmations for transactions in various Prime Brokerage accounts.  These incidents led to a meeting with, among others, Mr. Cronin, Mr. Ray, and Mr. Rusnak.  Mr. Cronin thereafter barred Mr. Rusnak's trading for a period of time, and Mr. Ray agreed to review all of Mr. Rusnak's trades and the rationale behind them.  But, in fact, Mr. Ray never carried out any such review.  (*E.g.*, expected testimony of D. Cronin, J. Rusnak; depositions of R. Ray 177:15-178:15, 196:22-197:8, 245:10-246:2, June 24, 2008, G. Saba, 106:21-107:5, May 18, 2009, A. Williams (AIB) 124:13-20, Sept. 26, 2008; documents including DTX A, DTX M2, DTX O2, DTX O3, DTX R6.)

147.    In 1999, internal audit of treasury operations at Allfirst failed to take a sample of Mr. Rusnak's transactions to determine if the transactions had been properly confirmed.  (*E.g.*, documents including DTX A, DTX A9.)

148.    Contemporaneous documents show that the middle office and credit risk review at Allfirst were aware as early as 1999 that Mr. Ray's reliance on the proprietary trading desk to report intra-month profit-and-loss (P&L) "expose[d the bank] to a trader concealing a significant risk until month end" but did not resolve the risk. (*E.g.*, documents including DTX L3.)

149.    In March 2000, AIB's group treasurer, Pat Ryan, received a phone call from Citibank employee Brendan Crowe.  Mr. Crowe called Mr. Ryan to ask about large gross monthly prime-account settlement of approximately $1 billion that was due to occur at the beginning of April.  Mr. Crowe asked Mr. Ryan if AIB was aware of the settlement and satisfied with Allfirst's use of AIB's credit line.  Mr. Ryan, in a subsequent phone call to Mr. Crowe, indicated that AIB was aware of the settlement amount and was satisfied with Allfirst's use of AIB's credit line.  In addition, Mr. Ryan contacted Allfirst's risk-assessment staff to investigate the issue, but no one at Allfirst or AIB inquired as to why the gross positions were so large. Notes from Brian King, Executive Vice President and Head of Risk Management, related to the Citibank inquiry state: "Bob Ray Intimidation Issue Similar To Kidder Peabody/Barings Scare Control People Into Not Asking The Tough Questions."  (*E.g.*, expected testimony of B. Crowe, T. Reid, A. Brady; depositions of G. Garth 161:2-167:21, Oct. 16, 2008, B. King 112:4-113:13, 114:18-115:22, Feb. 27, 2009; documents including DTX A, DTX E, DTX B27, DTX Z.)

150.    The back office at Allfirst occasionally called attention to unconfirmed trades, and Mr. Rusnak would thereafter produce confirmation that did not match the trade he had booked. For example, in June 2000, the back office questioned the absence of a confirmation of a trade done on an earlier date, and Mr. Rusnak produced a confirmation indicating that he had done the trade the same day the back office questioned it.  No one at Allfirst investigated the possibility that Mr. Rusnak had entered the trade only after the back office had flagged it.  (*E.g.*, expected testimony of J. Rusnak; depositions of J. Palmer 134:19-137:17, Nov. 17, 2008, G. Saba 278:4-281:23, May 18, 2009; documents including DTX A, DTX P2, DTX S9.)

151.    In July 2000, a risk assessment analyst at Allfirst responsible for treasury raised a significant concern that daily rates of foreign exchange transactions were not being obtained

from an independent source, but instead were being fed directly from Mr. Rusnak's personal computer to the database used to prepare a risk report. The risk analyst noted that arrangement was a "failed procedure" that created the possibility that the trader, i.e., Mr. Rusnak, "could manipulate the rates." (*E.g.*, deposition of G. Garth 212:11-214:2, 231:9-232:11, Oct. 16, 2008; documents including DTX A, DTX Y7.)

152.    After the close of the first quarter of 2001, a member of AIB's internal risk team discovered that the spreadsheet reflecting Mr. Rusnak's daily rates was corrupt, and that certain cells within the spreadsheet pulled rate information not from a neutral source like Reuters but were instead "link[ed] to a C-drive," which he understood to be a "red flag that there were control weaknesses within the spreadsheet [such] that [Mr. Rusnak] could manipulate numbers." As a result, Risk Assessment downgraded the "Control Credit Risk" rating in Allfirst's first quarter 2001 Risk Assessment Report from "Good" to "Weak," and the overall "Quality of Credit Risk Management" rating to "Acceptable." (*E.g.*, expected testimony of J. Rusnak; depositions of S. Murphy 235:9-13, May 6, 2008, G. Garth 239:8-241:3, 242:11-251:14, Oct. 16, 2008; documents including DTX A, DTX E10, DTX F10, DTX Q, DTX R.)

153.    Despite learning that Mr. Rusnak could have been manipulating his rates, no one at Allfirst attempted to examine if he had been doing so or otherwise to scrutinize the controls surrounding his activities, even though an auditor suggested to his superiors that Allfirst engage outside consultants to revalue Mr. Rusnak's book. (*E.g.*, expected testimony of J. Rusnak; deposition of S. Murphy, 240:2-245:25; documents including DTX A.)

154.    In August 2000, internal audit of treasury at Allfirst sampled 25 foreign exchange transactions to determine if they had been properly confirmed, but only one of the 25 tested was an options transaction. At that time, approximately 50% of the 63 foreign exchange options on

Allfirst's books were bogus.  In addition, in 1998 and 2000, the audit department relied on Mr. Saba's inaccurate assurances that "few holdover trades occur[red]," and on this basis, did not include holdover trades in the sample.  (*E.g.*, documents including DTX A, DTX A9, DTX B9.)

155.    Although it was known to Mr. Rusnak's superiors, the middle office, and the credit risk review area that Mr. Rusnak frequently exceeded the counterparty credit limits that AIB and Allfirst had established for foreign exchange trading, Mr. Rusnak was not sanctioned for exceeding these limits, and neither the middle office nor the credit risk review team investigated these incidents.  (*E.g.*, expected testimony of J. Rusnak; depositions of R. Ray 116:17-117:5, June 24, 2008, A. Williams (AIB) 109:12-110:7, 111:7-19, Sept. 26, 2008; documents including DTX A, DTX C3.)

156.    No one at Allfirst implemented rudimentary checks on Mr. Rusnak's activities, such as taping Mr. Rusnak's telephone line, despite agreement with Citi that the trades would be executed on recorded lines and an earlier practice at Allfirst of recording these lines.  (*E.g.* expected testimony of J. Rusnak; deposition of R. Ray, 384:3-385:7, June 25, 2008; documents including DTX A, DTX L2.)

157.    No one at Allfirst examined Mr. Rusnak's daily P&L figures to reconcile them against the general ledger.  Mr. Rusnak's P&L swung wildly during the relevant time period and frequently exceeded his stop-loss limit.  Instead of rectifying these policy violations, Allfirst personnel stalled a key risk assessment staffer's efforts to inspect stop loss data, and, for extended periods, failed to record these limits. (*E.g.*, expected testimony of D. Cronin, J. Rusnak; depositions of G. Garth, 276:18-277:12, Oct. 16, 2008, S. Murphy, 217:21-220:10, 220:21-221:2, May 6, 2008; documents including DTXA, DTX N.)

158.    In the early spring of 2001, in connection with a proposed options transaction between Allfirst and Bank of America, Kieran White, an employee at Bank of America, contacted a Senior Vice President of AIB's Financial Institutions Marketing Group, Phillip Shaw, about the transaction.  Mr. White informed Mr. Shaw that his colleagues at Bank of America were discussing a proposed foreign exchange option with Allfirst that his colleagues had described as a deep-in-the-money option, and told Mr. Shaw that the transaction was essentially a "loan."  Afterward, Bank of America provided Mr. Rusnak with the proposed terms of the transaction, which Mr. Rusnak found to be offensive.  As a result, Mr. Rusnak threatened to end Allfirst's trading relationship with Bank of America.  In response, Mr. White contacted Mr. Shaw, at AIB, and informed Mr. Shaw about Mr. Rusnak's threat.  Mr. Shaw suggested that Mr. White contact David Cronin at Allfirst.  Mr. White subsequently contacted Mr. Cronin and informed Mr. Cronin about the transaction and Mr. Rusnak's threat.  Mr. Cronin responded by telling Mr. White that he would resolve the issue.  Mr. Cronin then met with Mr. Rusnak and it was decided to go forward with the transaction based on the terms Bank of America initially proposed.  After the transaction was completed, Mr. Rusnak contacted Mr. White to express his displeasure that Mr. White had contacted Mr. Cronin.  As a result, Mr. White contacted John Irwin, Head of International Cash Management Sales and Product Management at AIB, and expressed concerns to Mr. Irwin about Mr. Rusnak's behavior and recommended that AIB "send[] over a team to investigate" Mr. Rusnak.  (*E.g.*, expected testimony of D. Cronin, J. Rusnak; deposition of K. White, 10:22-32:18, 73:6-18; 74:21-75:3, Jan. 22, 2009; documents including DTX 33.)

159.    Treasury management at Allfirst, internal audit at Allfirst, and internal audit at AIB knew that Mr. Rusnak was buying and selling "deep-in-the-money" options, and Allfirst's

treasury management considered such activity to be a profitable strategy.  For example, in April

2001, Allfirst's monthly management letter, which was circulated to employees at AIB,

expressly stated that Allfirst's FX trader "purchased and sold deep-in-the-money options" and

that "Bob [Ray] believes that this has been a profitable strategy."  (*E.g.*, expected testimony of

D. Cronin, J. Rusnak; documents including DTX G2, DTX F2.)

160.    In late May 2001, a market source informed AIB that Allfirst was engaging in

very heavy foreign exchange trading.  As a result of that tip, Michael Buckley, AIB's CEO,

contacted Mr. Cronin to ask about Allfirst's foreign exchange trading.  Mr. Cronin subsequently

investigated the matter by asking Mr. Rusnak about  Allfirst's volume of foreign exchange

trading and Mr. Rusnak told Mr. Cronin that there had been no unusual activity and wrote on a

piece of paper that the average turnover was  $159 million.  After receiving this information, Mr.

Cronin reported to Mr. Buckley, both orally and in writing, stating that there was no unusual

activity at Allfirst and that the turnover rate was $159 million.  Shortly thereafter, Mr. Cronin

received reports that showed the turnover rate was significantly higher—at least three or four

times greater—yet Mr. Cronin never made any further inquiries on the subject.  (*E.g.*, expected

testimony of D. Cronin, J. Rusnak; deposition of M. Buckley 227:2-229:5, 229:17-233:17, June

26, 2008; documents including DTX A, DTX A126, DTX O4.)

161.    Allfirst's Assistant Vice President, Larry Smith, had a history of failing to

confirm trades that was known to his his superiors.  His superiors failed to discipline him

adequately or to monitor his activities to ensure that any such failures did not repeat themselves.

Mr. Smith's failures to confirm trades facilitated Mr. Rusnak's fraud.  (*E.g.*, expected testimony

of D. Cronin, J. Rusnak, G. Thoreson; deposition of G. Saba 212:3-4, 212:12-21, 212:25-213:25,

214:16-215:21, May 18, 2009; documents including DTX A, DTX F18, DTX Q5, DTX C13.)

J.  **Damages**

162.    AIB was not damaged by the alleged misstatements or omissions.  (*E.g.*, expected testimony of R. Stulz.)

163.    AIB was not damaged by any of the disputed transactions.  (*E.g.*, expected testimony of R. Stulz.)

164.    AIB did not suffer any damages as a result of Citibank's alleged wrongdoing. (*E.g.*, expected testimony of R. Stulz.)

165.    AIB's theory of damages is unsupported by the evidence.  (*E.g.*, expected testimony of C. Culp, R. Stulz.)

166.    Allfirst's and AIB's reckless conduct is equally, if not entirely, responsible for Mr. Rusnak's activities and any losses and damages resulting therefrom.  (*E.g.*, expected testimony of D. Cronin, C. Culp, D. DeRosa, R. Stulz; documents including DTX A, DTX X2; *see also supra* ¶¶ 108–60.)

167.    AIB failed to mitigate damages.  (*E.g.*, expected testimony of R. Stulz; documents including DTX A8.)

168.    Trading losses are not evidence of damages. (*E.g.*, expected testimony of C. Culp, R. Stulz.)

169.    The trading losses with Citibank were a small fraction of Allfirst's total losses. (*E.g.*, expected testimony of R. Stulz.)

K.  **M&T Bank**

170.    Allfirst breached the terms of the IFEMA and PBA prior to the sale to M&T Bank.  (*E.g.*, expected testimony of G. Thoreson; documents including DTX X2, DTX Y4.)

171.    Allfirst never properly assigned all rights and interests in the claims brought against Citibank in this lawsuit to AIB.  (*E.g.*, expected testimony of G. Thoreson; documents including DTX X2, DTX Y4.)

## L.    Ratification and Waiver

172.    Mr. Rusnak had the authority or apparent authority to enter into the February 20, 2001 transaction on Allfirst's behalf.  (*E.g.*, expected testimony of D. Cronin, G. Thoreson, J. Rusnak; documents including DTX X2, DTX L20.)

173.    Allfirst ratified the February 20, 2001 transaction.  (*E.g.*, deposition of M. Buckley 360:25-362:14, June 27, 2008.)

174.    Allfirst settled and paid Citibank on the outstanding February 20, 2001 option after having full knowledge of Mr. Rusnak's fraud and awareness of the terms of the February 20, 2001 transaction.  (*E.g.*, expected testimony of G. Thoreson; deposition of M. Buckley 360:25- 362:14, June 27, 2008; documents including DTX A8, DTX P14.)

175.    Because Allfirst settled and paid Citibank on the outstanding February 20 option after having full knowledge of Mr. Rusnak's fraud and awareness of the terms of the February 20, 2001 transaction, Allfirst waived any right to rescind this transaction.  (*E.g.*, expected testimony of G. Thoreson; deposition of M. Buckley 360:25-362:14, June 27, 2008; documents including DTX A8, DTX P14.)

176.    At the time of each of the disputed transactions, Mr. Rusnak had the authority or apparent authority to enter into the types of transactions he entered into with Citibank on Allfirst's behalf.  (*E.g.*, expected testimony of D. Cronin, G. Thoreson, J. Rusnak; documents including DTX X2, DTX L20.)

177.    Mr. Rusnak had the authority and apparent authority to enter into each of the

disputed transactions.  (*E.g.*, expected testimony of D. Cronin, G. Thoreson, J. Rusnak;

documents including DTX X2, DTX L20.)

**VIII.   ISSUES OF LAW**

The Court has advised the parties that it is unnecessary to supply Issues of Law.  Each

party is submitting a pre-trial Memorandum of Law together with this Joint Pre-Trial Statement,

and may submit a responsive Memorandum of Law on the schedule previously ordered by the

Court.

**IX.    ALPHABETICAL LIST OF WITNESSES TO BE CALLED AT TRIAL FOR EACH PARTY**

All parties reserve the right to call any witness listed on another party's list and any new

witnesses not listed in response to new arguments or evidence presented at trial or in rebuttal.[4]

Each party reserves the right to object to the calling of any witness (live or by deposition

designation) for any reason.

**A.    AIB:[5]**

1.    Anguilla, Peter (live)

2.    Azhar, Shaheryar

3.    Ball, Marcie

4.    Barnes, Murray

5.    Barnett, Steven

6.    Boos, Frederick

---

[4]  The parties agree that further objections and counter designations may be made with respect to deposition designations up until January 25, and that the parties waive objections to the timeliness of such supplemental objections or counter designations.

[5]  Plaintiff AIB intends to call six fact witnesses live along with its expert witnesses.  A substantial number of the witnesses listed below (44 witnesses) will be called by deposition designation; AIB has designated testimony for those witnesses in anticipation of the Defendant's defense case.  Depending on the scope of Defendant's ultimate defense case and the Court's rulings on *in limine* motions to be made by AIB, the number of witnesses AIB plans to call by deposition designation will likely be substantially less.

7.      Buckley, Michael

8.      Campbell, Leonard (live)

9.      Carpenter, Robert

10.     Collins, Joanne

11.     Craven, Joseph

12.     Cronin, David (live)

13.     Feig, Jeffrey

14.     Garth, Gloriane

15.     Haga, Kevin

16.     Henrikson, Anders

17.     Hurtt, Wynne

18.     Jayanti, Anu

19.     Kemp, James (live)

20.     Kennedy, Bridget

21.     Lazzaro, Steve

22.     Malkinski, Jacqueline

23.     Manganello, Brad

24.     Marra, Richard

25.     McErlean, Eugene

26.     Meyer, Christopher

27.     Moore, Richard

28.     Moroney, Mark

29.     Navatkoski, Janice (live)

30.     Olesen, Lars

31.     Oyefusi, Kimberly

32.    Palmer, Jan

33.    Pasqualini, Pamela

34.    Potenzone, Susan

35.    Price, Eric (live)

36.    Pusch, John

37.    Ray, Robert

38.    Reid, Toby

39.    Reynolds, George

40.    Ryan, Pat

41.    Saba, Gregory

42.    Slifker, Louis

43.    Smith, Larry

44.    Stanley, Joseph

45.    Tslav, Lana

46.    Webb, Dennis

47.    Wenner, Katryn

48.    Williams, Andrew (AIB)

49.    Williams, Andrew (Citi)

50.    Wilson, Maylin

**B.**    **Citi**:

1.    Barnes, Murray (live)

2.    Brady, Aidan  (live)

3.    Bramble, Frank

4.    Buckley, Michael

5.    Campbell, Len (live)

6.      Conway, George (live)

7.      Cronin, David (live)

8.      Crowe, Brendan (live)

9.      Crowley, Maurice

10.     Dalton, Tony

11.     Farrell, Anita

12.     Foley, John

13.     Garth, Gloriane

14.     Golden, Tony (live)

15.     Hurtt, Wynne

16.     Husich, Michael

17.     Irwin, John

18.     Jayanti, Anu (live)

19.     Kaldor, Greg

20.     Keating, Susan

21.     Kemp, James (live)

22.     King, Brian

23.     Kozak, Matthew

24.     Leckrone, Janine

25.     Mantini, Luisa

26.     Manganello, Brad (live)

27.     Marra, Richard (live)

28.     Meir, John

29.     Meyer, Chris (live)

30.     Mierzejewski, John

31.     Moore, Richard (live)

32.     Murphy, Stephen

33.     Navatkoski, Jan (live)

34.     Olesen, Lars

35.     Palmer, Jan

36.     Partlow, Ralph

37.     Price, Eric (live)

38.     Ray, Robert

39.     Reeves, Thomas (live)

40.     Reid, Toby (live)

41.     Reynolds, George (live)

42.     Rusnak, John (live)

43.     Saba, Greg

44.     Smith, Larry

45.     Thoreson, Greg (live)

46.     Weible, Richard

47.     White, Keiran

48.     Williams, Andrew (AIB)

49.     Williams, Andrew (Citi)

50.     Zia, Umran

## C.     **Deposition Designations**

The parties' joint index of deposition designations is attached as Exhibit C.

X.   <u>EXHIBITS</u>

The parties have agreed not to list exhibits that will be used for cross-examination and

impeachment.[6]

    A.  Plaintiff's list (with Defendant's objections) is attached as Exhibit A.

    B.  Defendant's list (with Plaintiff's objections) is attached as Exhibit B.

XI.   <u>EXPERTS TO BE CALLED AT TRIAL</u>

    A.   <u>AIB:</u>

        1.   Christodoulou, Christopher

        2.   Gomes, Ricardo

        3.   Mesrobian, Peter

        4.   Rua, Rick

        5.   Said, Klaus

    B.   <u>Citi</u>

        1.   Culp, Christopher

        2.   De Rosa, David

        3.   Stulz, René

XII.   <u>SUMMARIES OF WITNESS TESTIMONY</u>

    A.   <u>AIB:</u>

The following is intended to be a brief summary of the topics on which the Plaintiff

anticipates eliciting testimony from its live fact and expert witnesses.  The Plaintiff reserves the

right to offer testimony on additional topics, including in response to evidence of Citibank's

defenses and counterclaims.  The Plaintiff also reserves the right to call document custodians

---

[6]  The parties reserve their right to designate additional evidence relating to Bank of America's equitable share of any damages.

from either party for the purpose of authenticating or laying a foundation for certain documents, or to call any witness listed by Defendant.

## Fact Witnesses

### David Cronin

David Cronin will testify about Allfirst's Treasury Department, the supervision of Rusnak's trading, balance sheet usage, and his decision in early 2001 to impose a $250 million limit on Rusnak's balance sheet usage. He will also testify about his decision to shut down Rusnak's trading in early 2002 when Rusnak's balance sheet usage exceeded $250 million, and how that decision led to the discovery of Rusnak's fraud.

### Eric Price

Eric Price will testify about the Same-Day Options, the February 20, 2001 Options, and the May 9, 2001 trades. In the case of the Same-Day Options, he will be examined whether or not the options could be used for genuine foreign exchange trading and the actual purpose of the options. In the case of the February 20, 2001 Options, he will be examined about Rusnak's rationale for the transaction, the Citibank approval process, the fraudulent email misrepresenting the Citibank approval process, and his decision to disregard the Citibank credit policy requiring Citibank to contact the counterparty's CEO or CFO to confirm that they understood the actual purpose of the trade. In the case of the May 9, 2001 option, he will be examined about why the option could be used for genuine foreign exchange trading and the actual purpose of the option. He will also be examined about Rusnak's importance to the hedge fund sales desk. In addition, he will be examined about the magnitude of Rusnak's risk-taking and his longstanding knowledge that Rusnak was a rogue.

### Len Campbell

Len Campbell will testify about the Same-Day Options, the February 20, 2001 Options, and the May 9, 2001 trades.  In the case of the Same-Day Options, Campbell will be examined about Rusnak's rationale for the transaction, the actual purpose of the transactions, and Campbell's suspicion that Rusnak was using the transactions to circumvent limits on his trading.  In the case of the February 20, 2001 Options, Campbell will be examined about his knowledge of the transaction, including the fact that it was creating substantial credit exposure to Allfirst throughout 2001.  In the case of the May 9, 2001 trades, he will be examined about the actual purpose of the Morning Engineered Trades and the Afternoon Engineered Trades; he will also be examined about whether there was a legitimate commercial purpose to splitting the spot trade exercising the May 9 Option and Rusnak's netted position in yen into arbitrary positions at rates that were unavailable in market transactions.  Campbell will also be examined about the importance of Rusnak's trading to the Prime Brokerage desk.  In addition, he will be examined about the magnitude of Rusnak's risk-taking in 2001 and his knowledge that Rusnak's Same-Day Option sand May 9 trades were intended to deceive Allfirst.

### Peter Anguilla

Peter Anguilla will testify about the February 2001 Options, including whether and to what extent Price sought his approval before executing the Options.  He will also be examined about his instruction to Price to follow the Citibank policy requiring that Citibank contact the counterparty's CEO or CFO to confirm that they understood the actual purpose of the February 20, 2001 Options.

### Jan Navatkoski

Jan Navatkoski will testify about the fraudulent email that she and Price created on February 20, 2001 purporting to document the approval of the February 20, 2001 Options.  She

will also be examined about the decision that she and Price made to disregard the credit risk manager's instruction to follow the Citibank policy that would have required Citibank to contact Allfirst's CEO or CFO to confirm their understanding of the actual purpose of the February 20, 2001 Options.

### James Kemp

James Kemp will be examined about whether or not he discussed the February 20, 2001 Options with Price on the morning of the transaction before the trade was executed, as both he and Price testified in their depositions.

### Expert Witnesses

### Riccardo Gomes

Riccardo Gomes will testify about the evolution of Rusnak's fraud from 1997 to 2002 and how he evaded Allfirst's internal controls, including how he depended on Citibank's outside assistance to do so. In particular, he will also testify about how the Same-Day Options, February 20, 2001 Options, and May 9, 2001 Option enabled Rusnak to continue to evade Allfirst's internal controls in 2001. In addition, he will testify about how much Allfirst lost from Rusnak's trading in the aftermath of the Same-Day Options, February 20, 2001 Options, and May 9 trades. Mr. Gomes will also testify in response to many of the opinions offered by Citibank's expert, Christopher Culp.

### Peter Mesrobian, Rick Rua, Klaus Said

In response Citibank's contention that the Disputed Transactions were legitimate market transactions, AIB retained three expert witnesses who were members of the New York Federal Reserve Bank's Foreign Exchange Committee ("FXC") at the time of the Disputed Transactions. The FXC is an industry group that has been providing guidance and leadership to the global foreign exchange market since 1978. The FXC includes representatives of major institutions

engaged in currency trading in the United States and also publishes the "FXC's Guidelines for Foreign Exchange Trading."  The three members of the FXC that AIB retained ran three of the largest foreign exchange businesses in the foreign exchange market.  Klaus Said ran the foreign exchange business at JP Morgan and Credit Suisse; Rick Rua ran the business at Mellon Bank; and Peter Mesrobian ran the business at First National Bank of Chicago.

Each of them will testify about the legitimate purposes of foreign exchange trading; the actual purpose of the Disputed Transactions; and the inadequacy of Citibank's disclosure of the Disputed Transactions.  They will also address whether a reasonably experienced foreign exchange professional would understand that the Disputed Transactions were unauthorized and deceptive and will evaluate the credibility of Citibank's justification for the Disputed Transactions.  In addition, they will testify that the magnitude of Rusnak's risk-taking and profit and loss was inconsistent with his profile as a proprietary trader for a regional retail bank, and whether a reasonably experienced foreign exchange professional would understand that fact. They will also address many of the opinions offered by Defendants' experts Christopher Culp and David DeRosa.

While there is a significant overlap among the opinions to be offered by Mesrobian, Rua and Said, AIB submits that the court as the finder-of-fact will benefit from hearing from each of these authorities on market practice.  AIB contends that there is an overwhelming consensus among market professionals that none of the Disputed Transactions were legitimate market transactions, none of the confirmations of the Disputed Transactions were adequate, and that any reasonably experienced market professional would have understood that these transactions and their confirmations could not be justified.  In a case that depends in significant part on the court's findings regarding acceptable market practice at the time of the transactions, AIB can only

overcome Citibank's effort to deny that reality by ensuring that the court has heard from all three distinguished market professionals, each of whom will bring different experience and perspectives to these disputed facts.

### Chris Christodoulou

Chris Christodoulou has supervised or managed Treasury back offices for over thirty years.  He will testify about trade confirmation and expectations regarding back office employees.  In particular, he will address whether back office employees are responsible for reviewing the purpose or substance of trades.  He will also respond to certain other opinions offered by Citibank's experts relating to back office practice.

### B.    Citibank:

Citi sets forth below the topics on which it may seek to elicit testimony from witnesses that it may call live at trial.  This list of topics is inherently conditional and includes matters as to which Citi has lodged other objections and believes should not properly be part of this case; such matters are listed for completeness, in the event that inquiry into such matters is permitted.  Citi reserves the right not to offer testimony on any of the topics listed below.  Citi also reserves the right to offer testimony on subjects not listed in response to other evidence or arguments offered at trial, in response to rulings of the court, or to account for changes in applicable law.

Citi reserves the right to call document custodians from any party for the purpose of authenticating or laying a foundation for certain documents.  Citi also reserves the right to call any witness listed by Plaintiff.

Given the nature of the disputed facts in this case, many witnesses were involved in contested events, e.g., the February 20, 2001 option transaction.  Thus, similar topics may be noted for multiple witnesses.  At trial, in the event multiple witnesses are called to discuss particular events, each will be asked to describe their personal knowledge of, involvement in,

-81-

communications regarding, and documents reflecting such events.  Such testimony is not cumulative.

## Former Allfirst/AIB Employees

### Cronin, David

Plaintiff has represented that it will call Mr. Cronin in its direct case.  Defendant will cross-examine Mr. Cronin accordingly.  To the extent not covered in those examinations, Defendant may examine Mr. Cronin about: his background, training, and experience; the internal operations of AIB; the internal operations of Allfirst and its predecessor; internal AIB and Allfirst policies and practices; the relationship between AIB and Allfirst; the findings and conclusions of the Ludwig investigation; the circumstances of his dismissal from Allfirst in 2002; the circumstances surrounding the April 20, 2006 Order of Prohibition Issued Upon Consent that Mr. Cronin signed; supervision and monitoring of the Allfirst foreign exchange trading operation; foreign exchange trading at AIB; foreign exchange trading at Allfirst; his communications and other interactions with other Allfirst, M&T and AIB personnel; his interactions (if any) with Citibank; his communications with law enforcement and regulators relating to matters at Allfirst; and related matters.

### Rusnak, John

The nature, scope and extent of his activities at First Maryland and Allfirst and the involvement and knowledge of others in them; his guilty plea and cooperation agreement with the U.S. Government; communications with people at AIB, Allfirst, Bank of America, Citi, and other financial institutions; and related matters.

### Thoreson, Greg

Internal AIB and Allfirst policies and practices; his non-privileged communications with AIB and Allfirst personnel; his involvement in and knowledge of the investigation into the

alleged fraud, including preparation, distribution and editing of the Ludwig Report; notes he took during interviews of Allfirst and AIB personnel during the Ludwig investigation; AIB's motives for bringing this action; any insurance coverage or claims related to foreign exchange losses incurred by John Rusnak; his failure as general counsel to prevent Allfirst's losses; the general failure of Allfirst's risk, credit and audit departments to prevent Allfirst's losses; the circumstances under which AIB came to assert claims that properly belong to Allfirst; AIB's settlement with Bank of America; AIB's decision not to assert claims against former Allfirst employees that it has stated were "culpable" and "responsible" for Allfirst's losses; Allfirst's decision to terminate six employees (but not others) following receipt of the Ludwig Report; preparation of regulatory filings and other communications with regulators, including the SEC and the Federal Reserve; the topics covered in the 30(b)(6) examination at which he testified as Plaintiff's corporate representative; Plaintiff's discovery responses in this action, including responses to interrogatories and requests for admission; and related matters.

## Current and Former Citi Employees

In addition to the specific topics listed below, current and former Citi employees may testify about their background and experience; duties, responsibilities and actions at Citi; communications with AIB or Allfirst employees; communications concerning trades between Citi and Allfirst; their knowledge of and role in implementing Citi's internal policies and procedures; their knowledge of any fraud or misconduct at Allfirst and/or AIB; their knowledge of any fraud or misconduct at Citi; the timing of and reaction to learning of losses at Allfirst and the potential reasons therefor; Citi's efforts to provide information to Allfirst and to law enforcement following disclosure of Allfirst's losses; recorded conversations in which they participated; documents they authored, sent or received.

124062643 v3

### Barnes, Murray

Citi's policies and procedures relating to credit risk management; Citi's FX trade capture systems; his involvement in and communications regarding the February 20, 2001 option transaction; and related matters.

### Brady, Aidan

Citi's relationship with AIB, including Citi's extension of credit to AIB and Allfirst; Citi's March 2000 communication with AIB regarding Allfirst's trading activity; discussions with AIB and/or Allfirst following the disclosure of Allfirst's losses; his involvement in and communications regarding the February 20, 2001 option transaction; and related matters.

### Campbell, Len

His knowledge of and communications regarding FX transactions between Citi and Allfirst and other relevant parties; Citi's FX Prime Brokerage business and Prime Brokerage Agreement with Allfirst; Citi's FX Prime Brokerage's trade confirmation process and related documents; the CitiFX Prime Brokerage website; his knowledge of in-the-money options, same day options, and financing transactions; his relationship and interactions with John Rusnak; any topics covered by Plaintiff on Plaintiff's direct examination of Mr. Campbell during Plaintiff's case in chief; and related matters.

### Crowe, Brendan

His involvement in and communications regarding Citi's March 2000 communication with AIB regarding Allfirst trading activity; Citi's credit approval process and practices; and related matters.

### Golden, Tony

Citi's relationship with AIB and its subsidiaries; Citi's extension of credit to AIB and Allfirst; Citi's credit approval process and practices; and related matters.

124062643 v3

**Jayanti, Anu**

Citi's FX business and risk management and credit policies and procedures; her knowledge of FX market and industry practices; her knowledge of in-the-money options, same day options, and financing transactions; internal investigations and communications following disclosure of Allfirst's losses; and related matters.

**Kemp, James**

Citi's FX business; his knowledge of FX market and industry practices; his involvement in and communications regarding the February 20, 2001 option transaction; his interactions with John Rusnak; his knowledge of in-the-money options, same day options, and financing transactions; any topics covered by Plaintiff on Plaintiff's direct examination of Mr. Kemp during Plaintiff's case in chief; and related matters.

**Manganello, Brad**

His knowledge of and communications regarding FX transactions between Citi, Allfirst, and other relevant parties; the CitiFX Prime Brokerage website; Citi's FX back office operations, including the trade confirmation process; his preparation of the May 2002 "Allfirst Report"; SWIFT confirmations; Citi's back office telephone taping system; his interactions with John Rusnak; and related matters.

**Marra, Richard**

His knowledge of and communications regarding FX transactions between Citi, Allfirst, and other relevant parties; Citi's relationship with Allfirst; his relationship and interactions with John Rusnak; his internal communications following disclosure of Allfirst's losses; his knowledge of in-the-money options, same day options, and financing transactions; and related matters.

**Meyer, Chris**

Citi's FX business; Citi's FX Prime Brokerage business; his involvement in and communications regarding the February 20, 2001 option transaction; and related matters.

**Moore, Richard**

Citi's FX business; his knowledge of FX market, industry practices, and changes over time; his involvement in and communications regarding the February 20, 2001 option transaction; his knowledge of in-the-money options, same day options, and financing transactions; his internal communications following disclosure of Allfirst's losses; and related matters.

**Navatkoski, Jan**

Citi's FX business; her involvement in and communications regarding the February 20, 2001 option transaction; any topics covered by Plaintiff on Plaintiff's direct examination of Ms. Navatkoski during Plaintiff's case in chief; and related matters.

**Price, Eric**

His knowledge of and communications regarding FX transactions between Citi, Allfirst, and other relevant parties; Citi's Hedge Fund Sales desk, including its relationship with Allfirst; his knowledge of in-the-money options, same day options, and financing transactions; the evolution of market practices in the FX industry over time; his involvement in and communications regarding the February 20, 2001 option transaction; his relationship and interactions with John Rusnak; any topics covered by Plaintiff on Plaintiff's direct examination of Mr. Price during Plaintiff's case in chief; and related matters.

**Reeves, Thomas**

Citi's policies and practices related to credit limits, including the nature, purpose, establishment, allocation, management, exceedance, and modification of credit limits; the role of

the Global Foreign Exchange Credit Risk Manager; in-the-money options; his involvement in and communications regarding the February 20, 2001 option transaction; extensions of credit to Allfirst and AIB; the circumstances surrounding his November 29, 2002 draft memo concerning off-market transactions; and related matters.

### Reid, Toby

The purpose and structure of Citi's independent risk organization; the role of Senior Credit Officers; his work as the Credit Officer responsible for AIB and its subsidiaries (including Allfirst); Citi's policies and practices related to credit limits, including the nature, purpose, establishment, allocation, management, exceedance, and modification of credit limits; credit limits allocated to AIB and its subsidiaries (including Allfirst); Citi's March 2000 communication with AIB regarding Allfirst trading activity, including the significance of this outreach with respect to subsequent credit and risk decisions; the practice of obtaining parent support for credit extension to subsidiaries; documents in Citi's credit file for AIB and Allfirst; his involvement in and communications regarding the February 20, 2001 option transaction; his knowledge of in-the-money options, same day options, and financing transactions; and related matters.

### Reynolds, George

His knowledge of and communications regarding FX transactions between Citi, Allfirst, and other relevant parties; Citi's FX Prime Brokerage business, including its relationship with Allfirst and trade confirmation process; the CitiFX Prime Brokerage website; his interactions with John Rusnak; and related matters.

### Third-Party Witnesses

### Conway, George (Wachtell, Lipton, Rosen & Katz)

The Ludwig investigation and documents generated in connection therewith.

124062643 v3

## Citi Expert Witnesses

Citi sets forth below the topics on which it may seek to elicit testimony from expert witnesses it may call live at trial.  This list of topics is inherently conditional and includes matters as to which Citi has lodged objections and believes should not properly be part of this case; such matters are listed for completeness in the event that inquiry into such matters is permitted.  Citi reserves the right to not offer testimony on any of the topics listed below.  Citi also reserves the right to offer testimony on subjects not listed in response to other evidence or arguments offered at trial, in response to rulings of the court, or to account for changes in applicable law.

### Christopher L. Culp, Ph.D.

The matters addressed in his expert reports, including his expert opinions related to: (1) whether Allfirst or Citibank had the responsibility to oversee and supervise Mr. Rusnak's trading activity; (2) whether Mr. Rusnak was authorized by Allfirst to conduct the trades into which he entered into on Allfirst's behalf with Citi; (3) whether Allfirst's internal record-keeping and monitoring systems reflected the economic effects of Mr. Rusnak's transactions with Citi; (4) what caused the losses on the positions Mr. Rusnak took on Allfirst's behalf; (5) how Mr. Rusnak used fake option trades with Asian counterparties to generate false profits that appeared to offset his actual FX trading losses; (6) whether Allfirst's internal controls were adequate and commensurate with industry and regulatory standards prevailing when Mr. Rusnak was incurring losses, and, if not, whether any failures in those processes and systems enabled Mr. Rusnak to generate the false profits that appeared to offset his actual FX trading losses from Allfirst; and (7) whether plaintiff's allegations concerning certain specific transactions accurately characterize the questioned transactions with Citi that plaintiff claims helped Mr. Rusnak "advance and conceal his fraud."

In addition, to the extent offered by plaintiff, testimony rebutting many of the characterizations and opinions offered by plaintiff's experts, including: (1) whether plaintiff's experts define foreign exchange trading appropriately; (2) whether Citi was required to give any type of "enhanced disclosures" associated with the disputed transactions; (3) whether plaintiff's experts accurately describe certain disputed transactions as being "off-market," "historical-rate rollovers," or "synthetic loans"; (4) whether there is a basis to conclude that "enhanced disclosures" of the disputed transactions would have led Allfirst to uncover Mr. Rusnak's false Asian Option trades prior to February 2002; (5) whether there is a basis to conclude that "enhanced disclosures" of the disputed transactions would have led Allfirst to uncover Mr. Rusnak's creation of fictitious holdover and Prime Brokerage trades or his manipulation of revaluation rates; (6) whether Mr. Rusnak's activities would have been uncovered before the disputed transactions if Allfirst had an adequate internal-control framework; (7) whether, with respect to the disputed transactions, Citi provided accurate transactional disclosures and whether there is a basis to conclude that "enhanced disclosures" would have enabled Allfirst to avert its subsequent losses; and (8) whether plaintiff's experts appropriately characterize the economic substance of the disputed transactions, and whether there is a basis to conclude that "enhanced disclosures" would have caused Allfirst to take actions that would have reduced or eliminated its losses subsequent to those transactions.

### Dr. David DeRosa

The matters addressed in his expert reports, including his expert opinions related to an evaluation of BofA's and Citi's trading relationships with Allfirst, including an examination of the disputed transactions from an economic and foreign exchange industry custom and practice perspective. In addition, to the extent offered by plaintiff, testimony rebutting many of the characterizations and opinions offered by plaintiff's experts, including: (1) whether plaintiff's

experts' opinion relied on inaccurate information, making their opinions incomplete and unreliable; (2) whether plaintiff's experts limit construction of legitimate FX trading, ignore a wide variety of common FX trading, and have any basis to conclude that the transactions executed by Mr. Rusnak were somehow illegitimate; (3) whether plaintiff's experts ignore the foundation of Allfirst's FX trading relationship with BofA and Citi and assert a non-existent responsibility for counterparties to monitor or police each other based on extrapolated general Know Your Customer principles; (4) whether plaintiff's experts ignore several sets of material facts; (5) whether plaintiff's experts ignore that the disputed transactions were neither necessary nor sufficient to hide Mr. Rusnak's losses; (6) whether Mr. Rusnak could have incurred trading losses to the extent he did without having corrupted the internal controls at Allfirst; (7) whether plaintiff's experts fail to recognize the importance of the fact that Citi did not know about the primary mechanism with which Mr. Rusnak concealed his trading losses—his ability to put fake trades on Allfirst's books without detection—and that the failure to detect these trades rested solely with Allfirst; and (8) whether the disputed transactions were fully and properly confirmed, and, to the extent plaintiff's experts suggest that the disputed transactions were suspicious and Citi should have reached certain conclusion based on the transactions, is it reasonable to conclude that Allfirst, which had a full picture of Mr. Rusnak's activities, should have drawn the same conclusions even sooner.

### René M. Stulz

The matters addressed in his expert report, including: (1) the size and timing of Mr. Rusnak's trading with Citi after the commencement of the trading relationship relative to that of his overall trading activities during the period of his fraud between March 1997 and February 2002, and whether or not calculations of trading losses presented by plaintiff's expert, Mr. Gomes, are evidence of damages that can be attributed to Citi's alleged misconduct; (2) the

opportunities Allfirst had to uncover Mr. Rusnak's trading losses both before and after the foreign exchange trading relationship between Allfirst and Citi began; (3) the implications of the fact that Mr. Rusnak was a proprietary trader who purportedly engaged in arbitrage trading, and the extent to which Citi informed AIB about the nature of Mr. Rusnak's trading activities at the onset of and during their trading relationship; and (4) whether AIB's experts' characterization of Allfirst as an unsophisticated player in the foreign exchange market is consistent with Allfirst having been a subsidiary of a large multinational institution such as AIB.

**XIII.   TRIAL COUNSEL**

   **A.**   For Plaintiff:  Alan Levine, Ian R. Shapiro, and Reed A. Smith.

   **B.**   For Defendant: Theodore V. Wells, Jr., John F. Baughman, and Roberto Finzi.

**XIV.   ESTIMATE OF TRIAL TIME**

   **A.**   Plaintiff estimates two to three weeks.

   **B.**   Defendant estimates four weeks.


Dated: New York, New York
       November 16, 2015

COOLEY LLP                                    PAUL, WEISS, RIFKIND, WHARTON &
                                              GARRISON LLP


By:   */s/Alan Levine*                        By:   */s/John F. Baughman*
      Alan Levine                                   John F. Baughman
      Ian R. Shapiro

1114 Avenue of the Americas                   1285 Avenue of the Americas
New York NY 10036-7798                        New York, New York 10019
Tel.:  (212) 479-6000                         Tel.:  (212) 373-3000
Fax:  (212) 479 6275                          Fax:  (212) 757-3990

*Attorneys for Plaintiff AIB and*             *Attorneys for Defendant Citibank*
*Third-Party Defendant M&T*

124062643 v3